1

```
                        UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
                        CIVIL ACTION NO. 06-2003 (FLW)
        _____
        ROCHE PALO ALTO, LLC,              :
                   Plaintiff,              :
              V.                           :    TRIAL TRANSCRIPT
        RANBAXY LABORATORIES LIMITED,      :    VOLUME 10
        and RANBAXY, INC.,                 :    DECEMBER 22, 2008
                   Defendants.             :
        _____:
```

CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608

B E F O R E :  THE HONORABLE FREDA L. WOLFSON, USDJ

A P P E A R A N C E S :

GIBBONS, P.C.
BY:  DAVID E. DeLORENZI, ESQUIRE
     SHEILA F. McSHANE, ESQUIRE
  -and-
CADWALADER, WICKERSHAM & TAFT, LLP (N.Y.)
BY:  GREGORY A. MARKEL, ESQUIRE
     TONY PEZZANO, ESQUIRE
     BARTHOLOMEW VERDIRAME, ESQUIRE
     JEFFREY Z.Y. LIAO, ESQUIRE
     MICHAEL P. DOUGHERTY, ESQUIRE
     VINNY LEE, ESQUIRE
On behalf of the Plaintiff

MATHEWS, SHEPHERD, McKAY & BRUNEAU, ESQUIRES
BY:  ROBERT G. SHEPHERD, ESQUIRE
  -and-
KNOBBE, MARTENS, OLSON & BEAR, LLP  (CA)
BY:  JOSEPH M. REISMAN, ESQUIRE
     WILLIAM R. ZIMMERMAN, ESQUIRE
     ERIK T. ANDERSON, ESQUIRE
     DARRELL OLSON, ESQUIRE
     THOMAS P. KRZEMINSKI, ESQUIRE
     JOSEPH F. JENNINGS, ESQUIRE
     DARRELL L. OLSON, ESQUIRE
     CHRISTY G. LEA, ESQUIRE
On behalf of the Defendants
                    * * * * *
            VINCENT RUSSONIELLO, CCR-R
            OFFICIAL U.S. COURT REPORTER
       138 PAXSON AVENUE, TRENTON, NEW JERSEY 08690
                 (609) 588-9516
```

2

# C E R T I F I C A T I O N

   PURSUANT TO SECTION 753, TITLE 28 U.S.C., THE
FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE
TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE
ABOVE-ENTITLED MATTER.


                            S/Vincent Russoniello
                            VINCENT RUSSONIELLO, CCR-R
                            OFFICIAL U.S. COURT REPORTER

3

1                **M O R N I N G    S E S S I O N**

2

3           (In open court.)

4           THE CLERK:  All rise.

5           THE COURT:  Thank you.  Everyone may be

6     seated.  Good morning.

7           MR. PEZZANO:  Your Honor, we reached, with

8     opposing counsel, a proposal on post-trial briefing.

9     We can talk about that at the end of the day.  It's

10    your preference.

11          THE COURT:  Yes.  That's fine.

12          MR. PEZZANO:  We understand there is one

13    objection to an exhibit on the first witness, and it's

14    going to be raised before that witness testifies.

15          As to the final two witnesses, Dr. Maag and

16    Dr. Henck, my understanding is any objections to

17    exhibits may be raised during the course of their

18    examination.

19          MR. JENNINGS:  The objection, your Honor, is

20    to Dr. Stella's testimony about Defendant's Exhibit

21    459.  It's outside of the scope of the expert report.

22    It was not discussed or referenced in Dr. Stella's

23    expert report.

24          I understand plaintiff's logic.  They referred

25    me to a portion of Dr. Stella's report where he

4

1    basically says the defendants have offered expert

2    testimony regarding the obviousness of the invention.

3    I disagree.  I understand their position that, because

4    he generically disagreed, he can then discuss and

5    testify about anything that might have been referenced

6    in our reports.  He did discuss many things that were

7    referenced in our reports -- not this exhibit, not our

8    expert's testimony about this exhibit and report.

9            THE COURT:  What is Defendant's 459?

10           MR. JENNINGS:  Defendant's 459 is a Syntex

11   in-house memorandum about valganciclovir and what they

12   may have done in coming up with that.

13           MR. VERDIRAME:  Your Honor, Exhibit 459 is

14   already in evidence.  It was mentioned in Dr. Gokel's

15   expert report and included as an exhibit.  Dr. Stella

16   in his expert report says he reviewed the materials

17   identified by Dr. Gokel and the exhibits to

18   Dr. Gokel's expert report and said he disagreed with

19   Dr. Gokel's opinion.  That's the reason why it is

20   within the scope of his opinion.

21           THE COURT:  So he made a general reference

22   without specificity.

23           MR. VERDIRAME:  As to that document, yes, your

24   Honor.

25           MR. JENNINGS:  I would doubt there is a

5

1     general reference to the document.  This is the

2     paragraph they pointed me to:

3                     "Paragraph 106 of Dr. Ranbaxy

4             has presented expert reports that

5             conclude or suggest that the invention

6             of the '953 patent was obvious over

7             the prior art.  I disagree."

8             MR. VERDIRAME:  And he says he reviewed the

9     exhibits attached to Dr. Gokel's --

10            THE COURT:  Where does he say that?

11            MR. VERDIRAME:  He doesn't say anything

12    specific.  At the end of the report he lists the

13    materials that he reviewed.

14            THE COURT:  Did you depose him?

15            MR. JENNINGS:  Yes, we did.  This topic never

16    came up in his deposition.

17            THE COURT:  You didn't ask him about that part

18    of his opinion where he said he disagreed and what he

19    was referring to and what he based that on.

20            MR. JENNINGS:  There is much in his report --

21            THE COURT:  No, in his deposition.

22            MR. JENNINGS:  Not about the generic topic.

23    What plaintiff is referring to there is a list of

24    materials considered in the end, and the materials

25    considered list the expert report of George Gokel.

6

1          MR. VERDIRAME:  And exhibits.

2          MR. JENNINGS:  With exhibits.

3          THE COURT:  I'm going to let him discuss it.

4    The fact he made this general statement, but it was

5    not gone into and explored, I'll let him talk about it

6    today.

7          MR. VERDIRAME:  Roche calls Dr. Valentino

8    Stella.

9          THE COURT:  You are going to have to set a

10   foundation when he rendered the report and referred to

11   the exhibits, what he was relying on.

12         MR. VERDIRAME:  Okay.

13         THE COURT:  And I want to know when he

14   actually looked at this document in forming his

15   opinions.  If it was not until now, during trial, I

16   may change my ruling.

17         MR. VERDIRAME:  Okay, your Honor.

18

19   **VALENTINO J. STELLA**, called as a witness on behalf of

20   the plaintiff, having been first duly sworn, testified

21   as follows:

22

23         THE COURT:  You may proceed.

24         MR. VERDIRAME:  Your Honor, Dr. Stella is a

25   professor in pharmaceutical chemistry at the

1    University of Kansas and an expert in the area of

2    prodrugs.  He has authored numerous publications with

3    respect to prodrugs.  He will explain the difficulties

4    involved in making prodrugs.  He will explain that the

5    invention of the '953 patent provides unexpected

6    results with respect to improved oral bioavailability.

7

8    DIRECT EXAMINATION

9    BY MR. VERDIRAME:

10   Q.    Dr. Stella, would you please state your full

11   name and address for the record.

12   A.    Valentino J. Stella, 1135 West Campus Road,

13   Lawrence, Kansas.

14   Q.    Are you currently employed?

15   A.    Yes, I am.

16   Q.    Where are you currently employed?

17   A.    I'm a university Distinguished Professor of

18   pharmaceutical chemistry at the University of Kansas.

19   Q.    Approximately how long have you been at the

20   University of Kansas?

21   A.    I'm in my 36th year at the University of Kansas.

22   Q.    In the binder in front of you is Exhibit

23   PTX-655.  Is that your CV?

24   A.    Yes, it is.

25   Q.    Please describe your undergraduate and post-

*Stella - Direct/Verdirame*                           8

1   graduate education for us, Dr. Stella.

2   A.     Yes.

3         I received a Bachelor of pharmacy degree from

4   the Victorian College of Pharmacology in Melbourne,

5   Australia.  I completed the degree in 1967, and the

6   degree was actually conferred in 1968.

7         After getting my Bachelor's degree and working

8   for one year as a hospital pharmacist, I entered

9   graduate school in the United States.  In 1968, I came

10  to the University of Kansas to work on my Ph.D., and I

11  received my Ph.D. from the University of  Kansas in

12  1971.

13  Q.    Did you have a specialty or focus in earning

14  your Ph.D.?

15  A.    My Ph.D. is in analytical pharmaceutical

16  chemistry and pharmaceutics.  The work that I did in

17  my Ph.D. work was to the design and evaluation of a

18  prodrug of the anti-seizure drug Dilantin.

19  Q.    Are you the named inventor on any patents?

20  A.    I believe I have approximately 30 patents or

21  applied patents that are being evaluated right now.

22  Q.    Generally, what do your patents relate to?

23  A.    The majority of the patents are on prodrugs.  I

24  also had patents on some novel solubilizers, and a

25  couple of patents on controlled drug delivery.

*Stella - Direct/Verdirame* 9

1  Q.    Have any of your patents led to products that

2  have been used by patients?

3  A.    Yes, I have three drug products that are

4  approved by the FDA.  The first one is a drug called

5  fosphenytoin.  That is a water soluble prodrug of the

6  drug Dilantin, and it is used to treat grand mal

7  seizures.

8       I also have a drug called viread.  I did that

9  in my consulting capacity with a company called

10  Gilead.  Viread is an anti-viral drug, and I designed

11  the prodrug portion of that particular drug that made

12  it orally bioavailable.

13       Fortunately, last Monday I had my third drug

14  approved, and that is a drug called Lusedra, which is

15  a novel anesthetic drug.  It's number 3.  I was pretty

16  proud of that.

17       I'm also the inventor of a material called

18  captisol.  Captisol is a novel solubilizer.  It is

19  currently used in four drug products.  Those four drug

20  products are life-saving drugs.  One is an anti-fungal

21  drug and two are anti-schizophrenic drug.  The fourth

22  drug is a veterinary product.  I have two drugs that

23  are in clinical trials.  One is called R-788, which is

24  a novel prodrug of a drug called R-406.  That's in

25  Phase II-Phase III clinical trials with a company

1    called Rigel.

2          And then I have a product called Nanotax,

3    which is a drug to treat metastasize ovarian cancer in

4    women.

5    Q.    Are the publications and textbooks you have

6    authored and the fellowships and honors you have

7    received identified in your CV?

8    A.    They are.

9    Q.    Are any of your books particularly well known in

10   the scientific communities?

11   A.    I would say I have two books in the area of drug

12   stability, and I have two books in the area of

13   prodrugs.  Both sets of books have been very well

14   received.

15         My last book, which was published last year,

16   called "Prodrugs Challenges and Rewards" or "Rewards

17   and Challenges," I forget, actually sold out in its

18   first printing, and it is now in its second printing.

19   It's done very well.

20   Q.    Dr. Stella, are you an expert in the area of

21   drug delivery and prodrugs?

22   A.    Yes, I am.

23         MR. VERDIRAME:  Your Honor, we offer Dr.

24   Stella as an expert in the area of drug delivery and

25   prodrugs.

*Stella - Direct/Verdirame*                    11

1              MR. JENNINGS:  No objection, your Honor.

2              THE COURT:  Fine.  He will be accepted as an

3    expert in those areas.

4              MR. VERDIRAME:  Thank you.

5    BY MR. VERDIRAME:

6    Q.    Dr. Stella, what is your understanding of your

7    role in this case?

8    A.    My understanding is that I'm offering an expert

9    opinion on the validity of the '953 patent in light of

10   the prior art and from the point of view of one

11   skilled in the art.

12             I've also been asked to evaluate the expert

13   reports of Drs. Gokel and Sloan as to the validity or

14   correctness of their assessment of the validity of the

15   '953 patent.

16   Q.    Have you been qualified to testify as an expert

17   by a court before today?

18   A.    Yes, I have.

19   Q.    Are you being compensated for your work today?

20   A.    Yes, I am.

21   Q.    Does your compensation depend on the outcome of

22   this case?

23   A.    No.

24   Q.    Please put PTX-1 on the screen, which is also in

25   the binder in front of you, Dr. Stella.

*Stella - Direct/Verdirame*                    12

1          Do you recognize this exhibit?

2   A.    Yes.  This is the patent in suit.

3   Q.    Have you read the expert reports and listened to

4   the opinions of Ranbaxy's experts, Dr. Sloan and Gokel

5   regarding the validity of the '953 patent and whether

6   the invention of the '953 patent produced unexpected

7   results over the prior art?

8   A.    Yes, I have.

9   Q.    Do you agree with Dr. Sloan and Dr. Gokel?

10  A.    No, I do not.

11  Q.    Would you please briefly tell us why not.

12  A.    Well, I think, first, is that both Gokel and

13  Sloan assume that valganciclovir was mentioned in the

14  prior art that was present in the prior art.

15          Second is that I disagree with Sloan and Gokel

16  that the bioavailability, the superb bioavailability

17  seen with ganciclovir was predicted.  It wasn't.

18          Third is that Gokel and Sloan do not address

19  the issue of the diastereomers and the ability of the

20  diastereomers to in fact form a crystalline material

21  and to show superb bioavailability.

22          In my opinion, both Sloan and Gokel trivialize

23  the drug discovery and prodrug discovery process.  I

24  think their analysis is basically a hindsight

25  analysis.

1    Q.    What does this patent relate to generally,

2    Dr. Stella?

3    A.    This patent relates to the discovery of a novel

4    prodrug of ganciclovir with excellent oral bioavaila-

5    bility and the ability to treat and, therefore, treat

6    in a very good manner anti-viral diseases, especially

7    CMV.

8    Q.    What is "oral bioavailability"?

9    A.    Your Honor, this is relatively technical term,

10   so bear with me.  If my discussion is not adequate,

11   please ask questions.

12          When we give a drug intravenously -- and the

13   abbreviation that we have used is IV.  When we give

14   that drug into a vein, we can assume that we are

15   delivering 100 percent of the drug.  Why?  Because all

16   of the drug is being put directly into the vein.

17          When we take a drug orally, the drug has to

18   undergo a number of steps, which we will discuss

19   subsequently.  And so the amount of drug that can

20   reach what we call the systemic circulation or plasma

21   is limited by a number of barriers.

22          So when we talk about bioavailability, we are

23   comparing the ability to absorb a drug, let's say, for

24   example, orally and relative to the delivery of that

25   drug given intravenously.

*Stella - Direct/Verdirame*                    14

1          So "oral bioavailability" refers to the

2    fraction of drug that we give that reaches essentially

3    the systemic circulation or the plasma.  That

4    experiment, the ability to do that, involves a number

5    of techniques that we do in the laboratory in animals

6    and subsequently also in man.

7    Q.    Can you briefly tell us how oral bioavailability

8    is measured?

9    A.    I have sort of already mentioned that a little

10   bit.

11          Again, your Honor, essentially what happens if

12   you give a drug intravenously, we can assume 100

13   percent is delivered; we measure the plasma level, for

14   example, as a function of time and we compare that

15   plasma level time curve to giving the drug orally.  We

16   also measure plasma levels, and we compare what's

17   called area under the curve.  The abbreviation is AUC.

18          So we compare the plasma levels that you get

19   from oral delivery to a control, and that control is

20   the intravenous dose.  And by comparing the area under

21   the curve from the oral dose to the IV dose, we can

22   then determine what the absolute bioavailability of

23   the drug is.  That's essentially how that experiment

24   is performed.

25          If we do the experiment in experimental

1  animals, like the rat, for example, you usually can't

2  give the oral dose and the intravenous dose to the

3  same rat.  You can, but it's a difficult experiment to

4  do.  In humans and in higher animals, we do what's

5  called a cross-over study.

6          For example, your Honor, if I was to do the

7  bioavailability of ganciclovir in you, the first week

8  I might give you an intravenous dose of ganciclovir,

9  and the second week I would give you the oral dose of

10  ganciclovir, and I would compare the blood levels that

11  we got.  For another gentleman like Bart, Mr.

12  Verdirame, I would give him, perhaps, the oral dose

13  first and then the intravenous dose.  The advantage of

14  doing that is we have what's called an inpatient

15  control, that is, I can compare how the drug performed

16  in you and how it performed in Mr. Verdirame.  It is

17  not easy to do in a rodent animal model.  And the

18  importance of that will become obvious a little bit

19  later on.

20  Q.    Dr. Stella, do you have a demonstrative showing

21  the issues involved in trying to develop prodrugs

22  having improved oral bioavailability?

23  A.    Yes, I do.

24  Q.    Please put PTX-683 on the screen.

25          Is this the demonstrative you are referring

1    to?

2    A.    Yes, it is.

3    Q.    Please explain for us what PTX-683 shows.

4    A.    What I'm showing here, your Honor, is a drug

5    that has some barrier to its delivery.  I'm showing

6    the drug bouncing off the barrier.

7           I would like to talk a little bit why -- I'm

8    going to focus on why a drug might show very poor oral

9    bioavailability.  There are basically four reasons why

10   a drug will show poor oral bioavailability:

11          One is the drug may not dissolve.  That is it

12   never even reaches close to getting into the body.  It

13   is not unlike swallowing a piece of sand.  The sand is

14   not going to dissolve.  The molecule in that case will

15   simply end up in the feces.

16          The second, let's assume our drug can

17   dissolve.  Before it reaches the intestinal barrier,

18   there are enzymes that are designed to basically

19   destroy what we eat in our food.

20          So, for example, when you possibly had

21   breakfast this morning, you ate certain food products.

22   Right now digestion is going on in your GI tract

23   breaking down those food products; the same way your

24   drug can be destroyed in the contents of the small

25   intestine.

1          Let's assume our drug does dissolve and does

2     survive.  The next barrier would be the ability to

3     cross the cells that line the small intestine.  Those

4     cells are called enterocytes.  Those enterocytes are

5     there to prevent the absorption of materials the body

6     does not want to absorb.

7          The fourth barrier is that present in the

8     enterocytes and in the liver are enzymes that are

9     designed to destroy materials that the body does not

10    want to be exposed to.  When you had the piece of

11    lettuce maybe in your salad last night, there were

12    materials in that lettuce in your food that the body

13    may decide evolutionarily that is not good for you to

14    get exposed to.  So we have developed these enzymes

15    designed to destroy what is called exogeneous

16    materials.  So the ability of a drug to get into the

17    body is limited by those four barriers.

18          And what we do in prodrug research is we say:

19    Well, if this drug has some barrier to its delivery,

20    can we change the properties of this drug by making a

21    prodrug?

22          That's what's illustrated here on this slide

23    here, your Honor.

24    Q.   Are there difficulties involved in finding a

25    prodrug that will work?

1   A.     Absolutely, and those barriers are legend.

2          For example, let's assume that the barrier for

3   our delivery here is the inability to cross a

4   membrane.  Let's say we identify that.

5          No. 1 is that very often, early in the

6   development of a drug, we may not know why a drug is

7   performing poorly.  So the design of a prodrug is a

8   guessing game or at least an educated guess.  So what

9   we do in the case of a prodrug is that we add a

10  promoiety, and the idea here is we change the

11  properties of the drug so that it's able to overcome

12  the particular barrier for the delivery of that drug.

13         However, in changing the properties of the

14  drug, we are attempting to identify what the barrier

15  is and how that promoiety might help in overcoming

16  that barrier.  Assuming that we can deliver the drug

17  into the body through the prodrug, we also then have

18  to clip off the appendage to release the drug.  And so

19  designing a prodrug that overcomes all those steps and

20  yet still adequately delivers the drug is quite a

21  heroic task.

22  Q.     Dr. Stella, I would like to ask you about a

23  document which was discussed just prior to your

24  getting on the stand this morning, Exhibit 459.

25  That's in the binder in front of you.  It's DX-459.

*Stella - Direct/Verdirame*                                    19

1   A.    Yes.

2   Q.    Is that a document you reviewed in formulating

3   your opinion?

4   A.    I saw this document prior to the trial.  But I

5   really only reviewed it in detail since I have been at

6   the trial.

7          THE COURT:  When you gave your opinions both

8   in your deposition and rendered a report, did you rely

9   on this document in any way?

10          THE WITNESS:  No, I did not.

11          MR. VERDIRAME:  I will not ask further

12   questions about the document.

13          THE COURT:  Very well.

14   BY MR. VERDIRAME:

15   Q.    Dr. Stella, have you reviewed the claims of the

16   '953 patent in suit?

17   A.    Yes, I have.

18   Q.    Do you have an understanding about what those

19   claims are directed to?

20   A.    They are directed towards valganciclovir

21   hydrochloride in crystalline form.  It is a drug that

22   shows excellent bioavailability, and it is useful in

23   the treatment of a number of anti-viral diseases, but

24   namely CMV.

25   Q.    Would one of skill in the art have expected that

1   valganciclovir hydrochloride in crystalline form would

2   have provided improved oral bioavailability over

3   ganciclovir?

4   A.     No.

5   Q.     Why not?

6         Perhaps I can ask one further question.

7         Do you have a demonstrative that would help

8   explain your answer?

9   A.     Yes.

10        MR. VERDIRAME:  Please put the demonstrative

11  754 on the screen.

12        MR. WITNESS:  Yes.  This demonstrative, your

13  Honor, is fairly complicated.  So I will try to go

14  slowly and walk you through it.

15        THE COURT:  I'm glad you realized that.

16        THE WITNESS:  If you remember last week, your

17  Honor, we talked about the fact that valganciclovir,

18  which is shown here, two diastereomers, I put a

19  slightly less complicated version of that here, so you

20  can appreciate it.  What I'm going to do now is walk

21  you through the process whereby a design prodrug will

22  lead to adequate delivery of the drug.

23        So let's assume we have -- let's assume the

24  area above this little cartoon is the contents of the

25  small intestine.  If I put the two diastereomers in

1  the content of the small intestine -- I have mentioned

2  earlier today that there are enzymes present in the

3  small intestine that can chew up food products and can

4  adequately chew up drug products.  If it does that,

5  then we produce ganciclovir.  And ganciclovir we

6  already know is incapable of crossing the biological

7  membrane.  So if I get conversion of one or both of

8  the diastereomers in the contents of the small

9  intestine and I produce ganciclovir, I cannot deliver,

10  I cannot improve on the delivery of ganciclovir.

11       So the first step is:  Can I design a prodrug

12  that survives this milieu?  Remember, that milieu is

13  designed to destroy exogeneous materials.  So let's

14  assume the molecule does survive that.  There is no

15  apriority; you cannot predict whether this is going to

16  survive.  You can predict whether one of them or both

17  of them are going to survive.

18       The next step is:  Can one or both of these

19  diastereomers cross the biological membrane?  These

20  are relatively polar materials; and, so, in all

21  likelihood, if these are going to be absorbed at all,

22  they may have to interact with the stereospecific

23  transport illustrated here.

24       This is a protein molecule that embedded in

25  the surface of the membrane.  Effectively, what these

*Stella - Direct/Verdirame*                                    22

1    materials have to do is interact with a very complex

2    molecule and be transported across this membrane.

3           I have another demonstrative that sort of

4    speaks to the critical nature of this process.

5           MR. VERDIRAME:  Please put Exhibit 755 on the

6    screen for a moment.

7           THE WITNESS:  Your Honor, when Dr. Sloan

8    talked about this process the other day, he stole my

9    thunder because he saw my demonstrative.

10          Dr. Sloan suggested that an interaction of a

11   drug molecule -- and over here on the right, I'm

12   showing you valacyclovir, which the Ranbaxy experts

13   have assumed incorrectly predicts the behavior of

14   ganciclovir.

15          So one can think of this molecule interacting

16   with the stereospecific transporter as something like

17   a lock and key.  No. 1 is no one knew what the shape

18   of the lock was because if you remember in the

19   Beauchamp papers, they only talked in generalarities

20   about being a stereospecific transporter.  Dr. Sloan

21   mentioned what was important was the valine component.

22   I have drawn that here as one of the teeth in the key.

23   Dr. Sloan mentioned this is all that was necessary.

24          Your Honor, if you have a key and it doesn't

25   have a handle, you can't open the lock.  So it is not

1    the valine that is important; it is the total

2    molecule.  This molecule in total has to interact with

3    the stereospecific transporter of unknown origin, of

4    unknown source, and of unknown structure.

5           So let's consider now that we have

6    valganciclovir -- could I have the next one.

7           So, effectively, what I have shown you here

8    with this model key is that this component down here

9    is the hydroxymethyl group you heard discussed

10   extensively by both sides.

11          Now, will this key fit this lock and will it

12   open the lock?  It might; it might not.  We can't

13   predict from one molecule valacyclovir -- that a

14   structurally structural compound like valganciclovir

15   will interact with the stereospecific transporter.

16   This additional appendage may have a tremendous

17   effect; it may have no effect.  We don't know.  It's

18   highly unpredictable.  The key may fit the lock, but

19   whether it will open the door, I don't know.

20          I'm not sure what kind of car you drive, your

21   Honor, but you can take your key for your car and

22   maybe someone has a very similar model car; and if you

23   compare the keys, often they look very similar.  There

24   is only a little bit of difference in the key.  Does

25   your key open the other person's car?  It might.

*Stella - Direct/Verdirame*                    24

1    Probably won't.  That's by design.

2         So now we have a problem:  Can this compound

3    -- and this is one of the diastereomers.

4         Can I have the next slide.

5         If I take the other diastereomer, since we

6    don't know what the shape of the keyhole is, I don't

7    know the shape of the keyhole, so I drew that as a

8    gray area up here.  You don't know if this is going to

9    fit.  And if it does fit, will it open?  And so to

10   assume that valacyclovir predicts -- valganciclovir is

11   a stretch of the imagination.  I think it is very much

12   hindsight analysis, and whether the two diastereomers

13   would also interact, one and not both, we wouldn't

14   know that.  We wouldn't know that at this time.

15        I would like to go back to the previous

16   demonstrative, please.

17        So let's assume in the best case scenario that

18   both of these molecules, one or both, are able to get

19   inside the cell.  Now, -- let's assume we are able to

20   get this molecule -- and I don't know whether one or

21   both will.  The environment in this cell is called

22   inside the enterocyte, is really designed to break up

23   food products, and exogenous materials.  So if I

24   produce ganciclovir again, that molecule can just as

25   easily float back into the intestine or go on to be

1    absorbed.  So just because we produced this inside the

2    cell doesn't mean it gets into the body.

3            Can I have the next slide, please.

4            This is the bottom of the cell.  So we have to

5    go through this cell to reach the bloodstream.  How

6    does it get out of what we call the basolateral

7    membrane?  I don't know whether both of these can get

8    through that membrane.  It's highly unpredictable.

9    And the next step converts it to ganciclovir.

10           So now, your Honor, you have a dilemma.  You

11   have a prodrug that must survive the intestine, may or

12   may not survive the enterocytes; and if I design it so

13   that it survives up here and up here, what's to say it

14   is going to get converted in the body?

15           And so the balancing act of trying to design a

16   prodrug that adequately delivers this drug ganciclovir

17   into systemic circulation is a highly unpredictable

18   convenient.

19   BY MR. VERDIRAME:

20   Q.    And what happens if you succeed in all of these

21   endeavors?

22   A.    If you succeed in all of those endeavors, you

23   have good oral bioavailability.  The failure is not

24   only that you didn't design the right molecule; if you

25   expose the body to one or both of these materials, we

*Stella - Direct/Verdirame*                                    26

1   really don't know if they are going to be toxic or

2   not.   There is no way we can predict from a chemical

3   structure whether any molecule we produce is going to

4   be toxic or nontoxic.

5   Q.    Can we please turn back to Exhibit PTX-1, the

6   '953 patent.

7         Is there a place in the '953 patent which

8   shows the oral bioavailability achieved by the

9   vendors?

10  A.    Yes, I believe it is in column 28, example 9.

11  Q.    On the screen now is what you are referring to,

12  Dr. Stella?

13  A.    Yes, it is.

14  Q.    Please explain what this Table 7 from the '953

15  patent in this case shows.

16  A.    I would like you to focus on the bis-valine

17  ester which shows that the bioavailability as reported

18  here is 52 percent, and the ganciclovir valinate

19  acetate and hydrochloride, which is valganciclovir,

20  the bottom is valganciclovir which is at 98 percent.

21        I would like you to recognize, your Honor,

22  that the bioavailability of the mono-ester is about

23  1.5, approximately two times better than the

24  bis-valine ester.

25        MR. JENNINGS:  Your Honor, I'm going to have

*Stella - Direct/Verdirame*                    27

1   to object as outside the scope of the report.  This

2   particular data was not discussed in the report.

3          MR. VERDIRAME:  Your Honor, these results were

4   discussed in Dr. Stella's entire report.  The oral

5   bioavailability results achieved in the '953 patent is

6   the subject of Dr. Stella's report.

7          MR. JENNINGS:  It was discussed generically,

8   your Honor.  We went through the file history where

9   the applicants acknowledged the error with respect to

10  this data.  We had no notice the expert would be now

11  testifying in support of this data in their patent.

12         MR. VERDIRAME:  This is the patent, your

13  Honor.  This is exactly what Dr. Stella was talking

14  about in his report.

15         THE COURT:  You would think so if that's what

16  he is opining on.

17         You may continue.

18  BY MR. VERDIRAME:

19  Q.    Does this data show good results for valganci-

20  clovir hydrochloride?

21  A.    Yes, it does.

22  Q.    Is there other information in the file history

23  of the '953 patent that provides additional infor-

24  mation about bioavailability of the compounds valgan-

25  ciclovir hydrochloride?

*Stella - Direct/Verdirame*                    28

1   A.     Yes.   There is a declaration by Susan Malcolm.

2          MR. VERDIRAME:   Please put up DX-10 at page

3   1148 on the screen.

4   Q.     That's in the big binder in front of you,

5   Dr. Stella.

6   A.     Yes.

7   Q.     Is this data from the Malcolm declaration you

8   are referring to?

9   A.     Yes, it is.

10  Q.     What does this Table 7 show?

11  A.     This Table 7 shows a study, that is what's

12  called a side-by-side study, where the researcher,

13  Susan Malcolm, determined the oral bioavailability of

14  ganciclovir, what we call the parent drug.  It has a

15  bioavailability of 6.9 percent.  The bis-valinate has

16  a bioavailability of 34 percent.  And valganciclovir

17  has a bioavailability of 55.4 percent.

18         You'll notice, your Honor, the ratio of the

19  bioavailability of the monovalinate to the

20  bis-valinate is about the same as what was seen in the

21  example 9 of the '953 patent.

22  Q.     Are the bioavailability numbers in examples 9

23  and 10 of the '953 patent and the numbers in the

24  Malcolm declaration the same?

25  A.     No, they are slightly different.

1    Q.    Please explain why.

2    A.    First of all, the explanation for those

3    differences was actually present in the Malcolm

4    declaration.  In the paragraph immediately following

5    this Table 7 in the Malcolm declaration, it explains

6    why there is a difference, I believe, the rat data

7    that was in the '953 patent and the data that was in

8    the Malcolm declaration.

9          Earlier, your Honor, I described how you

10   perform an oral bioavailability assessment.  In the

11   oral bioavailability assessment, you remember I talked

12   about determining the area under the curve intravenous

13   versus oral.  When doing a drug discovery process

14   within a drug company, invariably what happens is very

15   early, the researchers do the area under the curve or

16   the plasma level time data for ganciclovir.  If you

17   run a control experiment, where you determine the

18   plasma level of the intravenous ganciclovir, if one is

19   comparing and determining absolute bioavailability, as

20   is illustrated here in both the Malcolm declaration

21   and the '953 patent example 9, a fair amount of error

22   comes into the data because the ratios are largely

23   determined by what the plasma level is from the IV

24   data.

25          So when one compares and determines the

*Stella - Direct/Verdirame*                                    30

1  bioavailability over here, you are at the mercy of the

2  quality of the data, the intravenous control data.

3  And Malcolm, Dr. Malcolm -- I think it is Dr. Malcolm,

4  Susan Malcolm, points out that in the data that was

5  presented in the '953 patent, had an inadequacy in the

6  control experiment -- that is, the intravenous

7  ganciclovir data.

8         If you notice, I emphasized the ratio of the

9  bioavailability from the valganciclovir, the bottom

10 compound here in yellow and the bis derivative and

11 that ratio was the same in the two studies.  The

12 absolute numbers were off.  That was adequately

13 described in the Malcolm declaration.

14 Q.    Is it correct to say that the data in example 9

15 of the patent is in error?

16 A.    No, it is not an error.

17 Q.    Looking at the data that's on the screen in

18 front of you, Dr. Stella, what is the oral bioavaila-

19 bility for ganciclovir?

20 A.    The oral bioavailability of ganciclovir is 6.9.

21 Q.    What is the oral bioavailability for ganciclovir

22 bis-valinate hydrochloride?

23 A.    34 percent.

24 Q.    What is the oral bioavailability for ganciclovir

25 monovalinate hydrochloride?

*Stella - Direct/Verdirame*                    31

A.     It is 55 percent.

Q.     And that's valganciclovir hydrochloride?

A.     Yes.

Q.     Are these results for ganciclovir monovalinate
hydrochloride good results?

A.     These are outstanding results in the rat model.

Q.     Does this data for the ganciclovir monovalinate
hydrochloride show results that would have been
expected by persons skilled in the art in 1994?

A.     No.

       MR. VERDIRAME:  Please put up DX-807.13
referred to by Dr. Sloan last week.

A.     Yes.

Q.     Were you here last week when Dr. Sloan referred
to this slide, Dr. Stella?

A.     Yes, I was.

Q.     Dr. Sloan testified that the results achieved by
the '953 patent allegedly were expected results.  Was
he correct?

A.     No, he was not.

Q.     Why not?

A.     Very simply, he and the examiner both made the
assumption that you can extrapolate the data from
acyclovir to ganciclovir.  These are two different
molecules.

*Stella - Direct/Verdirame*                    32

1          As I demonstrated in my lock and key example,

2    small structural differences in the molecules can lead

3    to big differences in the ability of those molecules

4    to both interact with viruses, as we know in the case

5    of the two compounds.  We know ganciclovir is more

6    toxic than acyclovir.  And to assume that valganci-

7    clovir, a promoiety, would perform as well as

8    acyclovir is a stretch of the imagination.

9          Both Sloan and the patent examiner inappro-

10   priately did not consider the improvement of the

11   bis-valinate.  And the bis-valinate is the only thing

12   that I know that was in fact presented in the prior

13   art.  I think that the patent examiner inappropriately

14   should have compared the improvement in the

15   bioavailability of valganciclovir only to ganciclovir

16   and the bis-valinate.

17   Q.    Did the examiner ever evaluate that comparison?

18   A.    No, they did not.

19   Q.    In your testimony today, did you evaluate that

20   comparison?

21   A.    Yes, I did.

22   Q.    Does the slide shown in front of you here today

23   confirm that the examiner did not evaluate that

24   comparison?

25   A.    Yes.

*Stella - Direct/Verdirame*                                      33

1           If you look at the last sentence here, your

2      Honor, "Hence, comparison with the bis-valinate does

3      not establish patentability in this rejection.", I

4      disagree with that.

5      Q.    Did the file history show that the applicants

6      continued to urge that the comparison should be with

7      the bis-valinate?

8      A.    Yes, they did.  All through their file history

9      they focused on and felt that what was important was

10     that that the comparison to the bis-valinate was a

11     critical element, and I think, stubbornly, the patent

12     examiner focused on the comparison to acyclovir and

13     valacyclovir.  Those are different molecules.  And as

14     you can see, your Honor, the complexity in being able

15     to deliver a prodrug like this is quite a challenge.

16     Q.    Did the examiner ever say there was no

17     unexpected results for the monovalinate as compared to

18     the bis-valinate?

19     A.    No, he did not.

20     Q.    Do you recall Ranbaxy's counsel noted last week

21     that the claims of the '953 patent covered individual

22     diastereomers of valganciclovir?

23     A.    Yes.

24     Q.    Do the claims of the '953 patent also cover the

25     mixture of the valganciclovir diastereomers?

1    A.    Yes, it did.

2    Q.    Was it pertinent to your analysis that the

3    claims cover a mixture of diastereomers in crystalline

4    form?

5    A.    Yes.

6    Q.    Why is that?

7    A.    The reason for that is, one, as I think was

8    adequately pointed out by Professor Mitscher, it was

9    quite surprising and unexpected that the diastereomers

10   in the hydrochloride formed a crystalline material.

11   Diastereomers often do not co-crystallize or

12   crystallize into a mixture.

13         Two is that the two diastereomers, the

14   mixture, showed really superb oral bioavailability.

15   Q.    Dr. Stella, having reviewed the '953 patent, the

16   prosecution history, and the bioavailability results,

17   do you have an opinion on the nonobviousness of the

18   '953 patent?

19   A.    I think the '953 patent was nonobvious.

20   Q.    Could you please briefly summarize your reasons.

21   A.    Well, first, the bioavailability of ganciclovir

22   from valganciclovir is outstanding.  The valganci-

23   clovir is a diastereomer mixture, and, as such, would

24   not be expected to readily crystallize, and would not

25   be expected that the mixture would provide the superb

*Stella - Cross/Jennings*                     35

1    bioavailability that was observed in this case, and it

2    also happens to be a great drug.

3    Q.    Thank you.

4         MR. VERDIRAME:  Your Honor, we have no further

5    questions.

6         THE COURT:  Are you moving in any exhibits?

7         MR. VERDIRAME:  There is Exhibit 655, which is

8    Dr. Stella's CV.  We would like to move that into

9    evidence.

10        Also, for demonstrative purposes, we would

11   like to move into evidence PTX-683, which was the

12   prodrug barrier diagram; demonstrative PTX-754,

13   regarding the animation for prodrug delivery; and

14   Exhibit 755, the lock and key exhibit.

15        MR. JENNINGS:  No objection.

16        THE COURT:  The one exhibit will be admitted

17   in evidence, and the others will be noted as

18   demonstratives.

19        (Plaintiff's Exhibit No. 655 was received

20        in evidence.)

21

22   CROSS-EXAMINATION

23   BY MR. JENNINGS:

24   Q.    Good morning, Dr. Stella.

25   A.    Good morning.

*Stella - Cross/Jennings*                    36

1          MR. JENNINGS:   If we could please have

2    Dr. Stella's demonstrative slide 683, please.

3    Q.    Now, Dr. Stella, using your demonstrative slide,

4    I would like to review with you the observations about

5    acyclovir and valacyclovir in relation to this slide.

6    Okay?

7    A.    Okay.

8    Q.    In your binder you have the prior art among

9    other exhibits.   If you could turn to Defendant's

10   Exhibit 170, please.

11   A.    Yes.

12   Q.    This is a paper where Dr. Beauchamp reports in

13   1992 her observations about valacyclovir.   Correct?

14   A.    That's correct.

15   Q.    And first in relation to your slide here,

16   acyclovir is the drug.   Correct?

17   A.    In the case of the Beauchamp paper, yes.

18   Q.    Okay.   And Dr. Beauchamp reports that the drug

19   had limited oral bioavailability.   Correct?

20   A.    That's correct.

21   Q.    Okay.   And so to improve that bioavailability,

22   Dr. Beauchamp made amino acid esters of that drug.

23   Correct?

24   A.    Yes, she made 18 esters.

25   Q.    And she reported her observations about that in

*Stella - Cross/Jennings*                    37

1    her paper?

2    A.    Yes.

3    Q.    She determined that L amino acid esters were

4    better.   Correct?

5    A.    That's correct.

6    Q.    And she reported those observations.   Correct?

7    A.    Yes.

8    Q.    And she determined that L-valine amino acid

9    ester was the best.   Correct?

10   A.    She found that the L-valine provided the best

11   oral bioavailability in the rat for this series of

12   molecules.

13   Q.    And she said in that exhibit clearly the L-valyl

14   ester provided the best any acyclovir bioavailability

15   which she reported as 63 percent.   Correct?

16   A.    Yes.

17   Q.    And she reported that observation, and she also

18   reported that on the other side of your barrier that

19   prodrug was very quickly and effectively hydrolyzed.

20   Is that correct?

21   A.    That's correct.

22   Q.    By "hydrolyzed" on your right side of your slide

23   it is transform or broken apart, so you have the

24   separate the promoiety from the drug.   Correct?

25   A.    That's correct.

*Stella - Cross/Jennings*                          38

1   Q.    In fact, if you could turn to Defendant's

2   Exhibit 170 at page 4, she says--

3   A.    Page 160 of the paper?

4   Q.    Yes.  And in the paragraph just before "aqueous

5   solubility," she says:

6                "Prodrug was undetectable one

7          hour post dose."

8          Do you see that?

9   A.    Yes.

10  Q.    That means she's reporting that one hour post

11  dose you can't find any more of the prodrug.  That's

12  the L-valine connected to the acyclovir.  Correct?

13  A.    That's correct.

14  Q.    It's been separated?

15  A.    Yes.

16  Q.    That's the highly efficient hydrolysis.

17  Correct?

18  A.    Yes.

19  Q.    And the examiner, of course -- you have been

20  here and you listened to us discuss the file history?

21  A.    Yes.

22  Q.    The examiner said he viewed the prior art and

23  determined in his view one of skill in the art would

24  consider ganciclovir and acyclovir extremely similar.

25  Correct?

1    A.     That's what he said.  I disagree with him.

2    Q.     Those two compounds have similar uses.  Correct?

3    A.     They are used for herpes infections.  One is

4    superior for the treatment of general warts, et

5    cetera, and herpes simplex, while ganciclovir is

6    primarily used for treatment of CMV.

7    Q.     So both are used to treat viruses in the herpes

8    family.  Correct?

9    A.     That's correct.

10   Q.     In fact, ganciclovir was reported in the Martin

11   paper as a potent and broadly active anti-herpes

12   agent.  Do you agree with that?

13   A.     Yes.  It is also fairly toxic.

14   Q.     Okay.  And acyclovir and ganciclovir are both

15   known to have that problem that we talked about, the

16   low oral bioavailability.  Correct?

17   A.     Yes.

18   Q.     And so these known potent anti-herpes agents had

19   the same need, improve their oral bioavailability.

20   Correct?

21   A.     That is correct.

22   Q.     And we have just gone through what

23   Dr. Beauchamp's observations were with respect to

24   valacyclovir.  Correct?

25   A.     Yes.

*Stella - Cross/Jennings*                                    40

1   Q.     So you would agree that these observations for

2   valacyclovir influenced the development of

3   valganciclovir.   Correct?

4   A.     I believe it restarted activity at Roche to

5   assess improving the bioavailability of ganciclovir.

6   Q.     So you would agree, then, that the observations

7   in the prior art about valacyclovir did in fact

8   influence the development of valganciclovir?

9   A.     They influenced it, but it really just restarted

10  the program to evaluate what would work with

11  ganciclovir because one would know that what was

12  applicable to acyclovir may not be applicable to

13  ganciclovir because of the structural differences.

14  Q.     Dr. Stella, are you familiar with the book

15  "Optimizing the Drug-Like Properties of Leads in Drug

16  Discoveries"?

17  A.     Yes.

18  Q.     In fact, you wrote a chapter in this book,

19  "Optimizing the Drug-Like Properties of Leads in Drug

20  Discoveries"?

21  A.     Yes.

22  Q.     And you wrote Chapter 10?

23  A.     Yes.

24  Q.     Would you like a copy?

25  A.     I would like to have another copy for my

1    library.

2    Q.    This is your chapter?

3    A.    Yes, it is.

4    Q.    In we could turn to page 231, the last

5    paragraph, you state in the last paragraph of your

6    book:

7            "Valacyclovir is an example where

8        lady luck plays a role."

9        And you illustrate the role that serendipity

10   plays in the drug discovery process:

11           "Is the choice of L-valine esters

12       one that someone would make from first

13       principles?  It is unlikely, but the

14       discovery and development of valgan-

15       ciclovir was influenced by the

16       observations made with valacyclovir."

17       You wrote that.  Correct?

18   A.    Yes.  I just told you I didn't disagree with

19   that.  I said that clearly the appearance of the

20   Beauchamp papers reenergized an interest in looking at

21   prodrugs of ganciclovir.

22   Q.    So you referred to "serendipity" with respect to

23   valacyclovir, but that discovery influenced valganci-

24   clovir.  Correct?

25   A.    To restart a program, yes.

*Stella - Cross/Jennings*                                    42

1   Q.    You didn't say that --

2   A.    I did, "influence the observations made by

3   valacyclovir."

4   Q.    You didn't say "restart a program"?

5   A.    Well, it's semantics, sir.

6   Q.    Okay.  Now, you agree that in Beauchamp's '339

7   patent she describes prodrugs for ganciclovir?

8   A.    Amongst many others, yes.

9   Q.    That patent is Exhibit 101 in your binder.

10   A.    Yes.

11        MR. JENNINGS:  Now, if we could have

12   Dr. Stella's demonstrative Exhibit 683 up again.

13   Q.    Now, I'd like to review with you, sir, what's

14   reported about ganciclovir in DX-101 and how it

15   relates to your demonstrative slide.

16        So we first have the drug which is ganciclovir

17   on the left side.  Correct?

18   A.    Correct.

19   Q.    And the patent states that "ganciclovir has low

20   oral bioavailability" in column 1, lines 21 and 22.

21   Correct?

22   A.    Yes.

23   Q.    And in the fifth paragraph --

24   A.    Where is that -- excuse me while I read this,

25   please?

*Stella - Cross/Jennings*                        43

1          (Pause.)

2          Yes, it does.

3    Q.    In column 1 there is a whole paragraph

4    discussing ganciclovir?

5    A.    Yes.  And a number of other derivatives.

6    Q.    And the ganciclovir compound is discussed in the

7    paragraph from lines 14 down to 24.  Correct?

8    A.    Yes, it does.

9    Q.    In the fifth paragraph, the '339 patent states:

10              "We have now found that amino

11         acid esters of the compounds referred

12         to above surprisingly have advan-

13         tageous bioavailability when adminis-

14         tered by the oral route resulting in

15         exceptionally high levels of the

16         parent compound in the body."

17         I read that correctly?

18   A.    Yes.

19         Can I make a comment about that, please?

20   Q.    Did I read that correctly?

21   A.    Yes.

22   Q.    And ganciclovir was one of the compounds

23   referred to above that paragraph 5 in column 1 of

24   Beauchamp's '339 patent.  Correct?

25   A.    Yes.

*Stella - Cross/Jennings*                         44

1    Q.    So in relation to your slide, we had ganciclovir

2    on the left, and that's the drug that doesn't get

3    through the barrier well; and then we have in

4    paragraph 5 of Beauchamp's paper, she reports that

5    amino acid esters of the compounds referred to above,

6    which include ganciclovir, have advantageous bioavail-

7    ability when administered by the oral route.

8         So that means they are getting through the

9    barrier.  Is that correct, sir?

10   A.    That is correct.

11        However, you heard my earlier discussion about

12   how to assess oral bioavailability.  One cannot do

13   oral bioavailability without having made the compound

14   and experimentally determining it.  There is nothing

15   in the '339 patent on the mono or the valine

16   ganciclovir.  The only compounds that are mentioned in

17   the '339 patent that are made, and you can only assess

18   bioavailability if the compounds are made, is --

19        THE COURT:  Let me just stop you.  You are

20   really critiquing what you explained.  I'll just ask

21   you, on cross-examination, listen to the questions and

22   respond to what they are.  I think you did answer it,

23   "That is correct," and the "however," really, is not

24   applicable.

25        I'll strike that part.

1  Q.    So the oral bioavailability means if you take

2  her at her word, it's getting through your barrier.

3  Correct?

4  A.    Yes.

5  Q.    And she goes on, and she refers to "exception-

6  ally high levels of the parent compound in the body"

7  in that same sentence.  Correct?

8  A.    That is correct.

9  Q.    So what that tells you, if you take her at her

10 word, is you are getting transformation on the right

11 side of the body so you have high levels of the drug

12 ganciclovir.  Correct?

13 A.    Taking her at her word, yes.

14 Q.    I would like to turn back for a moment to

15 Dr. Beauchamp's paper regarding valacyclovir.  This is

16 Exhibit 170.

17 A.    I have it.

18 Q.    You mentioned this on direct examination about

19 the amino acid portion of the valganciclovir molecule.

20 I would like to talk about it with respect to what

21 Beauchamp says in relation to valacyclovir.

22        She states on the bottom, towards the bottom

23 in the paragraph under discussion on page 5:

24              "On the other hand, the stereo-

25              chemistry of the amino acid in the

*Stella - Cross/Jennings*                    46

1              prodrug esters had a marked effect on

2              absorbtion."

3              She states that?

4    A.    Yes.

5    Q.    You agree here she refers to the stereochemistry

6    of the amino acid in this sentence of her paper.

7    Correct?

8    A.    Yes.

9    Q.    And you agree she found that L amino acids were

10   best.  Correct?

11   A.    Yes.

12   Q.    If we continue on at page 5 in the sentence

13   bridging column 1 and column 2 she states:

14              "The preference for the L versus

15         D isomer, and for the naturally

16         occurring branched chain amino acids

17         L-valyl and L-isoleucyl suggests that

18         a stereospecific transporter may

19         contribute to the improved absorption

20         of these esters."

21         Again, she's referring to the stereochemistry

22   of the amino acids she adding.  Correct?

23   A.    Yes.

24   Q.    And if you could turn to her 1993 paper.

25         MR. JENNINGS:  This is Defendant's Exhibit

1    171, please.

2    Q.    She addresses this same issue.  Page 9 of the

3    exhibit.

4         Do you have that before you?

5    A.    Yes.

6    Q.    So her 1993 paper, Dr. Beauchamp states:

7              "The structure activity rela-

8         tionship of the amino acid esters

9         suggests the involvement of a

10        stereospecific L versus D transport

11        process.  The common branched chain

12        amino acids, L-valine and L

13        isoleucine, are favored by this

14        proposed transporter."

15        Again, she's referring to the stereochemistry

16   of the amino acid she's adding to make the ester for

17   her prodrugs.  Correct?

18   A.    Yes.

19   Q.    Now, do you agree that the patent examiner found

20   that it was the amino acid that was responsible for

21   the improved bioavailability in the valacyclovir

22   publications?

23   A.    The patent examiner I think was a little naive

24   on this.  There is no question I think that the

25   L-valine esters clearly contributed to the adequacy of

1  the transport.  But, as I mentioned earlier, it is not

2  just the L-valine; it is what it is connected to.  The

3  whole molecule is transported, and the L-valine and L

4  esters play a very important role.

5          THE COURT:  The question was -- he asked:

6  What  did the patent examiner find?

7          THE WITNESS:  And I disagreed.

8          THE COURT:  So the answer to the question

9  was --

10          THE WITNESS:  I said: "Yes."  I meant to say:

11  Yes, the patent examiner did agree on that, but I

12  thought the examiner was naive on the total package.

13  BY MR. JENNINGS:

14  Q.    So you do agree the examiner found that it was

15  the amino acid that was responsible for the improved

16  absorption?

17  A.    Yes, but I can disagree with him.

18  Q.    Well, in fact, Dr. Stella, in your report, and

19  that's in the beginning of our binder that we provided

20  up to you, you did refer to the examiner in paragraph

21  127 of your report.

22          Let me read what you said in your report:

23              "My conclusion is bolstered by

24          the fact that the examiner of the '953

25          patent had essentially the same prior

*Stella - Cross/Jennings*                              49

1              art references before him and also

2              disagreed that these references

3              rendered the claims unpatentable."

4         Now, in your report, you took stock with the

5    examiner's view, you said here.  Correct?

6    A.    I took stock with the examiner's view that

7    valganciclovir hydrochloride in crystalline form was

8    patentable.

9    Q.    But the examiner never agreed that

10   valganciclovir itself was patentable.  Correct?

11   A.    In what way?

12   Q.    The examiner never agreed valganciclovir was

13   patentable.  Correct?

14   A.    No, he did not.  The examiner did not allow

15   valganciclovir per se to be patentable.

16   Q.    And the examiner also, over and over again,

17   refused to allow the compound valganciclovir

18   hydrochloride.  Correct?

19   A.    He refused to allow -- I don't agree with that

20   decision.

21   Q.    And the examiner only ultimately allowed a

22   patent here when it was narrowed to the specific

23   crystalline form, and the declarations we discussed

24   here at trial were submitted.  Correct?

25   A.    Yes.

*Stella - Cross/Jennings*                            50

1   Q.    You have offered no opinion about those

2   declarations and the crystallinity issues in those

3   declarations.  Correct?

4   A.    In my report I talked about the importance of

5   crystallinity but not as it relates to the patent, I

6   don't believe.

7   Q.    And you referred to -- well, in fact, do you

8   agree the examiner rejected the opinion you presented

9   here today that the key was unknown from the prior

10  art?

11  A.    I don't understand your question.

12  Q.    Well, you said something about Dr. Sloan

13  stealing your thunder?

14  A.    Yes.

15  Q.    By the way, Dr. Sloan is a co-inventor with you

16  on that phenytoin product?

17  A.    That's correct.  We are still good friends even

18  after that.

19  Q.    And this is in the big binder.  It's down to

20  your left in the big box, Defendant's Exhibit 10.

21  This is the prosecution history?

22  A.    Yes.

23  Q.    This is Defendant's Exhibit 10 at 1032.

24  A.    Yes.

25  Q.    In the file history here, the examiner states:

*Stella - Cross/Jennings*                    51

1              "Thus, it is clear that the key

2          is getting the right amino acid to

3          interact with the stereospecific

4          transporter and being the sort of

5          amino acid which is efficiently

6          enzymatically hydrolyzed, 'but for a

7          grammar issue, the examiner found that

8          the key in the examiner's view, the

9          key was, one, getting the right amino

10         acid to interact with the stereo-

11         specific transporter, and, two, that

12         amino acid being the sort that is

13         efficiently enzymatically

14         hydrolyzed.'"

15         Correct?

16   A.    That is correct for acyclovir.

17   Q.    And valganciclovir uses the same amino acid as

18   valacyclovir.  Correct?

19   A.    After extensive experimentation, yes.

20   Q.    So now we have this ganciclovir, which was a

21   broadly active anti-herpes agent with a particular

22   activity against CMV; and is it your opinion that

23   after Dr. Beauchamp discovered that L-valine ester of

24   acyclovir gave the huge improvement in the bioavaila-

25   bility of acyclovir, one of ordinary skill in the art

*Stella - Cross/Jennings*                                    52

1    would not even try a mono-L-valine ester of ganci-

2    clovir?

3    A.    One would start a research program to explore

4    the ability to deliver the drug through the use of

5    amino acid esters.

6    Q.    So do you agree with me, then, sir, that given

7    the huge improvement that Beauchamp reported from

8    making an L-valine amino acid ester of acyclovir, that

9    one of skill in the art would have been motivated to

10   try the mono-L-valine ester for ganciclovir to improve

11   its oral bioavailability?

12   A.    One would have been motivated to make the bis-

13   ester based on what was taught by both the '92 paper,

14   the '93 paper, and '339 paper.

15   Q.    I'm going to go back to my question.  Agree with

16   it or disagree with it.

17         Is it your opinion that after Dr. Beauchamp

18   discovered that the L-valine ester of acyclovir gave

19   this huge improvement in bioavailability and reported

20   those results, that one of ordinary skill in the art

21   would not even try a mono-L-valine ester for ganci-

22   clovir?

23   A.    One would not even try?  No.

24   Q.    So you agree one would try?

25   A.    No, they would not try.

*Stella - Cross/Jennings*                                    53

1    Q.    I understand your position then.

2          In PTX-754, you went through your slide on the

3    board.  You raised a lot of questions about bioavaila-

4    bility?

5    A.    Yes.

6    Q.    And whether you might ever get the drug in the

7    body?

8    A.    That's correct.

9    Q.    But if one simply takes Beauchamp at her word in

10   the '339 patent when she said in that U.S. patent that

11   her amino acid esters of ganciclovir had advantageous

12   bioavailability when administered by the oral route

13   resulting in exceptionally high levels of the parent

14   compound in the body, then we would have no question

15   about whether we are going to get high levels of the

16   parent compound in the body for those amino acid

17   esters.  Correct?

18   A.    The bioavailability referred to there must be a

19   reference to the bis-ester.

20   Q.    She doesn't say that in the sentence that I just

21   quoted from paragraph 5 of column 1.  Correct?

22   A.    That's what she states.  Am I allowed to do a

23   "however"?

24          THE COURT:  I'm not sure what you are saying

25   she does state.  I'm not sure what your answer just

1    referred to.

2            Maybe we better go back.  Ask a question

3    again.

4    Q.    Let's go to the document then.

5            We went through column 1, and we agreed that

6    in the third paragraph she talks about ganciclovir.

7    Correct?

8    A.    Yes.

9    Q.    And then in the first sentence of the fifth

10   paragraph, she says:

11              "We have now found that amino

12          acid esters of the compounds referred

13          to above surprisingly have advan-

14          tageous bioavailability when adminis-

15          tered by the oral route resulting in

16          exceptionally high levels of the

17          parent compound in the body."

18           What I'm asking you is:  If you take her at

19   her word here -- we don't have the questions that you

20   raised in PTX-754.  She is telling us we are going to

21   get high levels of the parent compound in the body

22   with the amino acid esters of ganciclovir.  Correct?

23   A.    That's what she says, but I disagree with the

24   generality you are using here.

25   Q.    We have talked about some data for amino acid

*Stella - Cross/Jennings*                                55

1   esters for ganciclovir.  Correct?

2   A.    You mean from the '953 patent and the Malcolm

3   declaration?

4   Q.    You talk about some data.  Correct?

5   A.    Yes.

6   Q.    You do recall the applicants acknowledged there

7   were errors with respect to the data in their patent.

8   Correct?

9   A.    They acknowledged there was inadequacy the way

10  the data was evaluated.

11  Q.    And they submitted a declaration to -- in fact,

12  they expressly explicitly withdrew any reliance on the

13  data in the patent; didn't they?

14  A.    That's because --

15        THE COURT:  Just answer the question.

16        THE WITNESS:  Sorry.

17  Q.    They explicitly withdrew any reliance on the

18  data in the patent.  Correct?

19  A.    I believe they -- I don't remember reading -- I

20  remember reading, but I don't remember the exact

21  language.  So I don't know if it is consistent with

22  what you just said.

23        MR. JENNINGS:  That language is available for

24  the Court.

25  Q.    If we talk about the data that was submitted in

*Stella - Cross/Jennings*                                    56

1   the declaration, we have data for two amino acid

2   esters of ganciclovir.  Correct?

3   A.     Yes.

4   Q.     And we have the bis-valine ester.  Correct?

5   A.     That's correct.

6   Q.     That was a five-fold increase over ganciclovir.

7   Correct?

8   A.     Yes it was.

9   Q.     So that's consistent with what Beauchamp says

10  right here in paragraph 5 of column 1 of her patent.

11  Correct?

12  A.     That is correct.

13  Q.     And we also have data for the mono-L-valine

14  ester.  Correct?

15  A.     In the Malcolm declaration.

16  Q.     Yes.

17  A.     Not in the '339 patent.

18  Q.     Okay.  And we have that data.  Correct?

19  A.     Yes.

20  Q.     And that data is also consistent with what

21  Beauchamp says in column 5 of her '339 patent.

22  Correct?

23  A.     Yes, and she could not have determined that

24  because she never made it.

25  Q.     You have no personal knowledge of what

*Stella - Cross/Jennings*                                    57

1    Dr. Beauchamp actually did.   Correct?

2    A.    How can I have knowledge of what Dr. Beauchamp

3    did.   I can only go on what's in the '339 patent.

4    Q.    You just testified what she did.  You have no

5    personal knowledge?

6    A.    No, I have no personal knowledge.

7    Q.    She says you are going to get this improved

8    bioavailability and exceptionally high levels of the

9    parent compound in the body, and we have data for two

10   examples of amino acids of ganciclovir, and her

11   statement holds true for each of them.   Correct?

12   A.    Only for those -- yes, only holds  true for

13   those she made.

14   Q.    Her statement in paragraph 5, column 1, holds

15   true for each of the amino acid esters of ganciclovir

16   for which we have looked at data.   Correct?

17   A.    She doesn't present any data -- sorry.  You are

18   referring to the Malcolm declaration?

19   Q.    Yes.

20   A.    Say it again.   I was thinking you were referring

21   to the '339 patent.

22   Q.    She has a statement in her '339 patent that says

23   you are going to have improved oral bioavailability

24   and exceptionally high levels of the parent compound

25   in the body for amino acid esters of ganciclovir.

*Stella - Cross/Jennings*                                    58

1    Correct?

2    A.    She said that, and she could not have done the

3    mono-ester.

4          MR. VERDIRAME:   Objection.

5    Q.    But she says that.  Correct?

6    A.    She says that.

7    Q.    And sitting here today, we have looked at two

8    amino acid esters of ganciclovir.  Correct?

9    A.    Again, are you referring to the Malcolm?

10   Q.    Yes.  Correct?

11   A.    Yes.

12   Q.    And that data is consistent with what Beauchamp

13   says one gets with the amino acid esters of

14   ganciclovir.  Correct?

15   A.    That's an outstanding result.

16   Q.    And you haven't referred us to any data --

17   strike that.

18          There are four amino acid esters mentioned by

19   name -- strike that.

20          There are four amino acids referenced by name

21   in Beauchamp's '339 patent.  Correct?

22   A.    Yes.  And the preferred number is actually 14.

23   Q.    There are four amino acids mentioned by name in

24   the '339 patent.  Correct?

25   A.    That's correct.

*Stella - Cross/Jennings*                               59

1   Q.    And valine is one of the four?

2   A.    Yes.

3   Q.    And we reviewed data for valine both as a bis

4   ester and mono-ester.  Correct?

5   A.    Yes.

6   Q.    And both have improved bioavailability, and you

7   haven't pointed us to any data for any of the other

8   three that did not conform to what Beauchamp says in

9   paragraph 5 of column 1.  Correct?

10  A.    Could you restate that, please?

11  Q.    We have improved bioavailability for both of the

12  valine esters of ganciclovir, and you have not pointed

13  us to any data for any of the other three that she

14  names in her '339 patent where her statement in

15  paragraph 5 is not correct?

16        MR. VERDIRAME:  Your Honor, I object to this

17  question.  Counsel is trying to rewrite the '339

18  patent by including information from the Malcolm

19  declaration into the patent which is not there.

20        THE COURT:  It is not clear to me at all

21  that's what he is doing, and I'm going to let him

22  probe this.  He is probing this expert's opinions.

23        THE WITNESS:  It's been a while since I read

24  the '339 patent.

25        THE COURT:  Why don't you direct him to the

*Stella - Cross/Jennings*                                    60

1   portion of it you would like him to look at.

2          Are you going to be awhile, Mr. Jennings?

3          MR. JENNINGS:  Could be 15 minutes.

4          THE COURT:  Let's take a break for a moment,

5   and you can bring him back in the patent.

6          You may step down.

7          (Witness temporarily excused.)

8          THE CLERK:  All rise.

9          (Recess.)

10          (Continued on the next page.)

11   ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Stella - Cross/Jennings*                               61

1              (In open court.)

2              THE CLERK:  All rise.

3              THE COURT:  Thank you.  Everyone may be

4    seated.

5              Thank you.  Mr. Jennings, you may proceed

6

7    **VALENTINO J. STELLA**, resumed.

8

9    CROSS-EXAMINATION (continued)

10   BY MR. JENNINGS:

11   Q.    Dr. Stella, we were discussing Beauchamp's '339

12   patent which is DX-101 in your binder.

13              I would like to draw your attention to the

14   paragraph on column 2 starting at about line 17.  Do

15   you see these four amino acids referred to by name:

16   glycine, alanine, valine, and isoleucine?

17   A.    Yes.

18   Q.    The preference for the L amino acid is also

19   stated here in this paragraph?

20   A.    Yes.

21   Q.    And for esters with these four amino acids, have

22   you seen any data inconsistent with the statement in

23   the first sentence of paragraph 5 of column 1 -- and

24   I'll read you that sentence:

25                   "We have now found that amino

*Stella - Cross/Jennings*                                    62

1           acid esters of the compounds referred

2           to above surprisingly have advan-

3           tageous bioavailability when adminis-

4           tered by the oral route resulting in

5           exceptionally high levels of the

6           parent compound in the body."

7    A.    I would like to go back and just read the

8    information on column 1 just to make sure I fully

9    understand the context.

10   Q.    The context is this sentence here in paragraph 5

11   of column 1, and with respect to that first sentence

12   of paragraph 5 of column 1, would you agree --

13   A.    What I want to do is look at what is said about

14   amino acid esters in column 1.  So I just want to

15   refresh my memory on that.

16         Will you hold off for a minute while I read

17   that again?

18         THE COURT:  The question mentions the

19   compounds referred to above.

20         THE WITNESS:  I just want to read that for one

21   second.

22         (Pause.)

23   A.    Yes.

24   Q.    You have that sentence in mind?

25   A.    Yes.

*Stella - Cross/Jennings*                                    63

1   Q.    And valganciclovir is one of the compounds

2   referred to above.   Correct?

3   A.    That's correct.

4   Q.    With respect to the amino acids glycine,

5   alanine, valine, and isoleucine, we have seen no data

6   inconsistent with the statement in paragraph 5, first

7   sentence.   Correct?

8   A.    No.   Can I go back to that?

9   Q.    We have seen no data inconsistent with this

10  statement?

11  A.    No.   The only data that I want to --

12  Q.    It's just not clear.   When I say we have seen no

13  data inconsistent, is that a correct statement?

14  A.    Yes.

15  Q.    Now, you will agree -- we have to take -- that's

16  the rule here.   We have to take Dr. Beauchamp for what

17  she says at face value.   Correct?

18  A.    On the bioavailability, yes.

19  Q.    So you agree that's the rules here, we take her

20  at face value when she says she discovered

21  "advantageous bioavailability when administered by the

22  oral route resulting in exceptionally high levels of

23  the parent compound in the body"?

24  A.    I have to take her at her word, but she can only

25  support that with the data on compounds she made, and

*Stella - Cross/Jennings*                                    64

1    the only compounds that are shown here in the examples

2    1 through 6, not all of them are ganciclovir, are

3    compounds related to the bis-esters.

4          So that bioavailability statement could not be

5    asserted to mono-esters because they were never made

6    and tested.

7    Q.    Let's look at what the examiner said with

8    respect to the rules taking Dr. Beauchamp at her word

9    in her U.S. patent.

10          If you could turn, please, to Defendant's

11   Exhibit 10 -- this is the big binder -- at page 1037,

12   the examiner stated:

13                "This is a U.S. patent, and

14          what it says is taken at face value

15          unless persuasive reasons are

16          presented to show that the statements

17          are inaccurate.  That has not been

18          done here.  Applicants have made no

19          attempt to show inaccuracy but,

20          instead, try to read the reference as

21          if there were no teaching that

22          mono-esters are useful for this

23          utility."

24          That's what the examiner said.  Correct?

25   A.    That's what the examiner said.

*Stella - Cross/Jennings*                    65

1  Q.    And you today are trying to read the reference

2  as if there is no teaching that mono-esters are useful

3  for this utility.  That's how you are trying to read

4  the reference today.  Is that correct?

5  A.    All I am saying is the reference to bioavaila-

6  bility that was in the '339 patent could not have been

7  to a mono-ester because the mono-esters were never

8  made.  Bioavailability of the mono-esters were never

9  assessed because to assess them you would have had to

10 make them, and they were never made.

11       My feeling, my expert opinion is that you

12 cannot read into bioavailability in that statement

13 that you are referring to, to the mono-esters, because

14 they were never made and, therefore, could not have

15 been determined.

16 Q.    You have no personal knowledge as to what was

17 ever made.  Your statement is based entirely on the

18 fact there was not an example specifically making the

19 mono-ester in the patent.  But you have no personal

20 knowledge that Dr. Beauchamp never made a mono-ester.

21 Correct?

22 A.    No, I do not know that Dr. Beauchamp made a

23 mono-ester.

24 Q.    Now, will you agree that the named vendors of

25 the '953 patent identified valganciclovir as the lead

*Stella - Cross/Jennings*                                    66

1    prodrug for ganciclovir using the same prodrug

2    approach as that for acyclovir?

3    A.    The patent defines valganciclovir hydrochloride

4    in crystalline form, and that's what they are

5    claiming.

6    Q.    Do you agree that the named vendors of the '953

7    patent identified valganciclovir as the lead prodrug

8    for ganciclovir using the same prodrug approach as

9    that for acyclovir?

10   A.    If they used the same approach for ganciclovir

11   as they used for acyclovir, they would have made the

12   bis-esters.

13   Q.    So you disagree with my statement?

14   A.    Yes.

15   Q.    Could you please turn to the exhibit marked 809

16   for identification in your binder.  It is excerpts

17   from the Journal of Pharmaceutical Sciences.

18   A.    Yes.

19   Q.    You are familiar with the Journal of

20   Pharmaceutical Sciences?

21   A.    Yes, I am.

22   Q.    Are you part of the editorial board?

23   A.    Yes, I am.

24   Q.    Could you please turn to page 1109 of the

25   journal.  Do you have that before you?

*Stella - Cross/Jennings*                                            67

1    A.    Yes.

2    Q.    This is an article titled "Prodrugs of

3    Nucleoside Analogues for Improved Oral Absorption and

4    Tissue Targeting."  Did I read that correctly?

5    A.    Yes.

6    Q.    One of the authors is Hans Maag, one of the

7    named vendors of the '953 patent.  Is that correct?

8    A.    That's correct.

9    Q.    And the article identifies him as a member of

10   the Department of Medicinal Chemistry, Roche Palo

11   Alto, LLC.  Correct?

12   A.    Yes.

13   Q.    Could you please turn to page 1114 of the

14   journal article.

15         Do you see in the bottom right-hand section of

16   Dr. Maag's article there is a title, "Acyclovir and

17   Valacyclovir"?

18   A.    Yes.

19   Q.    Could you please turn to page 1116 of the

20   article.

21         The next section is titled, "Ganciclovir and

22   Valganciclovir."  Correct?

23   A.    Yes.

24   Q.    And the first sentence of that sentence

25   states:

*Stella - Cross/Jennings*                                            68

1              "Ganciclovir structurally similar

2          to acyclovir but differing from the

3          latter by the addition of a hydro-

4          xymethyl group to the side chain is

5          also active against HSV and cyto-

6          megalovirus CMV."

7          Did I read that correctly?

8    A.    Yes.

9    Q.    HSV is herpes simplex virus.  Correct?

10   A.    That's correct.

11   Q.    Could you please turn to page 117.

12   A.    Yes.

13   Q.    The first sentence of the first full paragraph

14   on the left-hand column states:

15              "Using the same prodrug approach

16          as that for acyclovir, the valine

17          ester of ganciclovir (valganciclovir)

18          was identified as the lead prodrug

19          based on marked increase in oral

20          bioavailability."

21          Did I read that correctly?

22   A.    That's correct.

23   Q.    That's what the inventor said about the

24   identification of valganciclovir as the lead prodrug.

25   Correct?

*Stella - Redirect/Verdirame*                                        69

1    A.     That was in 2008.

2    Q.     Is that what the inventor said --

3    A.     Yes, that was in 2008, and that's hindsight.

4           THE COURT:  All you need to do is answer the

5    question.  If they want to follow up on something on

6    redirect, they may.

7    Q.     That's what the inventor said.  Correct?

8    A.     Yes.

9    Q.     The inventor said he used the same prodrug

10   approach.  Correct?

11   A.     That is correct.

12          MR. JENNINGS:  Thank you, sir.  No further

13   questions.

14          THE COURT:  Mr. Verdirame.

15

16   REDIRECT EXAMINATION

17   BY MR. VERDIRAME:

18   Q.     Dr. Stella, please keep that publication in

19   front of you.  DX-809.

20          That's still in front of you?

21   A.     Yes.

22   Q.     Counsel just asked you about page 117 of that

23   publication?

24   A.     Yes.

25   Q.     Could you please turn to page 116 right before

*Stella - Redirect/Verdirame* 70

1   it, and the second column towards the middle of the

2   bottom right-hand paragraph --

3           MR. JENNINGS:  Hearsay, your Honor.

4           THE COURT:  Are we looking at Dr. Maag's --

5           MR. VERDIRAME:  The same publication, yes.

6           MR. JENNINGS:  Objection; hearsay.

7           THE COURT:  He is not offering it for the

8   truth.  You asked him about the document, whether he

9   agrees with it.  Let me hear the question.

10  BY MR. VERDIRAME:

11  Q.   Dr. Stella, do you see in the middle of the

12  paragraph on the right, on the bottom, the publication

13  says:

14           "Prodrugs approaches were

15           applied to improve oral bioavaila-

16           bility of ganciclovir."

17           Do you see that?

18  A.   Yes.

19           MR. VERDIRAME:  I have no further questions,

20  your Honor.

21           THE COURT:  All right.  Thank you.

22           MR. JENNINGS:  Your Honor, it's hearsay.  It's

23  a party offering their own statement out of court.

24           THE COURT:  I don't have the document before

25  me.  Let me see what it is.  Is it a declaration?  Is

*Stella - Redirect/Verdirame*                71

1    it a publication?

2         MR. VERDIRAME:  Publication.

3         THE COURT:  You asked him about what was said

4    in the publication.  The whole publication is hearsay.

5    The questions that you asked him about, what went on,

6    I haven't heard him say that he'd actually done.  I'm

7    not admitting it for the truth.  It was written there.

8         MR. JENNINGS:  It was an admission for a party

9    opponent.

10        THE COURT:  I'm not admitting it for the truth

11   of the statement that's indeed what he did in the

12   study.

13        MR. JENNINGS:  I'm using it to impeach the

14   expert witness' testimony that they did not apply the

15   same prodrug approach.  An admission of a party

16   opponent is admissible to impeach the expert testimony

17   of Dr. Stella.

18        THE COURT:  What is the purpose for which you

19   are admitting this statement?

20        MR. VERDIRAME:  Counsel had focused on one

21   part of the prodrug.

22        THE COURT:  Dr. Maag is coming.  Let's wait

23   and have him do it.  I'll strike that, and you can

24   bring it up with him.

25        MR. VERDIRAME:  Very well.

*Maag - Direct/Pezzano*                                          72

1          THE COURT:  Thank you, Dr. Stella.  You are

2    excused.

3          (Witness excused.)

4          MR. PEZZANO:  Your Honor, our next witness

5    will be Dr. Hans Maag.  He is the vendor of Roche's

6    patent No. 6083953, the '953 patent in suit.

7          He is currently the Vice President and deputy

8    head of chemistry of plaintiff, Roche Palo Alto, LLC,

9    and has been employed by Roche and its predecessor

10   company Syntex U.S.A., Inc., since 1975.

11         Dr. Maag will lay a foundation for the powder

12   X-ray diffraction analysis in June 1994 of the

13   crystalline valganciclovir hydrochloride embodiment of

14   the claimed invention shown in PTX-255 A.

15

16   **HANS MAAG**, called as a witness on behalf of the

17   plaintiff, having been first duly sworn, testified as

18   follows:

19

20   DIRECT EXAMINATION

21   BY MR. PEZZANO:

22   Q.   Dr. Maag, please state your home address for the

23   record.

24   A.   My address is 442 Saul Saleto Boulevard in Saul

25   Saleto, California.

*Maag - Direct/Pezzano*                                73

1    Q.    Are you currently employed?

2    A.    I'm employed by Roche Palo Alto.

3    Q.    What is your current title?

4    A.    My current title is Vice President of Chemistry

5    and Deputy Head of Chemistry in Palo Alto.

6    Q.    How long have you held those positions?

7    A.    I became Vice President in 2001 and Deputy Head

8    in 2003.

9    Q.    When did you begin your employment with Roche?

10   A.    I started my career at Roche in New Jersey in

11   1975.  I moved to Syntex in Palo Alto in 1985, and

12   Syntex was acquired by Roche in 1995.

13   Q.    So you left Roche and then landed back at Roche?

14   A.    Yes, that's correct.

15   Q.    Approximately when was the Roche acquisition of

16   Syntex?

17   A.    The acquisition of Syntex happened in 1995.  It

18   was completed in 1995.

19   Q.    While you were at Syntex before the acquisition,

20   what type of work did you do?

21   A.    Through my career industry, I always worked as a

22   medicinal chemist in all locations.

23   Q.    Including Roche?

24   A.    Including Roche.

25   Q.    For purposes of facilitating your testimony here

*Maag - Direct/Pezzano*                                    74

1    today, do you understand that the reference to Roche

2    includes the predecessor Syntex?

3    A.    I understand that.

4    Q.    Can you summarize chronologically your

5    educational background.

6    A.    I received my undergraduate training at the

7    Federal Institute of Technology in Zurich,

8    Switzerland, and finished the undergraduate studies

9    with what we call a diploma, which is roughly

10   equivalent to a Bachelor of Science in the U.S..  I

11   continued at that institute for graduate studies and

12   received a doctorate in science and technology which

13   is roughly equivalent to a Ph.D. in this country.

14   Q.    And was your doctorate degree in organic

15   chemistry?

16   A.    My degree is in organic chemistry, particularly

17   in synthetic chemistry.

18   Q.    I would like to direct your attention now to

19   Plaintiff's Exhibit No. 1.  It's on the screen.

20        Are you aware the '953 patent is the subject

21   of this lawsuit?

22   A.    Yes.

23   Q.    And are you an inventor of the claimed invention

24   of this patent?

25   A.    Yes.  I'm an inventor on this patent.

*Maag - Direct/Pezzano*                                    75

1    Q.    If you turn in the patent to column 30.   There

2    are six claims listed there.   You can look in your

3    binder in front of you.

4          Are you one of the vendors of the subject

5    matter of these claims?

6    A.    Yes, I am.

7    Q.    Who are your co-vendors?

8    A.    John Nestor, Scott Womble, Paul Fatheree and

9    Charles Dvorak.

10   Q.    Now, I would like to direct your attention to

11   PTX-255 A.   That's in your binder, and we will show it

12   on the screen as well.

13         Have you seen this powder X-ray diffraction

14   analysis before?

15   A.    Yes, I have.

16   Q.    At the top of the page of the powder X-ray

17   diffraction analysis what is the No. 18951-142-60?

18   A.    This number indicates the sample as referenced

19   by a notebook.   The notebook is 18951 and the page is

20   142.

21   Q.    Now, I would like to direct your attention to

22   the next exhibit which is also in your binder,

23   PTX-255 B.

24         What is shown here in PTX-255 B?

25   A.    On this exhibit is a copy of a log book held in

*Maag - Direct/Pezzano*                                      76

1   the Analytical Department listing the experiments done

2   with a particular instrument.

3   Q.    What is the log book that you are referring to?

4   A.    The log book shows the experiment being done on

5   an XRD powder diffraction equipment.

6   Q.    Does this log book also include analyses you

7   have requested from the Analytical Department?

8   A.    This log book has on the top line an entry which

9   refers to valganciclovir hydrochloride, and I do not

10  recall the exact circumstances.  I was leading that

11  effort at the time.  So, indirectly, I must have

12  requested this analysis.

13  Q.    Does the log book entry that you referred to

14  correspond to -- does the log book entry that you been

15  referred to on PTX-255 B correspond to PTX-255 A X-ray

16  powder diffraction analysis?

17  A.    The top line refers to the same sample as is in

18  PTX-255 A.  The connection is through the lab notebook

19  reference, 18951-142-60, as well as through the file

20  name and the lab reference number, which is 086644.

21  Q.    And on the log book entry, what is the date that

22  is shown here?

23  A.    The log book entry is June 1994.  On this copy,

24  unfortunately, one digit is cut off.  I would estimate

25  it is possibly June 10th, 1994.

*Maag - Direct/Pezzano*                    77

1    Q.    Why do you estimate it is June 10, 1994?

2    A.    Because one can see a zero, and the sample which

3    was reference sample, which was referenced here, was

4    prepared June 2nd, 1994.  Also, to add, lower down in

5    this log book is a date of June 17th.  So the top line

6    has to be before June 17th, and, therefore, it is

7    likely June 10th, 1994.

8    Q.    What is the significance of that date "June 10"

9    or "June 1994"?

10   A.    It clearly demonstrates that this material was

11   analyzed very soon after it was prepared in June 1994.

12   Q.    Who was the analytical chemist for this material

13   identified on the log book entry?

14   A.    The analytical chemist analyzing the sample is

15   Larry Norder.

16   Q.    Who is Larry Norder?

17   A.    He, at that time, was employed as an analytical

18   chemist at Syntex.

19   Q.    Now, turning back to the powder X-ray

20   diffraction analysis, PTX-255 A?

21         In the upper left-hand corner of this powder

22   X-ray diffraction analysis there is a date June 23,

23   2004.  Do you see that?

24   A.    Yes.

25   Q.    What is that date?

1    A.     That date is an error.  It does not correspond

2    to the log book entry, nor, to my understanding, when

3    the sample was actually recorded.

4    Q.     What should that date be?

5    A.     The date should be June 10th, 1994.

6    Q.     If you turn to PTX-255 C now, these are three

7    laboratory notebook pages bearing Bates numbers

8    R0315573 through 75.  Have you seen these before?

9    A.     Yes, I have.

10   Q.     Who is the author of these laboratory notebook

11   pages?

12   A.     These are notebook pages from the work of Paul

13   Fatheree.

14   Q.     What is shown on these pages?

15   A.     These pages show the first experiments to

16   prepare valganciclovir hydrochloride, and this

17   particular page details the hydroxynation step to

18   remove the protecting groups.

19   Q.     If you turn to the next page, what is shown on

20   the second page, which is Bates No. RO315574?

21   A.     The second page shows the continuation, and, in

22   particular, the crystallization of 1 gram of the

23   material obtained on the previous page.

24   Q.     What is the designation of that material that

25   you are referring to?

*Maag - Direct/Pezzano*                                    79

1    A.    The designation of 0.65 grams of crystals as the

2    lab notebook reference 18951-1-42-60.

3    Q.    Is that the lab notebook entry that matches up

4    with the X-ray powder diffraction pattern shown on

5    PTX-255 A and the log book PTX-255 B?

6    A.    Yes, these numbers match.

7    Q.    Now, what is shown on the third page of this

8    document, the third laboratory notebook page,

9    RO315574?

10   A.    The third page shows an almost identical

11   experiment as on the first page except on a somewhat

12   larger scale.

13   Q.    Now, I would like to direct your attention to

14   the '953 patent, which is Exhibit 1.  Is the work that

15   is disclosed on these laboratory notebook pages

16   R0315573 through 75 on PTX-255 C disclosed in the '953

17   patent?

18   A.    In the patent it's not exactly the same experi-

19   ment.  The experiment in example 3 was conducted on a

20   larger scale.  But in terms of the transformation and

21   the way of isolation, it is essentially identical.

22   Q.    Let's turn back to those laboratory notebook

23   pages again shown in PTX-255 CA.

24         What was your role in the work in connection

25   with those laboratory notebook pages?

1   A.     At that time I directed the prodrug effort for

2   ganciclovir, and in my role, I directed Paul Fatheree

3   to conduct these experiments.

4   Q.     And did he report this work to you?

5   A.     He reported the results to me on essentially a

6   daily basis.  Most communications were done verbally.

7   And I certainly visited his lab very frequently.

8   Q.     Now, turning back to the second page of

9   PTX-255 C, and the sample you have identified by the

10  designation 18951-142-60, what was the date this

11  sample was obtained?

12  A.     The date associated with this sample is June

13  2nd, 1994.

14  Q.     What is the compound that is the subject of this

15  sample?

16  A.     The compound is valganciclovir hydrochloride.

17  Q.     What is the date that Paul Fatheree signed this

18  laboratory notebook page?

19  A.     He signed it on June 23, 1994.

20  Q.     And was this sample the subject of the powder

21  X-ray diffraction pattern shown on PTX-255 A?

22  A.     Yes.

23  Q.     Now, I would like to direct your attention --

24  let's turn to that powder X-ray diffraction again,

25  PTX-255 A.

1          There is a number at the top RS79070-294.  Do

2    you see that?

3    A.    Yes.

4    Q.    If you turn to PTX-255 B on the log book entry,

5    is the same number written down under the heading

6    compound 79070-294?

7    A.    Yes.

8    Q.    And that's in handwriting on the log book entry.

9    Correct?

10   A.    Correct.

11   Q.    Is it fair to say that handwritten entry was

12   later typed onto the X-ray powder diffraction pattern

13   PTX-255 A?

14   A.    Yes, that's likely the event.

15   Q.    Now, is that an accurate identifier for the

16   sample that is the subject of the X-ray powder

17   diffraction pattern in PTX-255 A?

18   A.    It is not absolutely correct in that the first

19   five digits, 79070, designate the compound which is

20   valganciclovir.  However, 294 would be used for acidic

21   acid salt, whereas for the hydrochloride, what was

22   supposed to be used is 194.  We had at that time at

23   Syntex a very rather complex numbering system.

24          MR. PEZZANO:  I have no further questions,

25   your Honor.

*Maag - Direct/Pezzano*                                     82

1          I would like to offer into evidence

2    Plaintiff's Exhibits 255 A, 255 B, and 255 C.

3          MR. OLSON:  Your Honor, 255 A is already in

4    evidence.  We object to the introduction of 255 B,

5    which is apparently an XRD log book, which this

6    witness would have no personal familiarity with, nor

7    would he have prepared this.  He is basically giving

8    his 14-year after-the-fact assessment what he believes

9    now, without any personal knowledge, with respect to

10   what actually occurred.  He is trying to explain away

11   dates he says are in error on the scan and designa-

12   tions for the different salts than what he says now is

13   the case, the hydrochloride salt.

14          And with respect to 255 C, this, of course, is

15   not his notebook.  He indicated in his testimony he

16   verbally communicated primarily with Fatheree; and, in

17   addition, we were never provided with Mr. Fatheree's

18   entire notebook.  They indicated during discovery that

19   they tried to locate it and could not.  So we were

20   provided with literally a handful of pages of the

21   notebook.  I'm not suggesting it exists somewhere.

22   They just can't find it.  They tried.  They couldn't

23   produce it.  And what the witness is doing, he is

24   making assumptions that certain things are correct on

25   these documents and certain things are incorrect when

*Maag - Direct/Pezzano*                                              83

1    it could be just the reverse.

2         What he's assuming are errors might be

3    accurate, and what he is assuming is correct might be

4    inaccurate, and he doesn't know because he is just

5    giving us his present day assessment of these

6    documents, which he had no direct involvement in.  He

7    is not knowledgeable about XRD scans or patterns.  He

8    left that up to the Analytical Department.  He is not

9    part of that department and never has been.

10        THE COURT:  Mr. Pezzano, let's take them one

11   document at a time.  255 B first.

12        MR. PEZZANO:  255 B, that's the log book.  The

13   witness clearly testified this was a log book that was

14   maintained by Roche's Analytical Department.  He is

15   involved in requesting analyses -- and so are the

16   other medicinal chemists at Roche -- requesting

17   analyses by the Analytical Department.

18        He is fully aware, as he testified, his log

19   book entry notebook exists, and he was in charge of

20   the very project relating to the prodrug project

21   development for valganciclovir hydrochloride.  He

22   directed this very research that is designated in this

23   log book entry, notebook entry 18951-142-60, which

24   appears in the X-ray powder diffraction --

25        THE COURT:  The problem is, Mr. Pezzano,

*Maag - Direct/Pezzano*                                    84

1    assume for the moment that he can identify what was

2    kept by this department.  He has gone beyond that, to

3    testify what he believes is an inaccuracy.  He

4    distinguished 294 versus 194.  I can't accept that

5    testimony from him.  This document may come in as

6    something that was maintained, but it comes in

7    whatever it is, without him giving substance to

8    whether that was an error or not.  I don't know that

9    Mr. Olson objects on that ground without testifying

10   about what that 294 versus that 194 number would mean.

11        MR. PEZZANO:  This witness has been involved,

12   and exhibits that were marked in this very action.

13   For example, DX-594 is one where the very valgan-

14   ciclovir hydrochloride entry 79074-194 is identified

15   on that document.  Dr. Maag was involved.  He authored

16   that very document.  So he is fully familiar with the

17   designation 79070-194 --

18        THE COURT:  What he says is -- this was his

19   testimony when you asked him about that:

20             "It is not absolutely correct in

21        that the first five digits, 79070,

22        designate the compound which is

23        valganciclovir.  However, the 294

24        would be used for acidic acid salt,

25        whereas for the hydrochloride that was

*Maag - Direct/Pezzano*                                            85

1      supposed to be used as 194."

2          Then he goes on to say:

3              "We had a complex numbering

4          system."

5          But he doesn't verify what they used.  He

6   can't tell us what they actually did in there.  No, I

7   can only accept this document as it appears.  He is

8   not the witness to be explaining if an error was done

9   in transcription here or what was actually done on

10  that day.  I have the document for what it is.  It

11  says what it says, and we can draw inferences from it

12  the same way he perhaps has, but he can't tell us

13  definitively.

14         Your exhibit is admitted in the manner which

15  it is, but the testimony is limited on that issue.

16         (Plaintiff's Exhibit No. 255 B was

17         received in evidence.)

18         THE COURT:  Let's go to 255 C.

19         MR. PEZZANO:  They are the very laboratory

20  notebook pages, and the witness testified he directed

21  this very work on these laboratory notebook pages.

22         THE COURT:  Did he ever see these laboratory

23  notebook pages prior to this case?

24         Mr. Maag, did you see these laboratory

25  notebook pages at any time when the work was being

*Maag - Direct/Pezzano*                                         86

1    done?

2          THE WITNESS:  I do not recall the specific

3    instances.  I worked very closely with Paul Fatheree.

4    I visited his lab.  I reviewed the results, and I do

5    not recall at what point I saw these notebook pages

6    the first time.

7          MR. PEZZANO:  It's about 15 years ago.

8    Dr. Maag was in charge of the project, and he did, as

9    he testified, clearly direct the very work that occurs

10   on these pages; and, as he's indicated, he was

11   familiar with the results and communicated with his

12   co-vendors regarding those results.

13         THE COURT:  What did he testify as to these

14   pages in C?

15         MR. PEZZANO:  He testified that he directed

16   this work to be undertaken by his co-vendors and that

17   they reported this work to him.

18         THE COURT:  Now, Mr. Olson, your objection to

19   C is what?  I know you said you don't have the whole

20   notebook.  But with regard to these specific pages,

21   what is your objection?

22         MR. OLSON:  And, of course, it is not his lab

23   book.

24         THE COURT:  I understand.

25         MR. OLSON:  An additional comment here, your

1    Honor, and it goes to not seeing the other pages is

2    that the reason there is interest in these pages of

3    this lab book, is that it bears this identification

4    number, the dash 60, which they then try to apply to

5    these other documents.  The point here, your Honor,

6    there may well be other pages from his notebook that

7    we don't have with an acetate experiment perhaps that

8    relates to this, but they are saying this relates to

9    this, their hydrochloride experiment relates to what

10   on their face are acetic acid experiments.

11        THE COURT:  Let me understand how these

12   notebook pages were produced and why only these were

13   available on not the entire notebook.

14        MR. PEZZANO:  This was the subject of

15   intensive discovery in the case.  We responded in

16   detail in interrogatories 4 and 5 as to why this

17   notebook is missing.  We had a Rule 30(b)(6)

18   deposition of Roche's designee Brian Buckwalter.  He

19   stated the entire notebook is missing, and the library

20   has -- and this very document PTX-182, this is a Roche

21   library record, that indicates the notebook which was

22   stored in the library is missing.

23        THE COURT:  How are these pages available?

24        MR. PEZZANO:  These pages were available

25   because there were invention disclosures that were

1   submitted to the attorneys as to what the invention of

2   valganciclovir hydrochloride was, and, therefore, they

3   were separate and apart from the notebook.  That's why

4   these pages exist, because they were separately

5   documented and provided to the attorneys in connection

6   with the prosecution of the patent application leading

7   to the '953 patent, and, therefore, that's why they

8   existed separately from the entire notebook in Roche's

9   files.  The entire notebook, however, to this date is

10  missing, based on all the information I previously

11  told you.

12          THE COURT:  Where is Mr. Fatheree or

13  Dr. Fatheree?

14          MR. PEZZANO:  Mr. Fatheree is located in

15  California.  He is no longer employed by Roche.  They

16  did take Dr. Fatheree's deposition.

17          THE COURT:  Was he questioned about these

18  pages?

19          MR. PEZZANO:  Yes.

20          THE COURT:  What did he say?

21          MR. PEZZANO:  He testified these pages were

22  his work that led to the invention of the '953 patent.

23          THE COURT:  Okay.  I think what I'm hearing,

24  Mr. Olson, more is I don't really think I have an

25  issue of authentication, given all of that.  I can

*Maag - Cross/Olson*                                    89

1   admit them, but I understand your argument will be as

2   to the weight to be given to them because the other

3   pages are missing.

4          In that limited context, I'll admit them, and

5   you can make whatever arguments you want, whether they

6   demonstrate all the work that was done or whether this

7   is something else.

8          (Plaintiff's Exhibit No. 255 C was

9          received in evidence.)

10         THE COURT:  Mr. Olson.

11         MR. OLSON:  Just to remind your Honor, this

12  is, basically, we are treating this as our direct.

13         THE COURT:  I understand.  We had this

14  discussion last week.

15

16  DIRECT EXAMINATION

17  BY MR. OLSON:

18  Q.    Good morning.

19  A.    Good morning.

20  Q.    Dr. Maag, just to try and make this go as easily

21  as possible, you have been handed a binder, and that

22  binder contains, at the front, your two depositions

23  that were taken in this case, which we may or may not

24  refer to, but they are there.

25         And then following that, there are a series of

*Maag - Cross/Olson*                                    90

1    exhibits, and they are arranged by DX numbers first.

2    So I'll call out DX chronologically; and after all the

3    DX numbers, there are PTX numbers, which are at the

4    back, and those are Roche's numbers.   Okay?

5    A.    Okay.

6    Q.    Now, I have a question for you with respect to a

7    different scan than you were asked about in your

8    direct.   It's a scan that's in evidence, and it is in

9    the back of your binder, and it's PTX-281 A.

10           This is another scan different than the one

11   you looked at this morning, 255 A.   Correct?

12   A.    Correct.

13   Q.    But similar format, similar style.   I don't mean

14   the scan itself, the information?

15   A.    Yes.

16   Q.    Now, will you agree with me, like the 255 A

17   scan, it bears an ID number on the scan?

18   A.    Yes.

19   Q.    And, specifically, that ID number is 79070 Lot

20   108, and then slash ETOH, which, can we agree, Doctor,

21   that would stand for the solvent ethanol?

22   A.    Yes.

23   Q.    If we look at one other scan, 282 A, which is

24   also in evidence, that's another XRD scan, and it also

25   bears an ID number on it, and that ID number is 79070

*Maag - Cross/Olson*                                    91

1   Lot 108/ethanol/two-hour ambient.  Again, the ETOH

2   would refer to ethanol?

3   A.    Yes.

4   Q.    And can we agree the two-hour ambient would be

5   subjecting the sample to two hours of ambient

6   conditions?

7   A.    Right.

8   Q.    Now, if we look at DX-104, this is a Roche

9   preformulation book that is already in evidence.

10        Do you recognize it?

11  A.    Yes.

12  Q.    And it bears your name on the front of the

13  document.  Correct?

14  A.    Correct.  I'm on the distribution list.

15  Q.    So you would have received a copy of this at the

16  time?

17  A.    Yes.

18  Q.    And the time here is about -- it's dated March

19  22, 1996?

20  A.    Yes.

21  Q.    Then if we go to page 18 of DX-104 excipient, do

22  you see that there is a scheme 1 with various forms

23  indicated on that page with various letters, and the

24  letters are identified below the scheme.

25        Do you see that?

1    A.     Yes.

2    Q.     And if we look at E, "E" is recrystallization

3    from ethanol.  Do you agree I read that correctly?

4    A.     Yes.

5    Q.     So this document indicates that if you

6    recrystallize form X with ethanol, you obtain form B.

7           I'm just asking you whether this document

8    indicates that on this page?

9    A.     This scheme indicates that.

10   Q.     And the arrow here is shown as a one-way arrow,

11   not as a reversible arrow.  Would you agree with that?

12   A.     Yes.

13   Q.     Now, I would like to move to a different topic;

14   and, really, for the rest of the time here this

15   morning, I would like to discuss with you your

16   declaration that you submitted to the patent office in

17   connection with the '953 patent.  All right?

18   A.     Yes.

19   Q.     So let's look at that declaration.  It's DX-180.

20          Do you recognize this as the first page of

21   DX-180, your declaration?

22   A.     Yes.

23   Q.     Let's just turn to the last page 8 to see that

24   it bears a signature.  And will you confirm that's

25   your signature?

*Maag - Cross/Olson*                                    93

1   A.    Yes.

2   Q.    And it bears a date of April 6th, 1999, which

3   would be the date that you executed this declaration?

4   A.    Correct.

5   Q.    Now, let's turn to page 7 of DX-180, which is

6   the previous page.  And there is a conclusion section.

7         Are you with me?

8   A.    Yes.

9   Q.    And if we look at the first sentence of that

10  conclusion.  That's a fairly long sentence.  It's on

11  the screen.  It's blown up.

12         I would like to focus you on a particular

13  clause of that sentence, a particular aspect of the

14  sentence, and it is highlighted, and let me read that.

15  In the conclusion you make the statement:

16              "And the inability of others

17          to prepare crystalline ganciclovir

18          mono-L-valinate acetate."

19          Did I read that correctly?

20  A.    Yes.

21  Q.    That was one of the conclusions that you drew in

22  your declaration.  Is that fair?

23  A.    Yeah.  This is probably the first time I

24  realized that there is a clear error in this

25  statement, in that the second half of the sentence

1    should read:

2              "And the ability of others

3         to prepare crystalline ganciclovir."

4         THE COURT:  Why don't you go back and just

5    answer the question Mr. Olson asked.  He asked you:

6         Was that one of the conclusions that you drew

7    in your declaration?

8         THE WITNESS:  Yes.

9         THE COURT:  He answered it.  He said, "Yes."

10   BY MR. OLSON:

11   Q.   I'm directing my questions right now, Dr. Maag,

12   to that particular statement, the inability of others

13   to prepare the mono acetate.

14        Are you with me?

15   A.   Yes.

16   Q.   Now, you never personally prepared the mono

17   acetate.  Correct?

18   A.   Personally, no.

19   Q.   And at the time of this declaration, you were

20   not personally aware of anyone who had tried to

21   prepare the crystalline ganciclovir mono-L-valinate

22   acetate?

23   A.   The mono-L-valinate acetate was prepared in the

24   fall of 1993, and I would need to refer to the

25   notebook pages of Haiyingcai to ascertain what efforts

1    were made to crystallize his material.

2    Q.    If I understand the point you are trying to

3    make, you recall that someone prepared the mono

4    acetate, I believe you said, in '93?

5    A.    Right.

6    Q.    But you don't know whether that was crystalline?

7    A.    At the time I prepared this statement, I must

8    have had additional evidence, which at the moment I

9    don't recall.

10   Q.    Well, let me ask it this way.  I'm trying to get

11   to the basis of -- first of all, are you now

12   disagreeing with the statement in the declaration?

13   A.    No.

14   Q.    You are not trying to change the statement?

15   A.    No.

16   Q.    And the statement is the inability of others to

17   prepare the mono acetate; right?  That's the statement

18   we are talking about?

19   A.    Right.

20   Q.    You are not trying to change that?

21   A.    No.

22   Q.    Now, I want to ask you about the basis that you

23   made that statement in your declaration in 1999.  This

24   statement regarding the inability of others to prepare

25   the monovalinate acetate was purely based upon the

*Maag - Cross/Olson*                                             96

1   fact that you were given this statement by your

2   counsel at the time.   Correct?

3   A.    The declaration was prepared with counsel, and I

4   included all the information which was available at

5   that time to me.

6   Q.    I appreciate that.

7         Answer my question the best you can.   Maybe

8   you did.   My question is:

9         This particular statement -- I'm not talking

10  about the declaration in its entirety, just this

11  particular one.

12        I'm asking you if that statement in your

13  declaration was based upon a statement that you had

14  been given by your counsel.   Yes or no?

15  A.    Certainly this was written with the -- with

16  counsel.   However, at this very moment I do not recall

17  what evidence I had at that point.

18  Q.    Okay.   Let me see if I can help refresh your

19  recollection.   I know your deposition was awhile back.

20        Let me show you what you said in your

21  deposition.   This would be page 175.   It is your first

22  deposition, page 175, and the line numbers would be 7

23  to 24.

24        Do you have the page now?

25  A.    Yes.

*Maag - Cross/Olson*                                        97

1   Q.    And the discussion here is talking about a

2   summary of the inability of others to prepare the mono

3   acetate, and you say yes."

4          And then there was a question:

5          "Did you review this summary?"

6          And you say:

7          "Well, the summary is what you have in

8          the documentation.

9          So the question was:

10         "Just this sentence?"

11         Referring to the sentence we are talking about

12   in the declaration.

13         And you say:

14         "To the best of my recollection.

15         "QUESTION:  So you were only forwarded

16         one sentence regarding the inability

17         of others to prepare ganciclovir

18         mono-L-valinate acetate.  Is that

19         correct?"

20         Objection.

21         "ANSWER:  I don't have any

22         recollection of any other

23         information."

24         Other than being provided with this statement

25   from counsel.

1          Is that a fair reading of your deposition we

2     just looked at?

3          MR. PEZZANO:  I object as mischaracterizing

4     the testimony.

5          THE COURT:  You have to go to the page before.

6     This particular section doesn't say "counsel," but if

7     you go to the page before it, I think it does.  Let

8     him go back and look at that.

9          MR. OLSON:  I know what you are saying.  Could

10    we look at the page before, and could we look at the

11    page after and tie it down.

12         THE COURT:  I looked at the page before and

13    there is a reference to "counsel."

14         MR. OLSON:  Yes, there is, and that has to do

15    with --

16         THE COURT:  I guess the other was the bis.

17         MR. OLSON:  Yes.  Page 176, line 18, through

18    page 177, line 14.  So if we could see that.

19         THE COURT:  All right.

20    BY MR. OLSON:

21    Q.    So in line 18 it's:

22         "QUESTION:  Well, I'm referring to this

23          particular situation regarding the

24          statements made here in your conclu-

25          sion regarding the inability of others

1        to prepare" -- and it's referring to

2        the bis and the mono.  Both statements

3        are in the question.

4        You say:

5        "ANSWER:  I trusted the information I

6        was given.

7        "QUESTION:  Did you tell the patent

8        office that you were given this

9        information?

10       "ANSWER:  I had no direct communi-

11       cations with the patent office ever.

12       "QUESTION:  Did you tell the attorney

13       that you were just given this

14       information?

15       "ANSWER:  I indicated a few minutes

16       ago that I received this information

17       from counsel, so I don't understand

18       your question.

19       "QUESTION:  Okay.  So is it correct to

20       say that you received this information

21       about the work of others from counsel?

22       "ANSWER:  Yes."

23       Now, that we have looked at these two pages,

24  does that help refresh your recollection that the

25  basis for the statement in your declaration about the

*Maag - Cross/Olson*                                    100

1    inability of others to make the mono acetate was based

2    upon a statement that you got from counsel?

3           MR. PEZZANO:  Again, I'm going to say

4    mischaracterizing the testimony there.  I would refer

5    to the last question and answer.  It refers to

6    information about the work of others from counsel.

7           THE COURT:  I read all three or four pages

8    now.  It is clear what it is referring to.

9           Can you answer the question, Dr. Maag?

10          THE WITNESS:  Can you repeat the question?

11   BY MR. OLSON:

12   Q.   Now that we have gone through the deposition,

13   before we went through the deposition, you didn't

14   recall.  You couldn't answer my question because you

15   didn't recall.  Now we went through the deposition

16   pages.

17          Now I'm asking if it refreshes your recol-

18   lection as to -- and here is my question -- whether

19   the basis for your statement about the inability of

20   others to make the mono acetate was based upon a

21   statement you received from counsel?

22   A.   Yes.

23   Q.   All right.

24          Let's move on.  Page 2 of DX-180.  We are in

25   your declaration still.  We are just moving toward the

*Maag - Cross/Olson*                                    101

1    start of it.

2          Now, there is a section of page 2 entitled

3    "Preparation of."  It's the lower half of the page 2.

4    Are you with me?

5    A.    Yes.

6    Q.    And it is also on the screen.  It talks about

7    the "Preparation of ganciclovir bis L-valinate acetate

8    generally following example 5 of the Beauchamp patent

9    on a reduced scale."  Did I read that correctly?

10   A.    Yes.

11   Q.    Just for ease of reference, I'm going to call

12   this the "first preparation."  We are going to go

13   through your declaration and see if there are other

14   preparations you made.

15          Is it okay with you if I refer to this as the

16   "first preparation"?

17   A.    Yes.

18   Q.    It says, "Generally following example 5."  You

19   will agree then you made modifications to the

20   Beauchamp procedure?

21   A.    Yes.

22   Q.    And one of the modifications you made as an

23   compilation was the reaction time that you used in

24   preparation 1?

25   A.    Yes.  I also made changes in terms of the

1   reagents used in this experiment because Beauchamp

2   prepares the protected L-valine in situ.

3   Q.    So you are referring to one of the modifications

4   you made.

5            Now I want to ask you about a modification you

6   made with respect to reaction time.  All right?

7   A.    Yes.

8   Q.    Now, in the preparation No. 1, the first

9   preparation, it states in that first paragraph, you

10  say you stirred at room temperature for ten days.

11  Correct?

12  A.    Yes.

13  Q.    And I'll represent to you -- I don't want to

14  take the time to look this up.  It is in the record.

15  I'll represent to you in example 5 of the Beauchamp

16  patent she uses a reaction time of 18 hours.

17  A.    Right.

18  Q.    Do you have any reason to doubt that's correct,

19  that she used 18 hours?

20  A.    Right.

21  Q.    You used ten days?

22  A.    Right.

23  Q.    The reason you used ten days was because when

24  you set the reaction up here that you did, you then

25  went on vacation?

1   A.    That's in my deposition, yes.

2   Q.    And you stand by that testimony?

3   A.    Yeah.  Also in the subsequent experiment, I

4   stayed much closer to the Beauchamp conditions and got

5   the same result.

6   Q.    Thank you for that clarification.

7         Now, let's move to page 3 of DX-180 and see

8   what you ended up with with this first preparation.

9   You ended up with "4.4 grams of material," which you

10  characterized as a glass.  True?

11  A.    Yes.

12  Q.    And you characterized that as a glass solely

13  upon your own visual inspection of the sample?

14  A.    Yes.

15  Q.    Now, you agree you could have, if you wanted to,

16  you could have sent the sample out to XRD, the

17  analytical, to assess crystallinity.  You could have?

18  A.    Well, in this particular case, I would refer to

19  the next sentence in that it clearly demonstrates that

20  this material was not a pure material, and, therefore,

21  I would not carry out more detailed analysis with

22  impure materials.

23  Q.    You were trying to get pure material here.  In

24  your view, if you didn't get pure material, then you

25  wouldn't be interested in sending it out for further

*Maag - Cross/Olson*                                    104

1   analyses?

2   A.      Correct.

3   Q.      Including XRD analysis?

4   A.      Yes.

5   Q.      But based upon your visual inspection of the

6   sample, will you agree with me you could not rule out

7   that there were at least some small amounts of

8   crystals present in the sample?

9   A.      Well, I would stick to my previous testimony,

10  and the next sentence, in that it is to me very

11  unclear what this material exactly was.

12  Q.      And you didn't send it out to find out what it

13  was; did you?

14  A.      I did carry out an analysis and determined this

15  was a mixture of product.

16  Q.      You did not send it for any crystallinity

17  analysis, sir?

18  A.      No.

19  Q.      Correct?

20  A.      No.

21  Q.      And as to this first preparation, there were no

22  follow-on crystallization attempts as we'll see later

23  in other preparations.  Is that true?  You did no

24  follow-on crystallizations here?

25  A.      Not with this sample.

1   Q.    That's all I'm asking.

2         Now, let's go to the second preparation, page

3   4.  This has the title, "Further Preparation of

4   Ganciclovir Bis L-valinate Acetate."  Correct?

5   A.    Correct.

6   Q.    I'm going to refer to this as the "second

7   preparation" just for ease.

8         Now, in this one you report getting 6.2 grams

9   of ganciclovir bis L-valinate acetate as an amorphous

10  solid.   True?

11  A.    Yes.

12  Q.    And you determined that this sample was

13  amorphous purely by your visual inspection?

14  A.    Correct.

15  Q.    Again, you did not send this out for an XRD

16  analysis to assess crystallinity?

17  A.    No.

18  Q.    No, you did not?

19  A.    I did not.

20  Q.    Now, let's look at something that happened in

21  addition later on this.  And to do that, we have to go

22  away from your declaration for a moment to DX-305.

23         Now, DX-305 is a fax cover letter from you?

24  A.    Yes.

25  Q.    To a Mr. Von Morze.  And he was the patent

*Maag - Cross/Olson*                                                   106

1   attorney or one of the patent attorneys you were

2   working with in connection with your declaration?

3   A.     Correct.

4   Q.     This is dated February 28, 1997.  Correct?

5   A.     Correct.

6   Q.     If you would just look at the remaining eight

7   pages of DX-305 -- just page through them, these pages

8   comprise your experimental work to be incorporated

9   into your affidavit, which was then under

10  consideration for submission to the patent office.

11  Correct?

12  A.     Yes.

13  Q.     And so we saw that your declaration DX-180 was

14  signed in April, April 6th, 1999?

15  A.     Right.

16  Q.     We are two years earlier, roughly, here?

17  A.     Yes.

18  Q.     So as early as 1997, Roche was considering

19  submitting a sworn statement from you for submission

20  to the patent office?

21  A.     That's what I understand, yes.

22  Q.     It didn't actually get filed until 1999?

23  A.     Yes.

24  Q.     Will you agree with me that pages 2, 3, and 4 of

25  DX-305 are the first preparation that we just

*Maag - Cross/Olson*                                107

1   discussed that's recited in your declaration DX-180?

2   A.    Yes.

3   Q.    Will you agree with me pages 5, 6, and 7 of

4   DX-305 recite the second preparation we just discussed

5   in your declaration 180?

6   A.    Yes.

7   Q.    Now, let's talk about page 8, the last pages, 8

8   and 9 of this Exhibit DX-305.  It is entitled

9   "Experiment 3."  Do you see that?

10  A.    Yes.

11  Q.    And this experiment is a follow-on working with

12  the material that you obtained in the second

13  preparation?

14  A.    Yes.

15  Q.    If we look at what you ended up with in this

16  experiment 3, at the bottom of page 8, you report

17  that:

18          "The mother liquor was

19       pipetted off, and the crystalline

20       residue was dried giving 3 milligrams

21       of crystalline material third crop."

22       Did I read that correctly?

23  A.    Yes.

24  Q.    Now, this Experiment 3 was not included in your

25  declaration that went to the patent office as filed in

*Maag - Cross/Olson*                                    108

1    1999.  Correct?

2    A.    That is correct.  It represents a failed

3    experiment; and, basically, I ended up with material

4    which I was unable to identify.

5    Q.    Okay.  You jumped way ahead of me, but that's

6    fine.

7          Now, you will agree with me all of the

8    experiments of DX-305 were presented in your

9    declaration -- I think we just saw that -- except

10   Experiment 3.  Do you agree with that?

11   A.    Yes.

12   Q.    Now, you just gave me an answer to a question I

13   hadn't asked yet.  But why wasn't it included in your

14   declaration?  And you indicated that it was a fail

15   experiment?

16   A.    Yes.

17   Q.    And you were unable to identify the three

18   milligrams of crystalline material?

19   A.    Correct.

20   Q.    You characterized it as failed, and you did in

21   your deposition, because you didn't get enough pure

22   material?

23   A.    Yeah, it's very clear.  This experiment was done

24   1 1/2 years after I prepared the sample.  The goal at

25   that point was to prepare a reasonable quantity of

1   pure materials so we could carry out some testing.  I

2   went through the steps and ended up with three

3   milligrams of something which to this day I cannot

4   identify.  So I basically stopped and did something

5   else.

6   Q.    So to this day you don't know what it was?

7   A.    No.

8   Q.    All right.  And you didn't send it out for

9   analysis for XRD or any other kind of crystallinity

10  analysis to figure out what it was.  Is that fair?

11  A.    No.  I did basically a chromatogram on my own,

12  and that was -- and that was the level of characteri-

13  zation I carried out.

14  Q.    In answer to my question, you didn't do any

15  testing to assess crystallinity?

16  A.    No.

17  Q.    No, you did not?

18  A.    I basically --

19  Q.    Your answer was confusing.  Maybe it was my

20  question that was confusing.  I want to make sure, no,

21  you did not; that you are not disagreeing with me.

22        Did you send this out for any further

23  crystallinity assessment?

24  A.    No.  Not beyond my own assessment.

25  Q.    Doctor, in your declaration -- let's recall.

1    You state under oath in the declaration, you make the

2    statement -- and we looked at it -- that it is not

3    possible to make the bis-valinate acetate ester.  But

4    here, do you agree with me you are making three

5    milligrams of crystalline material, and you are

6    stating here on the witness stand that you have no

7    idea what it was.  And, yet, in your declaration, you

8    are making the statement it's not possible to make

9    this bis-valinate acetate ester.

10         Is that a fair assessment?

11   A.    Well, I believe that the 3 milligrams is not

12   valinate bis-acetate.

13   Q.    Doctor, you don't know what it was.  You just

14   stated you don't know what it was.  True?

15   A.    True.

16   Q.    Now, I just want to tie this DX-305 to your lab

17   book very quickly.  DX-181, if you could turn to.

18   That is a portion of one of your lab books, DX-181.

19   And if we look at page 3, will you agree with me that

20   we see at the top a so-called purification experiment

21   in I think it's April of 1994?

22   A.    Yes.

23   Q.    And this is the Experiment 3 that we were just

24   looking at, the typed-up version that you did for your

25   patent attorney in DX-305?

*Maag - Cross/Olson*                        111

1   A.     Yes.

2   Q.     So this experiment occurred in about April, May

3   1994?

4   A.     Correct.

5   Q.     That's long before your declaration in 1999?

6   A.     Yes.

7   Q.     And on this page you report the results, and we

8   have highlighted it on the screen.  You report that

9   you got crystalline residue, and below it you indicate

10  about 3 milligrams?

11  A.     Right.

12  Q.     And the word "crystalline" is underlined; and,

13  in fact, it appears to be the only word in the whole

14  page that's underlined.  Do you agree with me?

15  A.     I don't know how the underline arrived.  It's

16  certainly not something I would do in a notebook.

17  Q.     You would agree with me this is your book and it

18  is underlined?

19  A.     It is now underlined.

20  Q.     Let's go on and talk about the third

21  preparation.  Let's go back to DX-180.  That's your

22  declaration.  And the third preparation starts on page

23  5.

24         Are you with me?

25  A.     Yes.

*Maag - Cross/Olson*                                    112

1    Q.    The title there is on the screen.  This is

2    preparation of ganciclovir bis L-valinate acetate,

3    generally following example 5 B of the Beauchamp

4    patent at a larger scale.  Right?

5    A.    Yes.

6    Q.    Now, if we look at DX-8, that's a large file

7    wrapper history, but it is in your binder as becomes

8    8.  Specifically, page 43 of 350.  Are you with me?

9    A.    No.  I'm lost.

10   Q.    It's DX-8 in your binder.

11   A.    Okay.

12   Q.    And if you would turn to page 43.  Underneath

13   the DX-8, you will see various numbers of 350, and

14   this is 43 of 50 that I am on.

15   A.    I got it.

16   Q.    Do you recognize this?  This would be a

17   portion -- this is a page from the application that

18   eventually became the '953 patent?

19   A.    Okay.

20   Q.    We are on page 43 of the exhibit, but I'll just

21   note for the record it is page 29 of the application

22   on the bottom there, and it's lines 9 through 18.

23        Could you read that paragraph to yourself, and

24   let me know when you are finished.

25        (Pause.)

*Maag - Cross/Olson*                                   113

1    A.    Okay.

2    Q.    Do you agree with me this paragraph discloses

3    numerous ways to crystallize the mono-valine ester?

4    A.    Yes.

5    Q.    Do you agree these disclosed ways are not

6    special or uncommon procedures?

7    A.    The procedure outlined here is not special.

8    However, it is still surprising this diasteric mixture

9    crystallizes.

10   Q.    I'm just asking you whether these crystalli-

11   zation procedures that are outlined here are special

12   or uncommon.  That's all I'm asking you right now.

13   A.    They are common.

14   Q.    And in your declaration you did not try each of

15   these procedures recited in your application on any of

16   the preparations.  True?

17   A.    I'm not quite following.  In the declaration it

18   refers to the crystallization of the bis-valine

19   material.

20   Q.    And I'm not trying to jump around on you.  Let

21   me try to be clear.

22         I'm asking you whether you applied each of

23   these procedures in the preparations in your

24   declaration.

25   A.    I applied quite a number of conditions as

*Maag - Cross/Olson*                                       114

1   detailed in the declaration.  I would segregate in

2   terms of attempts, solvents such as alcohols,

3   chlorinated solvents, tetrahydrofuran and aromatic

4   solvents, and all these different conditions are

5   actually detailed in my declaration.

6   Q.    Are you sitting here telling me you tried all

7   these procedures as outlined on this page in your

8   preparations for crystallization attempts?

9   A.    What I stated in my declaration I used different

10  solvent systems, and I think they represent a detailed

11  approach to mimic most of the conditions outlined

12  here.

13  Q.    But not all?

14  A.    No.

15  Q.    "No," not all?  "No," you did not use them all?

16  A.    That would be impossible.

17  Q.    Okay.  It's impossible.

18         Let's look at what recrystallization attempts

19  you did make, sir.  All right?

20  A.    Yes.

21  Q.    Let's look at those six attempts.  Correct?

22  A.    I don't recall the exact number.

23  Q.    I'll refresh your recollection.

24         Let's look at DX-180.  Let's go to page 6

25  because we want to talk about the recrystallization

*Maag - Cross/Olson*                                    115

1    efforts, page 5.

2          We are talking about the third preparation,

3    and we see at the bottom of the page you tried various

4    crystallization attempts, and they are outlined on

5    page 6 and 7?

6    A.    Yes.

7    Q.    And there are six attempts?

8    A.    Yes.

9    Q.    Now, if we look at the first attempt on page

10   6 -- we have that on the screen, this relates to the

11   first recrystallization attempt, and the result was

12   that you obtained, quote, "the GBVA formed in oil."

13   A.    Yes.

14   Q.    Now, if we go to your notebook, that's DX-182,

15   and let's see that work in your notebook, 182, page 7.

16   Are you with me?

17   A.    Yes.

18   Q.    The bottom third of the page, there are some

19   experiments on March 15 and March 16 of 1999.  Do you

20   see that?

21   A.    Yes.

22   Q.    And across the bottom of the page there is a

23   Roman numeral I and a 2 and 3 and 4.  Those relate to

24   these various crystallization attempts?

25   A.    Yes.

*Maag - Cross/Olson*                                116

1   Q.    If we want to look at the first one, it's the

2   very left-hand part of the page, and it is underneath

3   the title, "Crystallization Attempts."  Do you see

4   that?

5   A.    Right.

6   Q.    So we see the result of March 16, 1999 at the

7   bottom was "oil" -- I can't read the word.

8   A.    "Oiled out."

9   Q.    And then you referred to page 46?

10  A.    Correct.

11  Q.    Which would be a reference to a further page

12  from your notebook?

13  A.    Yes.

14  Q.    So let's turn to page 11 of DX-182, and we see

15  that page from your notebook.  Correct?

16  A.    Yes.

17  Q.    And where in -- now, we are on April 14 of 1999,

18  and you referred to a continuation of sample 1, page

19  42?

20  A.    Yes.

21  Q.    So I guess you are roughly about a month later

22  than the previous work we looked at?

23  A.    Correct.

24  Q.    And you say that -- and I'm quoting:

25              "This week it was noticed that some

1          crystals had formed in this flask."

2              Did I read that correctly?

3   A.    Yes.

4   Q.    And then on the 15th you referred to 38

5   milligrams of material?

6   A.    Yes.

7   Q.    And then your conclusion on this experiment is

8   the last paragraph on that page, and we have it on the

9   screen.  We are on page 11 of DX-182.

10             Your conclusion that you state is:

11                 "Data most compatible with a

12             mixture of mono- and bis-valinate and

13             1 or less than 1 equivalent of acidic

14             acid."

15             Did I read that correctly?

16  A.    Yes.

17  Q.    That was your conclusion as to what that

18  material was at the time?

19  A.    Yes.  Based on the analysis which is listed

20  above.

21  Q.    And that analysis is NMR and MS?

22  A.    Yes, as well as elemental analysis.

23  Q.    So here you have a mixture -- in your own words,

24  you've got a mixture of mono- and bis-valinate that

25  was crystalline?

*Maag - Cross/Olson*                        118

1    A.     Yes.

2    Q.     And you didn't submit it for any crystallinity

3    analysis?

4    A.     No.

5    Q.     No, you did not?

6    A.     I did not.  It's not a pure sample.

7    Q.     I understand this qualification you keep making.

8    It's not pure, and you didn't do further analysis?

9    A.     Right.

10   Q.     Now, this continuation is about one week after

11   -- so we are in April 15, 1999.  Do you recall your

12   declaration was April 6, 1999?

13   A.     Correct.

14   Q.     We are about one week after you signed your

15   declaration?

16   A.     Yes.

17   Q.     Let's look quickly at DX-8 again.  It's the

18   application page 177.

19          Do you have that page?

20   A.     Yes.

21   Q.     Now, this is entitled "Response to Office

22   Action."  Did I read that correctly?

23   A.     Yes.

24   Q.     And at the top there is a signature by a Derek

25   Freyberg.  Do you recognize that name?

*Maag - Cross/Olson*                                    119

1    A.    Yes.

2    Q.    He was one of the patent attorneys you worked

3    with in connection with your declaration?

4    A.    Correct.

5    Q.    And the response refers in that paragraph to:

6              "Please enter the following

7           amendment and accompanying declar-

8           ations of Charles Dvorak and" yourself

9           "Hans Maag."

10   A.    Correct.

11   Q.    This is a reference to the DX-180 declaration

12   that we have been looking at?

13   A.    Yes.

14   Q.    And you would agree this certificate of mailing

15   at the top indicates that it was submitted to the

16   patent office on June 7, 1999?

17   A.    That's what it shows, yes, correct.

18   Q.    And right after your name, there is a reference

19   to "which are copies of those submitted but not

20   entered in parent application number" and it gives the

21   number, the '223 application.

22         Did I read that correctly?

23   A.    Right.

24   Q.    Now, we talked about the first crystallization.

25   Let's talk about the second one.  We are in the third

*Maag - Cross/Olson*                    120

1    preparation.  Let's go back to DX-180, page 6.

2            So we are in the second attempt, and we have

3    that paragraph on the screen, one paragraph.  Do you

4    see it?

5    A.    Yes.

6    Q.    And in this second crystallization attempt you

7    obtained what you refer to as an amorphous precipitate

8    of GBVA formed"?

9    A.    Correct.

10   Q.    And you determined that it was amorphous purely

11   visually?

12   A.    I believe so, yeah.  We'll need to go back.  If

13   I can check back with my notebook.

14   Q.    That would be DX-182.  I think you want to look

15   at the seventh page.  I think that's probably what you

16   wanted to find, isn't it?

17   A.    Yes.

18   Q.    So you are checking now the second crystalli-

19   zation that's identified in your notebook DX-182 on

20   page 7?

21   A.    Right.

22            (Pause.)

23            Okay.

24   Q.    You determined it visually?

25   A.    The notes in my notebook is from my visual

*Maag - Cross/Olson*                                          121

1    inspection, yes.

2    Q.    Now, let's look at the third recrystallization

3    attempt.

4          THE COURT:  When you finish this, we will

5    break; and today we will take a .45 minute lunch hour.

6    We won't take an hour.

7          MR. OLSON:  I probably have 10 minutes left of

8    cross.

9    Q.    DX-180, page 6.

10   A.    Okay.

11   Q.    That's the third recrystallization attempt?

12   A.    Okay.

13   Q.    Let's look at -- we'll get it on the screen.

14   It's on the screen now.  Is this third attempt you

15   say, "a few needles appeared."  Right?

16   A.    Yes.

17   Q.    And, of course, the needles would be crystals?

18   A.    Yes.

19   Q.    And the result you say:

20              "The drying resulted in 3

21           milligrams of a mixture of crystalline

22           and amorphous material."

23           Did I read that correctly?

24   A.    Yes.

25   Q.    And, then, if we go to your notebook DX-182,

*Maag - Cross/Olson*                           122

1   that same page, that page 7 we are going to find your

2   third recrystallization attempt.  Right?

3   A.    Yes.

4   Q.    It indicates, "a few crystals/needles."

5         Do you see that?

6   A.    Yes.

7   Q.    And then if we turn two pages to page 9 of

8   DX-182, we see the continuation of crystallization

9   attempt No. 3.  Correct?

10  A.    Correct.

11  Q.    And let's just look at the conclusion that you

12  drew there at the very bottom.

13        Conclusion:

14            "Crystalline material is most

15        likely bis-ester in a different

16        pronated or neutral form."

17        Did I read that correctly?

18  A.    Yes.

19  Q.    And you agree you did not send this material for

20  crystallinity analysis?

21  A.    No.  I indicated through my analysis that it was

22  a mixture.

23  Q.    But you didn't send it for crystallinity

24  analysis.  Correct?

25  A.    No, I did not send it out.

1  Q.    Just to kind of sum things up, Dr. Maag, and try

2  to finish this up so I can say I'm holding my time

3  limits here, we have now looked at three different

4  experiments in which you obtained crystalline

5  material.  Do you agree with me?

6       Let me categorize them for you.  The

7  Experiment 3, which was the purification of the second

8  preparation; the continuation of the first recrystal-

9  lization of the third preparation, and the third

10 recrystallization in the third preparation, in all

11 three of those experiments you obtained crystalline

12 material.  True?

13 A.    True.

14 Q.    In two of those instances of obtaining

15 crystalline material, that was not even reported to

16 the patent office examiner.

17      Let me categorize those two:  The Experiment

18 3, which was the purification of the second

19 preparation, and the continuation of the first

20 recrystallization were not reported to the examiner.

21 True?

22 A.    Yes.

23 Q.    And you never sent any of those three

24 crystalline samples out for crystallinity analysis.

25 Correct?

*Maag - Cross/Olson*                                          124

1    A.    That is correct.  We used these very small

2    amounts to see if it could induce progressive

3    crystallization to actually see if the material would

4    crystallize, but none of these were ever successful.

5    So we concluded that whatever the material was, it

6    could not be bis-valinate bis-acetate.

7    Q.    Sir, you didn't send them out for crystallinity

8    analysis to determine what those materials were; did

9    you?

10   A.    No, I did not.

11   Q.    In fact, you even testified today as to several

12   you didn't know what they were because you didn't send

13   them out for analysis.   Correct?

14   A.    I did not send them out.

15   Q.    And as to several other experiments we have

16   looked at, you obtained solids and you characterized

17   them as amorphous solids.  We have seen that.  Right?

18        We took the time to go through this, and we

19   saw several times you characterized solids that you

20   obtained as amorphous?

21   A.    Yes.

22   Q.    And you did that purely by visual inspection.

23   Correct?

24   A.    Correct.

25   Q.    And you didn't send them out for crystallinity

*Maag - Cross/Olson*                                    125

1   analysis to determine if there was perhaps a small

2   amount of crystalline material within that amorphous

3   material.  You didn't check that; did you?

4   A.    No, I did not.

5   Q.    Because you were looking to see if you could

6   produce relatively pure ganciclovir bis-acetate in

7   crystalline form.  Right?

8   A.    Yeah, that is really the objective, to prepare a

9   pure material in crystalline form.

10  Q.    You weren't looking to see if you could produce

11  small amounts of crystalline material.  That wasn't

12  the object of these experiments.  Correct?  You were

13  trying to get pure material, not worried about whether

14  you had small amounts of crystalline material.

15  Correct?

16  A.    Well, as a chemist, I want to see if I could

17  repeatedly crystallize a sample in order to get

18  anything that's useful.

19  Q.    I'm not talking about what you considered as

20  useful.  You were looking for pure crystalline

21  material.  You weren't interested if you might have

22  had a small amount of crystalline material.  Correct?

23  A.    I was interested in small amounts as long as I

24  could identify it as a pure material.  That's what I

25  was after.

*Maag - Cross/Olson*                              126

1  Q.    And in these situations you did not even send

2  them out for crystallinity analysis to determine what

3  you had.  Correct?

4  A.    I did not send them out.

5  Q.    So in your declaration, sir, rather than saying

6  -- you said in your declaration it's not possible,

7  it's not possible to make the bis-acetate in

8  crystalline form.  That's what you said in your

9  declaration.  True?  That's what you said.

10         What you really meant by that, sir, was that

11  you were unsuccessful in obtaining the bis-acetate as

12  a pure material in crystalline form.  Correct?

13  A.    Yes.

14         MR. OLSON:  Thank you.

15         Your Honor, housekeeping.  I'm moving into

16  evidence DX-181, DX-182, DX-305, and that's it.

17         MR. PEZZANO:  No objection.  I just have one

18  or two questions.

19         THE COURT:  Let's do it so we can finish the

20  witness.  They will be admitted in evidence.

21         Thank you.

22         (Continued on the next page.)

23         (Defendants' Exhibits Nos. DX-181, DX-182,

24         DX-305 were received in evidence.)

25  ///

*Maag - Redirect/Pezzano*                          127

1    REDIRECT EXAMINATION

2    BY MR. PEZZANO:

3    Q.    Dr. Maag, I just want to direct you to your

4    declaration, DX-180, at the sentence in paragraph 6 on

5    pages 6 and 7 of your declaration.

6          You state:

7              "From these data I conclude that

8          the crystalline material is a neutral

9          or partial salt form of ganciclovir

10         bis L-valinate and not GBVA which

11         explains the formation of only a small

12         amount of crystalline material and the

13         lack of progressive crystallization."

14         What did you mean by not GBVA?

15   A.    I referred to GBVA to ganciclovir bis-valinate

16   bis-acetate.

17   Q.    And did you conclude that the small amounts of

18   material were not ganciclovir bis-valinate acetate?

19   A.    I concluded from the behavior of this material

20   and the analysis I did that this was not bis-valinate

21   bis-acetate.

22   Q.    And you reported that in your declaration filed

23   to the patent office.  Correct?

24   A.    Correct.

25             MR. PEZZANO:  I have no further questions.

*Maag - Redirect/Pezzano*                          128

1          THE COURT:  Thank you, Dr. Maag.  You are

2   excused.

3          (Witness excused.)

4          THE COURT:  We'll break for lunch.

5          THE CLERK:  All rise.

6          (The luncheon recess is taken.)

7          (Continued on the next page.)

8   ///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Henck - Direct/Pezzano*                                129

1              **A F T E R N O O N   S E S S I O N**

2

3              (In open court.)

4              THE CLERK:  All rise.

5              THE COURT:  Thank you.  Everyone may be

6     seated.

7              Mr. Pezzano, you may proceed.

8              MR. PEZZANO:  Your Honor, on behalf of

9     plaintiff Roche Palo Alto, LLC, our last witness will

10    be Dr. Jan-Olav Henck on rebuttal.

11             THE COURT:  I guess it has been awhile.  So

12    why don't we swear in Dr. Henck  today.

13

14    **JAN-OLAV HENCK**, recalled as a witness on behalf of the

15    plaintiff, having been first duly sworn, testified as

16    follows:

17

18    DIRECT EXAMINATION

19    BY MR. PEZZANO:

20    Q.    Dr. Henck, do you recall on your direct

21    testimony you were questioned by the Court as to

22    whether there is any published literature that

23    reflects that all you need is one peak to identify a

24    crystalline material and, in particular, in distin-

25    guishing between a crystalline material and an

1    amorphous material?

2    A.    Yes.

3    Q.    And you replied you were both aware of industry-

4    wide recognized articles that do this and patents?

5    A.    Yes.

6    Q.    Did you bring with you any articles and patents

7    here today?

8    A.    Yes.

9    Q.    I would like to direct your attention to your

10   binder PTX-752.

11   A.    Yes.

12   Q.    Is the article entitled "Pharmaceuticals

13   Development and Formulation," an article you

14   co-authored with Joel Bernstein in a textbook

15   entitled, "Industrial Applications of X-ray

16   Diffraction," which was published in 2000?

17   A.    Yes.

18   Q.    Is this a peer-reviewed and industry-recognized

19   article in the field of polymorphism and powder X-ray

20   diffraction?

21   A.    Yes.

22   Q.    Turn to page 530 of this article.

23        What is described here in reference to the

24   Court's inquiry?

25   A.    On page 5130, if we go to the middle of this

1  page, there is a topic called "Qualitative Analysis."

2  It refers to an example where the X-ray diffraction

3  powder patterns are on the previous page 529.  It

4  refers to a drug formulation called Excedrin.

5        Excedrin contains three different drug

6  substances:  No. 1 being acetaminophen, aspirin, and

7  caffeine.  When we look at the X-ray diffraction

8  powder given on page 529, the X-ray diffraction powder

9  pattern at the top of the page shows the tablet

10  formulation, and the subsequent powder patterns are

11  the X-ray diffraction powder patterns of the pure

12  components.

13        For the X-ray diffraction powder pattern of

14  aspirin, we can identify the peak at 7.5 degrees, 3.5

15  degrees two theta.  So when we look at this

16  photograph, we can see for aspirin, we have a peak at

17  7.5 degrees two theta; and within the different

18  components, this is the only component that shows the

19  peak at 7.5 degrees two theta, and we can identify

20  this peak also in the drug formulation.  Only one peak

21  is necessary.  This is what is stated on page 5130.

22        When we look at another component in this drug

23  formulation, acataminophen, when we look at the

24  diffraction powder pattern of acetaminophen, we see we

25  have a peak at approximately 18 degrees two theta, and

1    this can also be identified in the drug formulation

2    because there is no peak for caffeine or aspirin at 18

3    degrees two theta.

4    Q.    Let's turn now to a second article, PTX-768 in

5    your binder.

6          Have you seen before this text entitled,

7    "Amorphous Food and Pharmaceutical Systems" published

8    by the Royal Society of Chemistry in 2002?

9    A.    Yes.

10   Q.    Is this peer-reviewed and industry-recognized

11   journal in the field of polymorphism and powder X-ray

12   diffraction?

13   A.    Yes.

14   Q.    In connection with this article, did you prepare

15   a demonstrative relating to this article to assist you

16   in responding to the Court's inquiry?

17   A.    Yes.

18   Q.    Let me show you PTX-764.

19   A.    The example before showed if you have different

20   crystalline materials, one peak can be used in order

21   to identify crystalline materials.

22         The previous example was related to

23   identifying different crystalline components by just

24   using one single peak.  In an X-ray diffraction powder

25   pattern this example here shows how one peak can be

*Henck - Direct/Pezzano* 133

1    used in order to identify a crystalline material and

2    an amorphous material.

3           So what we have here is a peak at 9 degrees

4    two theta.  We have to go back to the highlighted area

5    here in the text.  9 degrees two theta and this peak

6    was used to identify crystalline material, and later

7    on also quantify the amount of crystalline material in

8    a given sample.  So just one peak.  The peak at 9

9    degrees two theta was detected and used for this

10   analysis.

11   Q.    And if you look at each of the X-ray powder

12   patterns, how would a person skilled in the art detect

13   the crystalline material in this series of X-ray

14   diffractograms?

15   A.    This series of X-ray diffractograms, what's also

16   called a waterfall plot, shows the increase of

17   crystalline material by the intensity of the peak at 9

18   degrees two theta.

19          So the authors are stating in this article the

20   lower amount is about 2 percent of crystalline

21   material up to 60 percent of crystalline material.

22   Q.    And in the text itself, is this information

23   found on page 225?

24   A.    Yes.

25   Q.    Now, I would like to direct your attention to

1 PTX-716, another article in your binder?

2 A.    Yes.

3 Q.    Have you seen this article entitled,

4 "Quantifying Low Amorphous or Crystalline Amounts of

5 Alpha-lactose Monohydrate Using X-ray Powder Diffrac-

6 tion Near Infrared Spectroscopy and Differential

7 Scanning Calorimetry" that was published in 2004?

8 Correct?

9 A.    Yes.

10 Q.    Is this a peer-reviewed and industry-recognized

11 journal in the field of polymorphism and powder X-ray

12 diffraction?

13 A.    Yes.

14 Q.    If you turn to page 517 of this article, what is

15 described here in reference to the Court's inquiry?

16 A.    When we go to the middle of the first column, it

17 starts:

18         "Therefore, the evaluation of the

19         crystalline content is done using the

20         profile fitted area under the peak at

21         12.4 degrees two theta; whereas, the

22         amorphous content is evaluated by

23         calculating the ratio of the next

24         intense peak of all peaks to the

25         observed intensity over the whole

*Henck - Direct/Pezzano*                                    135

1        range."

2   Q.    I would like to refer your attention to the next

3   article, which is PTX-770 in your binder.

4        MR. ZIMMERMAN:  Your Honor, at this point I

5   have an objection to 770 through 774.  770 is not a

6   one-peak reference by any stretch.  The other ones

7   were responsive to your inquiry.  I didn't have an

8   objection.  That's not what this one goes to.

9        MR. PEZZANO:  It is responsive to your

10  inquiry.  I will ask the witness questions.  If your

11  Honor feels it is not responsive to your inquiry, then

12  it won't be admitted into evidence.  If you feel it

13  is, and we believe it is responsive.

14       MR. ZIMMERMAN:  If the witness uses it in a

15  one-peak fashion, then I don't have an objection.

16       THE COURT:  So we will wait and hear.

17  BY MR. PEZZANO:

18  Q.    Have you seen before this article entitled,

19  "Some Physiochemical Properties of Glassy

20  Indomethacin," and that was published in the Chemical

21  Pharmaceutical Bulletin in 1986?

22  A.    Yes.

23  Q.    Is this a peer-reviewed and industry-recognized

24  literature reference in the field of polymorphism and

25  powder X-ray diffraction?

1   A.     Yes.

2   Q.     If you turn to pages 4319 to 21, including

3   reference to figure 10, can you describe how this

4   article relates to the Court's inquiry?

5   A.     Yes.  When we look at figure 10 in this paper,

6   what we see is that the drug substance was stored at

7   laboratory conditions and is going from an amorphous

8   to a crystalline material over time.

9          Your Honor, you asked me how difficult it

10  would be to identify crystalline material and

11  amorphous material.  When you look at the powder

12  presence here, when they are progressing from

13  amorphous material to crystalline material on the

14  arbitrary units, what you will see is there are so

15  many peaks in the X-ray diffraction powder pattern

16  that you can use in order to identify a crystalline

17  material that it really doesn't matter which peak you

18  use when you compare amorphous to crystalline material

19  overall.

20  Q.     What were the conditions over which this article

21  describes that the material here converted to

22  crystalline material?

23  A.     Let me go into the paper.

24         It says, on page 4320, in the middle of the

25  page, it says --

1    MR. ZIMMERMAN:  Your Honor, this is where I'm

2 going to renew my objection.  This reference does not

3 go to one peak.  Dr. Henck just testified you could

4 look at many peaks.  He's using this to discuss the

5 solubility, and the solubility issue is not in his

6 expert report.  This exhibit was not in their expert

7 report, and it is not on his exhibit list.

8    MR. PEZZANO:  He didn't say "many peaks."  He

9 said you can use any peak of this material.  As it is

10 converting from amorphous to crystalline, you can take

11 any peak in that analysis to identify a distinction

12 between the crystalline material and the amorphous

13 material.

14    Second of all, he didn't mention anything

15 about the issue of solubility.

16    THE COURT:  I don't need anything else.  I

17 don't know why we're going into more testimony.  It's

18 getting in through the back door.  It's not necessary.

19 I heard his testimony about any peak.  That's enough.

20    MR. PEZZANO:  Now, that's the last of the

21 articles.  We just have a few patents the witness has

22 collected and he would like to testify about in

23 response to your inquiry.

24    THE COURT:  That wasn't my question.  I asked

25 for literature.  That's what I asked him about.

*Henck - Direct/Pezzano*                          138

1          MR. PEZZANO:  Okay.  We'll move on.

2    BY MR. PEZZANO:

3    Q.    Dr. Henck, I would next like to direct your

4    attention to the medical pill organizer study of

5    Ranbaxy's tablets and Dr. Rogers' testimony regarding

6    that study.

7          Were you present for Dr. Rogers' testimony?

8    A.    Yes.

9    Q.    Did Dr. Rogers have access to your peak data

10   underlying your powder X-ray diffractograms resulting

11   from your study?

12   A.    Yes.

13   Q.    Did Dr. Rogers critique the results of your peak

14   data and powder X-ray diffractograms for that study?

15   A.    No.

16   Q.    I would like to show you PTX-698.  It's in your

17   binder.  Feel free to reference those exhibits during

18   the course of my questions.

19          Showing you Exhibit 698, which includes

20   PTX-581 through PTX-585.  These are your X-ray

21   diffractograms in connection with your medical pill

22   tray organizer study that was over a period of five

23   weeks.  Correct?

24   A.    Yes.

25   Q.    Is it fair to say Dr. Rogers did not critique

*Henck - Direct/Pezzano*                          139

1   the underlying peak data for any of the -- if you turn

2   to the next slide and the next one -- any of the 3.5

3   degrees two theta peaks that are in your X-ray

4   diffractograms as part of this study?

5   A.    I'm sorry.  Can you repeat the question, please.

6   Q.    Is it fair to say Dr. Rogers did not critique

7   the underlying peak data for any of the 3.5 degrees

8   two theta peaks shown in your X-ray powder

9   diffractograms?

10  A.    Yes.

11  Q.    I would like to direct your attention to

12  Dr. Rogers' testimony concerning the methodology you

13  used for the medical pill tray organizer study.

14          Did you prepare a demonstrative to assist your

15  testimony regarding your methodology for that study?

16  A.    Yes.

17  Q.    Let's turn to PTX-765.

18  A.    Yes.

19  Q.    Is this the demonstrative you prepared in

20  connection with your medical pill tray organizer

21  study?

22  A.    Yes.

23  Q.    Do you recall Dr. Rogers' assertion that the

24  tablets in your medical pill tray organizer study were

25  ground in a mortar and pestle increasing the surface

*Henck - Direct/Pezzano*                              140

1    area of the tablets and exposure of the tablets to

2    moisture in the atmosphere?

3    A.    Yes.

4    Q.    What is your response to that testimony?

5    A.    The tablets were rendered into a powder so they

6    were not ground.  We used 10 tablets total for the

7    times zero testing in order to show that the procedure

8    that we have used does not induce crystalline material

9    into the sample.

10         Moreover, we have eight more samples that were

11   tested after 24 hours that did not show an appreciable

12   amount of crystalline material.  So, in total, we have

13   18 of 80 tablets that show the procedure we have used

14   does not induce appreciable amounts of crystalline

15   material in Ranbaxy's tablets.

16   Q.    And your testimony about the tablets were

17   rendered into a powder, was that information found in

18   any laboratory notebook records that were part of your

19   study?

20   A.    Yes.  When we look at PTX-718, my staff wrote

21   into that notebook each tablet sample was rendered a

22   powder by lightly crushing it in a mortar and pestle.

23   Each tablet was rendered a powder by crushing it in a

24   mortar and pestle, and we can look this up in the

25   notebook, and it's described there.

1    Q.    Are those notebook pages found in your

2    underlying binder, Binder No. 4, the big binder which

3    we provided for you?

4    A.    Yes.

5          MR. PEZZANO:   It's in Binder No. 4, the

6    medical pill tray binder.

7    Q.    Let's move on to the next point.

8          Do you recall Dr. Rogers' assertion that the

9    opadry coating was ground into each tablet in your

10   medical pill tray organizer study?

11   A.    Yes.

12   Q.    What is your response?

13   A.    We are dealing with a tablet here and removing a

14   compound.  For example, the coating of the material

15   that was rendered into a powder is a significant flaw

16   in the preparation of the sample for an X-ray

17   diffraction experiment because when you grind the

18   coating, what you will see is that on the part of the

19   coating that was exposed to the core of the tablet

20   there is material sticking on this coating and

21   removing the coating means that you not only remove

22   the coating from the sample, but you also remove other

23   components from the sample; and, therefore, removing a

24   compound of the sample can have a significant impact

25   on the quality of the analysis.  And, therefore, we

*Henck - Direct/Pezzano*                                    142

1    don't remove the coating from the material that was

2    rendered into a powder.

3    Q.    Do any of the elements in the opadry coating

4    have a crystalline peak at 3.5 degrees two theta?

5    A.    Our times zero studies show that the coating

6    does not contribute to a peak at 3.5 degrees two

7    theta.

8    Q.    Now, turning to the first bullet on that page,

9    do you recall Dr. Rogers' assertion that no duplicate

10   powder pattern runs were performed for each tablet in

11   your medical pill tray organizer study?

12   A.    We did much better.  We tested two tablets for

13   every week in the times zero study.  We tested

14   individual tablets.  We did not test one tablet

15   multiple times.  So measuring multiple tablets gives

16   you much more available information in a study like

17   this compared to running multiple powder patterns on

18   one sample.

19   Q.    In total, how many tablets were tested in your

20   study?

21   A.    80.

22   Q.    And this study was undertaken on a five-week

23   basis.  Correct?

24   A.    That's correct.

25   Q.    Now, I would like to direct your attention to

*Henck - Direct/Pezzano* 143

1  whether you recall Dr. Rogers' assertion that there

2  were no controls between rendering tablets into a

3  powder and each X-ray powder diffraction analysis in

4  your study.  Do you recall that testimony?

5  A.    Yes.

6  Q.    What is your response?

7  A.    The tablets were rendered into a powder for

8  testing immediately after they were removed from the

9  pill tray organizer.  This procedure -- we have years

10 of experience in optimizing this kind of a procedure

11 because we know that this is a critical step in

12 performing the analysis.  So the people that are doing

13 these kinds of analysis are well trained and know

14 exactly what to do.  This kind of procedure takes

15 about five to ten minutes overall.

16 Q.    And on your direct testimony you testified that

17 you were not present at all times when the tablets

18 were rendered into a powder for your medical pill tray

19 organizer study.  How do you know each tablet was

20 rendered into a powder and prepared for X-ray powder

21 diffraction analysis in the same manner according to

22 your protocol?

23 A.    We have a very well trained staff and also have

24 standard operating procedures.  We are a GP lab, and

25 the people we have trained follow these procedures

*Henck - Direct/Pezzano*                                    144

1  very carefully and to the word.  So it doesn't matter

2  whether I will be present for a specific study for

3  not.  These people know what they are doing.

4  Q.    Dr. Henck, do you recall Dr. Rogers' criticism

5  that you used an arbitrary Y scale in your study?

6  A.    Yes.

7  Q.    What is your response?

8  A.    We undertake the pill tray study to get a

9  qualitative idea of the conversion of Ranbaxy's API

10  from an amorphous material into a crystalline

11  material.  And in order to be able to compare many

12  different powder patterns using an arbitrary scale and

13  normalized X-ray diffraction powder patterns is a well

14  accepted way.  It is not unusual to use this for

15  representation purposes.

16  Q.    And getting back to your earlier testimony, I

17  believe you mentioned you had times zero tablets or

18  control tablets that were used in your medical pill

19  tray organizer study.  Did Dr. Rogers criticize at all

20  the methodology you used for the times zero tablets in

21  your study?

22  A.    No.

23  Q.    I would like to direct your attention to your

24  gastric fluid study.

25         MR. PEZZANO:  Why don't we show DX-803.8 point

*Henck - Direct/Pezzano*                                        145

1    27.

2    A.     Yes.

3    Q.     Were you present for Dr. Rogers' testimony

4    concerning his analyses of your gastric fluid study

5    peak data and powder X-ray diffraction analyses?

6    A.     Yes.

7    Q.     What does Dr. Rogers' analysis of your gastric

8    fluid study raw data show in DX-803.8.27?

9    A.     It shows a peak at 3.5 degrees two theta for the

10   tablets that were exposed to a gastric fluid, a

11   simulated gastric fluid after half minute, one minute,

12   two minutes, four minutes, and eight minutes.  The

13   times zero study does not show a peak at 3.5 degrees

14   two theta, which means here we do not have appreciably

15   amounts of crystalline valganciclovir hydrochloride.

16   Q.     And based on Dr. Rogers' own analysis of the

17   peak data underlying your X-ray powder diffraction

18   analyses, what does his analyses show in connection

19   with your conclusions?

20   A.     First of all, these are our data.  So these have

21   been measured in my laboratory.  In whichever way you

22   represent the data, whether you choose to use the raw

23   data or you choose to use normalized X-ray diffraction

24   powder patterns, there is always a peak at 3.5 degrees

25   two theta.

*Henck - Direct/Pezzano*                              146

1   Q.    And you referred to "normalized data."  What do

2   you mean by "normalized data"?

3   A.    Normalization is a standard process when

4   diffraction powder patterns are compared within one

5   study.  We need to take into account that we do not

6   have -- we do not compare the times zero tablet when

7   we look at the X-ray diffraction powder pattern from a

8   physical point of view exactly to a tolerability that

9   was exposed for one minute up to eight minutes or,

10  later on, 50 minutes.

11        What we see is that during the experiment we

12  change the composition of the tablets, which means we

13  partially dissolve the coating, for example, and

14  partially the outer core of the tablet will start to

15  dissolve, which means we have different types of

16  samples.  So we need to take this into account when we

17  compare these different powder patterns to each other,

18  and a way to do this is by normalization.

19  Q.    By the way, have you seen any documents where

20  Ranbaxy normalizes data?

21  A.    Absolutely.

22  Q.    We'll get to that later on.

23        Does the fact -- did you normalize the data in

24  your study analysis?

25  A.    Yes.

1   Q.    Does the fact that you normalized the peak data

2   and Dr. Rogers did not affect your opinions regarding

3   the gastric fluid study?

4   A.    No.   When you look at Dr. Rogers' representation

5   of my data and you compare it to my presentation of my

6   data, we both have a peak at 3.5 degrees two theta for

7   the material that was exposed to the simulated gastric

8   fluid after half a minute.   We have in both cases a

9   peak at 3.5 degrees two theta for one minute, for two

10  minutes, for four, as well as eight minutes.

11  Q.    And leaving that comparison on the Power Point,

12  comparing your XRD analyses of the gastric fluid study

13  toin Dr. Rogers' XRD analyses of the same peak data,

14  does Dr. Rogers' XRD analyses change your opinion

15  about whether at least a majority of Ranbaxy's

16  valganciclovir hydrochloride API converted to

17  crystalline form?

18  A.    No.

19  Q.    Why not?

20  A.    Because in both cases what we see is that over

21  time we see an increase of crystalline material when

22  we look at the powder X-ray diffraction patterns that

23  were obtained during the conduction of this study.

24  The peak at 3.5 degrees two theta appears in all the

25  different tablets and it is growing over time.   Each

*Henck - Direct/Pezzano*                           148

1   tablet will behave individually.  Each tablet was

2   analyzed separately, and it was analyzed by using an

3   X-ray diffraction method where the amount of material

4   would have an impact on the intensity of an X-ray

5   diffraction powder pattern, and, therefore, it doesn't

6   change my opinion.

7   Q.    Now, Dr. Henck, were you here for the testimony

8   of Romi Singh, the head of Ranbaxy's valganciclovir

9   hydrochloride tablet formulations group?

10  A.    Yes.

11  Q.    Did you hear her testimony regarding a purported

12  entropy theory, that Ranbaxy's tablets may dissolve

13  before they crystallize?

14        MR. ZIMMERMAN:  At this point, I object.  He

15  has no opinion in his report comparing the dissolution

16  time to his purported crystallization rate.  When I

17  asked him at his deposition and at this trial if he

18  knew anything about the dissolution rate for this

19  product, he said, no, he hadn't studied it.  It's

20  clearly outside of the scope of his expertise and

21  expert report.

22        MR. PEZZANO:  This is a new theory that arose

23  during the course of the trial.  The second is

24  Dr. Henck did specifically address his theory.  He did

25  the tests.  He tested Ranbaxy's tablets and showed

1    exactly the fact that they crystallized before they

2    dissolved.  His 15-minute tablet dissolved, but the

3    crystallized at 30 seconds, one minute, two minutes,

4    four minutes and eight minutes.  He did the tests.  So

5    he is perfectly qualified to testify on this point.

6         MR. ZIMMERMAN:  He hasn't done any dissolution

7    studies.  If he wants to talk about what he did in the

8    graphs.  He didn't do any comparison of dissolution

9    rate to alleged crystallization rate.  He doesn't know

10   what the dissolution rate of amorphous or crystalline

11   is; and for him to talk about dissolution and compare

12   it to a rate of crystallization is found nowhere in

13   his report.

14        THE COURT:  Are you going to go into that

15   area?  Is that your intent?

16        MR. PEZZANO:  My intent was to basically ask

17   him what does he agree with Romi Singh's testimony --

18        THE COURT:  Agree with what part?

19        MR. PEZZANO:  That her view was that the pills

20   would dissolve before they crystallized without

21   undertaking any tests to show that, and he would

22   simply say what the basis would be for his testimony

23   in rebuttal to that testimony.

24        THE COURT:  But that's not something he opined

25   on.

1        MR. PEZZANO:  Your Honor, we are not talking

2    about the rate of dissolution.  We are comparing the

3    fact the tablet crystallizes before it dissolves, and

4    that is clearly within the scope of Dr. Henck's study.

5    He showed in his study at the 15-minute point the

6    tablet dissolved; and in the 30-second to eight-minute

7    point, he showed the tablet crystallized; and all he

8    is going to testify about is the fact the tablets

9    crystallize before they dissolved.  And that is within

10   the scope of his study.  He is not going to talk about

11   the rate of dissolution.

12       MR. ZIMMERMAN:  It isn't in his report.  The

13   only thing in his report about dissolution is at 15

14   minutes, the tablet was gone.  If he is going to do

15   any comparison between the tablet crystallized before

16   it dissolved, he didn't talk about dissolution.  I

17   asked him about the dissolution rate of the amorphous

18   material and the crystalline material at his

19   deposition.  He didn't know the dissolution rates, he

20   hadn't studied them, he hadn't compared them.

21       MR. PEZZANO:  I'm going to rebut, I believe

22   the position we have taken right now is satisfactory

23   to have Dr. Henck testify, but I'm going to also point

24   out in his expert report, he specifically points out

25   Ranbaxy's bioequivalent and comparative dissolution

*Henck - Direct/Pezzano*                    151

1   studies support these conclusions concerning the fact

2   that Ranbaxy's tablets crystallize when in a person's

3   stomach --

4          THE COURT:  That's different than comparing

5   them.  I want to hear where he's got talking about the

6   dissolution versus crystallization, and which occurs

7   first.

8          MR. PEZZANO:  That crystallization occurs

9   before dissolving?  The only thing I can point to is

10  his test that showed at the 15-minute point the tablet

11  dissolved --

12         THE COURT:  I'm not going to have him give a

13  general opinion.  If he wants to point out where it

14  showed in his test, point that out as opposed to

15  giving an opinion.

16         MR. PEZZANO:  One of the sentences in his

17  report, he states:

18              "If Ranbaxy," -- this is talking about

19  Ranbaxy's dissolution studies.

20              "If Ranbaxy's tablets contained

21              amorphous material in the beginning of

22              the studies, this material transformed

23              rapidly into crystalline valganci-

24              clovir hydrochloride, which is then

25              dissolved during the studies described

1              in Ranbaxy's ANDA."

2              THE COURT:  If you want to talk about what

3    happened in the study, that's okay, as opposed to

4    opining or saying the views of Ms. Singh he supports;

5    and, as a general matter, this is what happens.  Feel

6    free to talk about factually what he observed.

7              MR. PEZZANO:  I will do that.

8    BY MR. PEZZANO:

9    Q.    Dr. Henck, in connection with your gastric fluid

10   study, what did you observe in relation to that study

11   concerning the crystallization of Ranbaxy's tablets

12   and their subsequent dissolving?

13             MR. ZIMMERMAN:  Objection; leading.

14             THE COURT:  That was.  You will have to

15   rephrase it.

16   BY MR. PEZZANO:

17   Q.    In connection with your gastric fluid study,

18   what did you observe in connection with the timing of

19   the crystallization of Ranbaxy's tablets?

20   A.    The conditions in the human body with the

21   elevated temperature at 37 degrees centigrade, and the

22   simulated water-based gastric fluid, we have

23   conditions here that promote crystallization, and this

24   is given in many literature citations where people are

25   discussing the behavior of amorphous material during

*Henck - Direct/Pezzano*                          153

1    dissolution testing where it crystallizes and,

2    therefore, within minutes --

3           THE COURT:  He just asked you what did you

4    observe, please.

5           THE WITNESS:  In our studies we observed the

6    material crystallizes before it dissolves.

7    BY MR. PEZZANO:

8    Q.    Now, did you hear Dr. Rogers' testimony that

9    exposure of Ranbaxy's tablets to ambient conditions

10   for any length of time after removal of the tablets

11   from the warm, moist gastric fluid conditions in the

12   stomach is what caused Ranbaxy's tablets to

13   crystallize in your gastric fluid study?

14          MR. ZIMMERMAN:  Your Honor, when he says

15   "stomach," I assume he means simulated stomach in the

16   question, just so we have a clear record.

17          THE COURT:  Obviously, that's what we are

18   talking about.  Right?

19          THE WITNESS:  Can you repeat the question?

20   BY MR. PEZZANO:

21   Q.    Did you hear Dr. Rogers' testimony that exposure

22   of Ranbaxy's tablets to ambient conditions for any

23   length of time after removal from the warm, moist

24   gastric fluid conditions in a simulated stomach is

25   what caused Ranbaxy's tablets to crystallize in your

*Henck - Direct/Pezzano*                                    154

1   gastric fluid study?

2   A.     Yes.

3   Q.     Do you agree with that analysis?

4   A.     No.

5   Q.     Why not?

6   A.     We have shown with the pill tray organizer study

7   if the material is exposed to ambient conditions, it

8   takes a couple of hours to see the crystallization of

9   valganciclovir hydrochloride.

10        So the ambient conditions do not contribute to

11  a crystallization of valganciclovir hydrochloride in

12  the time of the preparation of the samples which takes

13  place within a couple of minutes.

14  Q.     Now, I would like to direct your attention to

15  Dr. Rogers' testimony concerning the methodology you

16  used in your gastric fluid study.  Did you prepare a

17  demonstrative in connection with rebutting Dr. Rogers'

18  testimony?

19  A.     Yes, I did.

20  Q.     Let's show PTX-766.

21        Is this the demonstrative that you prepared in

22  connection with rebutting Dr. Rogers' testimony

23  regarding the methodology you used in your gastric

24  fluid study?

25  A.     Yes.

*Henck - Direct/Pezzano*                              155

1    Q.    Do you recall Dr. Rogers' assertion that your

2    tablet samples removed from the simulated gastric

3    fluid are exposed to moisture under ambient conditions

4    prior to XRD analysis?

5    A.    Yes.

6    Q.    What is your response?

7    A.    My response is what I stated previously.  The

8    crystallization caused by exposure to ambient

9    conditions is significantly lower, by an order of

10   magnitudes, than compared to the exposure of the warm

11   and moist conditions that we have in the stomach.  And

12   so it takes between 24 and 48 hours to see

13   crystallization after exposure of Ranbaxy's tablets to

14   ambient conditions; and within the gastric fluid

15   studies, it takes only a few seconds to see this type

16   of crystallization.  This is consistent with reports

17   in the scientific literature we got in those types of

18   studies.

19   Q.    Do you recall Dr. Rogers' assertions regarding

20   the length of time between removing the tablets from

21   the simulated gastric fluid and each X-ray powder

22   analysis including he referenced a 22 minute gap in

23   preparing the 30-second tablet sample compared to 10-

24   to 12-minute gaps for the other samples?

25   A.    Yes.

1    Q.    What is your response?

2    A.    The sample preparation for this testing takes

3    about 15 minutes plus or minus three minutes, and it

4    is related to cleaning the sample preparation area,

5    setting up a clean transmission sandwich holder for

6    this expert in a metal ring, and a polymer film is

7    used to prepare the sample, and then transferring the

8    sample to the holder, and putting it into the

9    diffractogram meter logging onto the instrument

10   computer software, and loading the sample and running

11   the scan program.

12        In our system, the operator of the instrument

13   has the freedom to put in the LIMS comment before he

14   or she starts the experiment, or you can do it

15   afterwards.  So it may appear a time difference where,

16   in reality, the preparation time is consistent, a very

17   short time range.

18   Q.    On your direct testimony, you testified you were

19   not present at all times when rendering the tablets

20   into a powder and taking the XRD analyses were

21   undertaken.  How do you know each tablet was rendered

22   into a powder in the same manner, according to your

23   protocol?

24   A.    We do those kinds of studies, those kinds of

25   tests very often.  We have very highly specialized

*Henck - Direct/Pezzano*                                      157

1    personnel that work on these kinds of tests.  They

2    work on the GMP and T, so they are highly trained and

3    follow these kinds of procedures very carefully.  So I

4    don't need to be present at any moment in time to be

5    sure they are following the protocol.

6    Q.    You mentioned "GMP."  What is that?

7    A.    That stands for "good manufacturing practice."

8    So we, as a company, as a lab, we perform tests on the

9    GMP.  We have been audited by the FDA numerous times.

10   The last three audits in 2003, 2005, and 2007, did not

11   yield to a single 483.  So we have been approved by

12   the FDA for our tests.

13   Q.    You mentioned about a 15-minute timeframe for

14   the analyses for the Simulated Gastric Fluid Study,

15   the rendering into a powder and the testing in the

16   XRD.  Is that timeframe longer or shorter than the

17   timeframe for rendering to a powder and X-ray

18   diffraction analysis for the medical pill tray

19   organizer study?

20   A.    The preparation for the gastric fluid studies

21   takes a little longer compared to the ones for the

22   pill tray organizer because it is a different

23   experimental setup.

24   Q.    What do you mean it's a different setup?

25   A.    The instrument that was used for the pill tray

*Henck - Direct/Pezzano*                    158

1   organizer is the Shimadzu -- this is the name of the

2   company that produces this kind of instrument, where

3   the powder pattern is recorded in reflection mode,

4   whereas for the gastric fluid studies we used the

5   panalytical instrument, where the X-ray diffraction

6   powder patterns are recorded in transmission.  So it's

7   a different experimental setup.

8   Q.    Now, do you recall Dr. Rogers' assertion that

9   rendering tablet samples into a powder in your study

10  introduced more moisture into the samples?

11  A.    Yes.

12  Q.    What is your response?

13  A.    The tablets were drip-dried and lightly ground

14  to a fine powder with a mortar and pestle to collect

15  the X-ray diffraction powder pattern afterwards, and

16  the procedure is outlined in one of the binders that

17  are describing the Simulated Gastric Fluid Study.  So

18  this would be in binder 3, I guess.

19         The times zero tablets were also rendered into

20  a powder under the same conditions.  So the moisture

21  in the room, the room temperature does not contribute

22  to a crystallization of valganciclovir hydrochloride.

23  Q.    You mentioned the procedure is set forth in your

24  book Binder No. 3 on the Simulated Gastric Fluid

25  Study.  What were you referring to specifically?

1    A.    To the procedure that describes how the samples

2    were prepared.

3    Q.    The laboratory notebooks?

4    A.    Yes, the laboratory notebooks.

5    Q.    On another point, and the last point:  Do you

6    recall Dr. Rogers' assertion that the eight-minute

7    tablet X-ray powder analysis had been independently

8    scaled compared to the other tablet X-ray powder

9    analysis?

10   A.    Yes.

11   Q.    What is your response?

12   A.    All the powder patterns in this representation

13   that I'd chosen were normalized.  And so the

14   eight-minute test -- the eight-minute X-ray

15   diffraction powder pattern was normalized in a way

16   like all the other powder patterns in this study.

17   Q.    I would like to show DX-803.8.23.

18        Were you present for Dr. Rogers' testimony

19   concerning his analyses of your crystalline seed study

20   peak data and X-ray powder patterns?

21   A.    Yes.

22   Q.    And what does Dr. Rogers' analyses show in

23   DX-803.8.23 of your crystalline seed study raw data

24   show?

25   A.    It shows with increasing amount of crystalline

1    material, we see a peak in the diffraction powder

2    patterns of the spiked sample, but we also have a peak

3    at 3.5 degrees two theta in the tablet samples.

4    Q.    And based on your opinions concerning the

5    crystalline seed study, does Dr. Rogers' analyses

6    change those opinions?

7    A.    No.

8    Q.    Why not?

9    A.    Because in whichever way you look at the data,

10   whether you look at the raw data, look at the

11   representation of the normalized X-ray diffraction

12   powder patterns, what you see is a peak at 3.5 degrees

13   two theta.

14   Q.    I would like to show you Defendant's Exhibit

15   603, which is in your binder.

16   A.    Yes.

17   Q.    Pages 52 to 69 in that exhibit.

18   A.    Yes.

19   Q.    Are these the texts TXT raw data peak files of

20   your crystalline seed studies?

21   A.    Yes.

22   Q.    How do you know that?

23   A.    Because the file name, and I recognize the file

24   name and I recognize this text file as being part of

25   the study.

*Henck - Direct/Pezzano*                                    161

1   Q.    And there were different file names on top of

2   the various pages of this exhibit.  Do they match up

3   with the file names for your crystalline seed study?

4   A.    Yes.

5   Q.    Who downloaded and printed these TXT text raw

6   data files?

7   A.    My staff at SSCI.

8   Q.    Have you reviewed these TXT text files for

9   accuracy to assure that they match up with the

10  electronic raw peak data generated for your

11  crystalline seed study?

12  A.    Yes.

13  Q.    Did you use this raw data in your crystalline

14  seed study?

15  A.    Sure.

16  Q.    And is this raw peak data the same data that

17  Dr. Rogers used in his analysis of your crystalline

18  seed study?

19  A.    Yes.

20  Q.    Now, were you present when Dr. Rogers criticized

21  your visual evaluation of the XRD patterns as the

22  basis for your conclusion that Ranbaxy's tablets 1 and

23  2 in your study included a crystalline seed?

24  A.    Yes.

25  Q.    Do you agree with Dr. Rogers' assessment?

1    A.    No.

2    Q.    Why not?

3    A.    Because visual inspection is used --

4         MR. ZIMMERMAN:  Your Honor, if I can have an

5    objection.  They are going to bring up a demonstrative

6    that is going to refer to an FDA document that was not

7    in Dr. Henck's report, not cited in his expert report,

8    not produced during the course of discovery in this

9    case, and not on the exhibit list, and they are going

10   to purport to have him testify about it.

11        MR. PEZZANO:  We haven't gotten there yet.

12   But I will point out that this exhibit, the FDA

13   guidance document, is publicly available information.

14   It is referred to because it is in rebuttal to

15   Dr. Rogers' testimony about the visual critique of

16   Dr. Henck's analysis, and the FDA itself on its

17   website advises a visual analysis of tablets is

18   permissible.  So that's the rebuttal, and this witness

19   knows that based on his analysis of the FDA's website.

20        MR. ZIMMERMAN:  It is not an analysis that was

21   conducted anytime prior to him testifying he said

22   today.  It wasn't in the expert report.  The FDA

23   guidance wasn't on the exhibit list, and Mr. Pezzano

24   isn't saying that.  He is saying it's publicly

25   available, and the witness is allowed to talk about

1   it.

2            THE COURT:   I'll find out if he actually

3   reviewed that FDA guidance, like we did with the

4   witness this morning.

5   BY MR. PEZZANO:

6   Q.     Do you agree with Dr. Rogers' assessment that

7   visual analyses and opinions are improper in

8   connection with the crystalline seed study?

9   A.     No.

10  Q.     Why don't you agree with that?

11  A.     Because visual inspection is a method that can

12  be used in order to identify materials, small amounts

13  of materials in any given material; and the FDA has

14  published several different guidelines for the

15  pharmaceutical industry to validate analytical

16  methods.  And the document I'm referring to, Q2B

17  "Validation of Analytical Procedures Methodology," and

18  under topic 6 of this document --

19            MR. ZIMMERMAN:   I'm going to renew the

20  objection at this time, your Honor.  The witness

21  hasn't established he knew about this document

22  before --

23            THE COURT:   That's the question we are going

24  to get now.

25            MR. ZIMMERMAN:   And he never cited it in

*Henck - Direct/Pezzano* 164

1   response at his deposition when I asked him

2   specifically about visual inspection.  So if he knew

3   about it at this time of his deposition, he should

4   have talked about it.  I asked him repeatedly about

5   visual inspection, and not once during that deposition

6   did he use the words "FDA guidance" anywhere.

7            MR. PEZZANO:  Your Honor, I'll ask him the

8   question:  When did you become aware of the FDA

9   guidance?  And my response is --

10           THE COURT:  I want to hear what he says.

11  BY MR. PEZZANO:

12  Q.    When did you become aware of the FDA guidance

13  information?

14  A.    I was aware of the FDA guidance since

15  approximately the year 2000-2001, because when I

16  worked in the pharmaceutical industry, we had to work

17  with these guidances.

18           THE COURT:  This specific one about visual

19  inspection, how are you familiar with it, and when did

20  you become familiar with it?

21           THE WITNESS:  I know the guidance Q2B where

22  this visual inspection has been published since

23  approximately the year 2000-2001.

24           THE COURT:  Okay.  You knew of it or you were

25  aware of what its contents were?

1          THE WITNESS:  I knew of it, and I studied the

2     contents.

3          MR. ZIMMERMAN:  Then that begs the question

4     why it wasn't in his report when he talked about

5     visual inspection, and why it wasn't discussed during

6     the deposition when visual inspection was raised, and

7     why it wasn't put on the exhibit list in this case.

8     If he knew about it, there is no excuse for it not

9     being in his Rule 26 disclosures.

10          MR. PEZZANO:  My response is, he listened.

11     He's using knowledge that he has.  He's listened to

12     the testimony of Dr. Rogers, Ranbaxy's expert, and he

13     is simply rebutting that testimony.  That's the only

14     information I have at this time.

15          I asked him the question:  When did you become

16     aware of it?  This is information that's knowledge in

17     his mind.  So he is simply rebutting testimony that

18     was made in this trial.  And I'm not really sure about

19     the specific questions that were asked, why those

20     questions didn't trigger the FDA guidelines.  I don't

21     have that information in front of me to respond to it

22     at this point.  I don't know the answer to that.

23     That's the best answer I can give you.

24          THE COURT:  Well, let me ask you this

25     question, Dr. Henck:

*Henck - Direct/Pezzano*                                166

1          After listening to Dr. Rogers testify, when

2    did it come to your mind and how did it come to you

3    that you would cite to this guidance?

4          THE WITNESS:  Dealing with this study, the

5    graphs I showed, the representation I showed, was a

6    representation for a person skilled in the art.  The

7    limit of detection discussion that arose by Ranbaxy,

8    from my point of view, this is a question that I think

9    you wouldn't ask in this context necessarily because

10   what you would do from an analytical point of view and

11   what the FDA states in the guidelines, to look at the

12   analytical results and see whether you can establish

13   the limit of detection by visual inspection.  I'm

14   doing this all the time.  I don't think about it

15   anymore.  This is what I'm used to.

16         THE COURT:  Go ahead, Mr. Pezzano.

17   BY MR. PEZZANO:

18   Q.    Who brought this to your attention, if anybody?

19   A.    No one.  I thought about this, and I said:  Wait

20   a minute.  When I heard this testimony, Ranbaxy is

21   working on the GP.  They know this document.  This is

22   something that's natural in this industry.

23         THE COURT:  Go ahead.

24   Q.    Let me direct your attention to PTX-763 in your

25   binder.

*Henck - Direct/Pezzano*                                167

1          What is this document?

2    A.    This is the document I'm referring to all the

3    time, Q2B, "Validation of Analytical Procedures

4    Methodology."  This is available information.  If you

5    go on the web and go to the FDA website looking for

6    guidance in the industry, you will find this document.

7    Q.    Where does it find the information that you

8    testified about, about visual evaluation?

9    A.    This is under Roman numeral VII on page 7 of

10   this document.

11         And it says on "Detection Limit," and it says,

12   "Based on visual inspection."

13         "Visual evaluation may be used for

14         noninstrumental methods, but may also

15         be used with instrument methods."

16         The second topic is "Based on signal

17   to noise."

18   Q.    Now, I'm going to turn my attention to

19   Defendant's Exhibit 551.  If you can turn in your

20   binder to that exhibit, and we will show it on the

21   screen.

22   A.    Yes.

23   Q.    Have you seen this document before?

24   A.    Yes.

25   Q.    What is shown here?

1    A.    This is a valganciclovir placebo tablet produced

2    by Ranbaxy.

3    Q.    Does Ranbaxy detect any peak in its placebo for

4    magnesium stearate at 3.6 degrees two theta?

5    A.    No.

6    Q.    How about in the attached peak list?  The second

7    page of this exhibit in your binder.

8    A.    No.

9    Q.    By the way, in this attached peak list, did

10   Ranbaxy normalize its peak data?

11   A.    Yes.

12   Q.    How do you know that?

13   A.    When you look at the relative intensity scale at

14   the right side of this Table 7, these are normalized

15   intensity data; and, as I said, this is a standard

16   procedure because what people skilled in the art do,

17   they compare diffraction powder patterns from

18   different sources.  So it makes more sense to compare

19   them on a relative intensity scale than on an absolute

20   scale.

21   Q.    Now, I would like to turn your attention to

22   DX-552.

23   A.    Yes.

24   Q.    Have you seen this document before?

25   A.    Yes.

1  Q.    What is shown here?

2  A.    This is a valganciclovir hydrochloride tablet

3  from Ranbaxy that was exposed to 25 degrees centi-

4  grade, 60 percent relative humidity for 35 days.

5  Q.    Does Ranbaxy detect any peak in its tablets for

6  magnesium stearate at 3.6 degrees two theta?

7  A.    No.

8  Q.    What about the attached peak list?  Page 2 of

9  this exhibit.

10  A.    No.

11  Q.    Did Ranbaxy normalize the data in its peak list

12  on page 2 of this exhibit?

13  A.    Yes, the relative intensities are given.

14       Can we go to the next exhibit.  They are given

15  on the right side in this column.

16  Q.    I would like to direct your attention now to

17  Plaintiff's Exhibit 699, which is your crystalline

18  seed study diffraction analyses; and if you could turn

19  to the last page of this exhibit.

20       I apologize.  Go to the first page.  That's

21  your placebo analysis.  Correct?

22  A.    Yes.

23  Q.    How have you compared your placebo analysis to

24  the placebo analysis in Ranbaxy's Exhibits DX-551 and

25  DX-552?

*Henck - Direct/Pezzano*                              170

1    A.    Yes.

2    Q.    How does it compare?

3    A.    We don't see a peak at 3.6 degrees two theta,

4    and we don't have a peak at 5.4 degrees two theta.   We

5    also need to take into account this is the placebo

6    mixture which means the concentration level of

7    magnesium stearate in this tablet is more than 2

8    percent because the API is missing.   So we cannot

9    detect this on a 2 percent level.   So it is not

10   surprising if you look at an actual tablet that it is

11   not analyzable.   Or detectable.

12   Q.    Let's turn to your actual analysis of Ranbaxy's

13   tablets in your crystalline seed study PTX-7:45 and

14   PTX-746:

15   A.    Yes.

16   Q.    Could the magnesium stearate in Ranbaxy's

17   tablets have contributed to the peaks at 3.5 degrees

18   two theta and 5.4 degrees two theta in your XRD

19   analyses?

20   A.    We have seen before for the placebo itself we do

21   not see a peak at 3.5 or 3.6 degrees two theta.   So I

22   assume this is due to crystalline valganciclovir

23   hydrochloride if we see a peak at 3.6 degrees two

24   theta.

25   Q.    How about at 5.4 degrees two theta?

*Henck - Direct/Pezzano*                    171

1   A.     At 5.4 degrees two theta there may be a small

2   amount of magnesium stearate that is present and can

3   be detected.  What we have to take into account here

4   is that the intensity of the peaks in magnesium

5   stearate at 3.6 degrees two theta is significantly

6   lower than the intensity of the peak at 5.4 degrees

7   two theta.

8   Q.     Now, I would like to direct your attention to --

9   did you hear Dr. Rogers' testimony concerning the

10  methodology you used in your crystalline seed study?

11  A.     Yes.

12  Q.     Did you prepare a demonstrative rebutting

13  Dr. Rogers' testimony and critique of the methodology

14  you used in your crystalline seed study?

15  A.     Yes.

16  Q.     Let's show PTX-757.

17         Is that the demonstrative that you prepared to

18  assist your rebuttal of Dr. Rogers' testimony

19  concerning the methodology of your crystalline side

20  study?

21  A.     Yes.

22  Q.     Do you recall Dr. Rogers' assertions that the

23  X-ray patterns that you prepared were run over a

24  period of 3.5 months, and the length of time between

25  the rendering of the tablet into a powder and the XRD

*Henck - Direct/Pezzano*                    172

1    analysis was unknown in your crystalline seed study?

2    A.    Yes.

3    Q.    What is your response?

4    A.    As I stated earlier, we are operating under GMP.

5    Our instruments are calibrated and maintained.  So the

6    quality of the powder pattern does not change as a

7    function of time.  So it doesn't matter whether there

8    is a time difference of 3 1/2 months or not.

9         The placebo excipient mixture with crospovi-

10   done microcelac 100 and magnesium stearate was stored

11   in a glass scintillation vial, and this can be found

12   in the lab notebooks that are related to this study.

13        And, so, Ranbaxy themselves gave their tablets

14   a shelf life of two years.  So 3 1/2 months of the

15   components that are making up the placebo, there will

16   be no change from a physical as well as chemical point

17   of view of these components.

18        Also, its spiked samples were kept in a kept

19   vial and stored so that there will be no change over

20   time.  Then Ranbaxy's tablets were lightly crushed and

21   then run on the XRD instrument.

22   Q.    Let's turn to the next slide.

23        Do you recall Dr. Rogers' assertion that your

24   crystalline seed study did not include a limit of

25   detection analysis or a calibration curve?

1    A.    Yes.

2    Q.    What is your response?

3    A.    We used the visual inspection to identify a peak

4    at 3.5 degrees two theta, and we see an increase in

5    analytical response of the mixtures for 0.1, 0.3, and

6    0.5 percent crystalline valganciclovir hydrochloride.

7    This is in comparison with the tablets we can identify

8    the small amount of valganciclovir hydrochloride in

9    the tablets.

10            MR. PEZZANO:  Your Honor, can we just take a

11   real brief break?  I have probably another 10 minutes.

12            THE COURT:  What do you mean, Mr. Zimmerman?

13   I'm hoping to not have more than 40 minutes.

14            THE COURT:  At 4 o'clock I have to be out of

15   here, not just out of the courtroom, but out of the

16   courthouse.  When I said 4:00, I really meant a little

17   before.  You guys are going to be running awfully

18   close.

19            THE CLERK:  All rise.

20            (Recess.)

21            (Continued on the next page.)

22   ///

23

24

25

*Henck - Direct/Pezzano*                                    174

1          (In open court.)

2          THE CLERK:  All rise.

3          THE COURT:  Thank you.  Everyone may be

4     seated.

5

6     **JAN-OLAV HENCK**, resumed.

7

8     DIRECT EXAMINATION (continued)

9     BY MR. PEZZANO:

10    Q.    Dr. Henck, do you recall Dr. Rogers' assertion

11    that the samples in your crystalline seed study were

12    not homogenous?

13    A.    Yes.

14    Q.    What is your response?

15    A.    The samples for making up an analytical placebo

16    were mixed geometrically, and this is the most

17    homogenous sample you can get.

18    Q.    And do you recall Dr. Rogers' assertion that no

19    attempt was made to use the same manufacturer and

20    specifications of excipients used in Ranbaxy's tablets

21    to your crystalline seed study?

22    A.    We used the same type of excipients from

23    industry recognized suppliers.  As far as I remember,

24    Meggle is a company in Germany that makes microcelac

25    100.  We use this supplier from the original supplier.

1    Magnesium stearate from Fischer, who is a recognized

2    supplier in the industry, and crospovidone from Fluka,

3    who is also a recognized supplier in the pharmaceuti-

4    cal and chemistry.  And with all of these materials,

5    we get Certificates of Analysis which shows this is

6    the compound that we want and the chemical purity.

7    Q.    Are those suppliers identified in the underlying

8    laboratory notebook in your exhibit binder at PTX-577?

9    A.    Yes.

10   Q.    Did you hear Dr. Rogers' testimony regarding a

11   partially ordered product that is not in crystalline

12   form?

13   A.    Yes.

14   Q.    Do you agree with his testimony?

15   A.    I respectfully disagree with Dr. Rogers.

16   Materials can be crystalline or amorphous.

17   Q.    And are you aware of any peer-reviewed and

18   industry-recognized publications consistent with your

19   testimony that there is only a crystalline form and an

20   amorphous form?

21   A.    Yes.

22   Q.    I would like to show you PTX-772.

23        This is a tex by J.W. Mullin called

24   "Crystallization," 4th Edition, 2001.

25   A.    Yes.

*Henck - Direct/Pezzano*                    176

1   Q.    Have you seen this text before?

2   A.    Yes.

3   Q.    Is this an industry-recognized and peer-reviewed

4   text in the field of polymorphism and powder

5   diffraction?

6   A.    Yes.

7   Q.    If you turn to Chapter 1 in this text.  It is in

8   your binder, which is entitled, "The Crystalline

9   State."  What is discussed here?

10  A.    This is the introductory chapter of this book.

11  When we go into the middle of this page, we see it

12  says:

13              "Solids may be crystalline or

14          amorphous, and the crystalline state

15          difference from the amorphous state in

16          the regular arrangement of the

17          constituent molecules, atoms, or ions

18          into some fixed and rigid pattern

19          known as lattice."

20              J.W. Mullin in this book on crystal-

21  lization is around for many, many years now.  It is in

22  its 4th edition, and some people consider it the bible

23  for crystallization.

24  Q.    Is there any mention here of a partially ordered

25  form?

1    A.     No.

2         MR. PEZZANO:  I have no further questions.

3    I'll read in my exhibits at the end.

4

5    CROSS-EXAMINATION

6    BY MR. ZIMMERMAN:

7    Q.     Good afternoon, Dr. Henck.

8    A.     Good afternoon.

9    Q.     In the spiking study, the Simulated Gastric

10   Fluid Study and the Pill Tray Study, you looked for a

11   peak in the low angle region, namely a peak at 3.5

12   degrees two theta.  Right?

13   A.     That's correct.

14   Q.     And you agree that there are solid materials

15   with an intermediate order between that of a liquid

16   and a crystal that exhibit X-ray diffraction patterns

17   with one low angle peak.  Correct?

18   A.     If you are referring to, for example, liquid

19   crystals, then my answer would be, yes, those

20   materials would show a peak at low diffraction angles

21   but may differ between what you refer to being a

22   liquid crystal and the material we are looking at

23   here, valganciclovir hydrochloride is a solid and

24   liquid crystals --

25   Q.     Dr. Henck, we have limited time.  If you can

*Henck - Cross/Zimmerman*      178

1  answer my questions directly.

2       I was talking about a solid.  You agree there

3  are solid materials --

4       MR. PEZZANO:  I object.  The witness was

5  responding to that question.  He was in the middle of

6  an answer.  I know we have a time constraint.  The

7  witness was providing an answer.

8       THE COURT:  I think he was giving what his

9  understanding of the question was.  Let Mr. Zimmerman

10  clarify what his question was so Dr. Henck answers

11  what he is asking.

12  BY MR. ZIMMERMAN:

13  Q.  Dr. Henck, you agree there are solid materials

14  with an intermediate order between that of a liquid

15  and crystal which exhibit diffraction patterns with

16  one low angle peak?

17  A.  I do not agree.

18       MR. ZIMMERMAN:  If we can bring up DX-821.

19  Q.  Dr. Henck, this is an article entitled,

20  "Designing a Molecular Delivery System Within a

21  Preclinical Timeframe."

22  A.  Yes.

23  Q.  Are you familiar with this article?

24  A.  Yes.

25  Q.  You co-authored this article.  Right?

*Henck - Cross/Zimmerman*                                179

1    A.     Yes.

2    Q.     The co-author was Dr. Stephen Bryn, the founder

3    of SSCI, which is the company that did testing for

4    Roche on valganciclovir hydrochloride in 1998 and

5    again for this litigation.  Right?

6    A.     1998?  I don't think that's correct.

7    Q.     The SSCI 1998 preformulation report?

8    A.     I thought it was 1996.

9    Q.     The '96 preformulation report Roche did, and the

10   '98 SSCI report?

11   A.     I have to take your word for it.  I can't

12   recall.

13   Q.     The document is in evidence.  So we won't worry

14   about the date.  But it's the same Stephen Byrn?

15   A.     Yes.

16   Q.     This article DX-821, is dated March 2007, and

17   was published in the Journal of Drug Discovery Today.

18   Right?

19   A.     Yes.

20   Q.     And the Journal of Discovery Today is one of the

21   most cited review journals in the field of drug

22   discovery.  Right?

23   A.     That's correct.

24   Q.     If we could go to page 190 of your article, you

25   state:

*Henck - Cross/Zimmerman*                        180

1            "Liquid crystals and plastic

2        crystals, also referred to mesophases,

3        are solid materials with an order

4        intermediate between that of a liquid

5        and that of a crystal."

6        Is that right?

7   A.    Yes.

8   Q.    Later on you say:

9            "Operationally, most pharmaceutical

10       mesophases are birefringent and given

11       an diffraction pattern with one low

12       angle peak and a halo."

13       That's what you wrote?

14  A.    That's correct.

15  Q.    In all the experiments you did in this case, you

16  were looking for one low angle peak?

17  A.    That's correct.

18  Q.    Were you in the courtroom when Dr. Rogers gave

19  his testimony?

20  A.    Yes.

21  Q.    You agree that Dr. Rogers' testimony that there

22  are solid materials with an intermediate order between

23  that of a crystalline and an amorphous material was

24  accurate and correct; don't you?

25  A.    No, I don't agree.  I respectfully do not agree

1   with Dr. Rogers' statement.  What Dr. Rogers described

2   was nucleation and not intermediate order.

3   Q.    If we could turn to page 191 of your article,

4   Dr. Henck, "Designing a Molecular Delivery System

5   Within a Preclinical Timeframe."

6         On this page, you state:

7             "Solids can also produce diffuse

8             scattering for amorphous and

9             disordered solids, only diffuse

10            scattering is produced.  For systems

11            with intermediate order between

12            crystals and amorphous, a mixture of

13            diffuse scattering and bragg peaks is

14            observed."

15        And you wrote that; right?

16  A.    Yes.

17  Q.    And by "bragg peaks," you are referring to peaks

18  in an XRD pattern.  Correct?

19  A.    Correct.

20  Q.    You have seen Dr. Rogers' plots of the raw data

21  from the Simulated Gastric Fluid Study.  Right?

22  A.    Yes.

23  Q.    And you have not taken any issue with the

24  accuracy of Dr. Rogers' plots; have you?

25  A.    No.

*Henck - Cross/Zimmerman*                    182

1    Q.    Okay.  If we look at PTX-766.04, you see the

2    title "Dr. Rogers' assertions," and then it refers to"

3    at least your XRD for the tablet that had been exposed

4    to the simulated gastric fluid for eight minutes being

5    independently scaled?

6    A.    Yes.

7    Q.    You agree that the XRD plot for the eight-minute

8    sample in the gastric fluid study that you prepared

9    was independently scaled; don't you?

10   A.    It was normalized.

11   Q.    It was independently scaled relative to all of

12   the other XRDs from the gastric fluid study.  Right?

13   A.    I don't know what your question means because

14   they were normalized.

15   Q.    Did you normalize each XRD for the Simulated

16   Gastric Fluid Study separately and then put it on one

17   plot?

18   A.    Yes.

19   Q.    Or did you normalize them all together?

20   A.    No, they were normalized separately.

21   Q.    Did you normalize each one for the 100 percent

22   value would be the same height?

23   A.    Yes.

24   Q.    Dr. Henck, in all of the simulated gastric fluid

25   studies that you performed, the peak at 3.5 was the

*Henck - Cross/Zimmerman*                           183

1   biggest peak in the XRD pattern.  Right?

2   A.    For the gastric fluid study?

3   Q.    Yes.

4   A.    Yes.

5   Q.    So if you normalized each one the same, and the

6   biggest peak was always the same height, shouldn't the

7   peak at 3.5 be exactly the same for each XRD in the

8   gastric fluid study if what you are saying is

9   truthful?

10  A.    Yes.

11  Q.    If we could bring up the gastric fluid study

12  PTX-698, the last page.

13  A.    Yes.

14  Q.    I'm sorry.  PTX-700, the last page.

15  A.    Yes.

16  Q.    Dr. Henck, are you telling me that the peak at

17  3.5 in the Simulated Gastric Fluid Study is the same

18  height all the way through?

19  A.    No.

20  Q.    And you just told me a minute ago that if you

21  had normalized them all the same way, the peak at 3.5

22  would be the same every single time in this

23  experiment.  Right?

24  A.    This is correct.

25  Q.    So isn't it true that you independently

*Henck - Cross/Zimmerman*                                    184

1   normalized each one of these?

2   A.     When you look --

3   Q.     It's a yes or no question.

4   A.     No, it is not a yes or no question because when

5   you look at the X-ray diffraction powder patterns and

6   you look at the X-ray diffractogram, for the four-

7   minute test you will see the peak at 3.5 degrees two

8   theta is not the highest intense peak.

9   Q.     Okay.

10   A.     And that means if you normalize an X-ray

11   diffraction powder pattern, you get the highest peak

12   with 100 percent intensity.  In the powder pattern for

13   the four-minute test, for example, when we look at the

14   powder pattern, this is at approximately 20 degrees

15   two theta.

16   Q.     So when you normalized them, you are saying the

17   biggest peak in each one should be the same height?

18   A.     Yes.  The biggest peak per X-ray diffraction

19   powder pattern.

20   Q.     Should the biggest peak for the zero time match

21   the biggest peak for the 30-second time match the

22   biggest peak for the one-minute time?

23   A.     Of course not.  It can't be.  That's why we

24   normalized the X-ray diffraction pattern because what

25   we see during the experiment is the change of the

1    composition of the tablet.

2    Q.    When you normalize, you take the biggest peak in

3    a pattern and make it 100.   Right?

4    A.    Yes.

5    Q.    If we normalize the 30-second time and we

6    normalize the zero time, the biggest peak in the

7    30-second time should be 100; the biggest peak in the

8    zero time should be 100; and they should be the same

9    height.   Right?

10   A.    Yes.

11   Q.    Is that what you are telling me happened here?

12   A.    When we look at the peak at 3.5 degrees two

13   theta for the eight-minute experiment, and we look at

14   the height here and compare it to the height of this

15   peak, when we go from the baseline of the X-ray

16   diffraction powder pattern, I would say, yes, it's

17   approximately the same height.

18          I'll need to go back and see exactly what it

19   is, but this is what I would expect.

20   Q.    When I asked you on your direct examination the

21   first time, you didn't mention normalization and

22   couldn't remember how you prepared the pattern.   When

23   did you learn you normalized the patterns?

24   A.    I look at the raw data first, and like Dr.

25   Rogers did with his analysis, and then I normalized

1    the X-ray diffraction powder pattern and used this

2    representation for the expert reports that I wrote.

3    So it's about approximately 1 1/2 to two years ago.

4    Q.    But you didn't remember that when you testified

5    previously?

6    A.    No.

7    Q.    And in doing the normalization, how did you

8    choose the height you were going to normalize to?

9    A.    When you normalize an X-ray diffraction powder

10   pattern, you don't choose to normalize the specific

11   peak.  You normalize the powder pattern.  What

12   normalization does, it puts the highest intense peak

13   at 100 percent and scales the other peak relatively to

14   it.

15   Q.    By normalizing each pattern separately and

16   putting them on the same graph, you change the visual

17   comparison of how the patterns look relative to each

18   other.  Correct?

19   A.    No.  What I did was, I loaded all these

20   different powder patterns, the raw data, into our

21   software, normalized them, and put them on top of each

22   other to be able to distinguish them.  This is what I

23   did.

24   Q.    If we could bring up a side-by-side comparison

25   of PTX-699 and DX-803.8.23.

1          Dr. Henck, this is Dr. Rogers' data which you

2    admitted you had no issue with, and your data from the

3    spiking study?

4    A.    Right.

5    Q.    If your normalization didn't affect the data,

6    they should show the same thing.  Right?  They should

7    or shouldn't?

8    A.    They are showing the same thing qualitatively.

9    Q.    And they should show the same relationship

10   between the peak heights.  Right?

11   A.    What was that?

12   Q.    Your normalization shouldn't alter the peak

13   height relationship between the graphs.  Right?

14   A.    No, this is not correct.  Because when you look

15   at the diffraction powder pattern for the tablets, for

16   example, then I choose normalization in this context

17   because what we are comparing are completely different

18   tablets.  We are comparing a placebo mixture at the

19   bottom of the X-ray diffraction to three spike samples

20   with 0.1, 0.3, and 0.5 percent crystalline valganci-

21   clovir hydrochloride.

22          Let me explain, because I think that's

23   important.  And then when we look at the X-ray

24   diffraction powder pattern for the two tolerabilities,

25   we see that the normalization is necessary in this

1    case in order to be able to compare all these

2    different materials with different composition and

3    different history to get a representative picture.

4    Q.    I'm going to make this as easy as I can, and I'm

5    going to try to ask you yes or no questions.  If we

6    agree Dr. Rogers' graphs are right?

7    A.    They are correct, yes.

8    Q.    And then yours either maintained the same

9    relationship as Dr. Rogers or they change it.  Right?

10   A.    I don't know what you are referring to with

11   regard to relationship.

12           THE COURT:  One at a time, please.

13   Q.    If the .3 spiked standard in Dr. Rogers' test

14   has a smaller peak at 3.5 than the .1 spiked standard,

15   and it is correct, and your data shows a bigger peak

16   at 3.5 for the .3 data than the .1 data, then your

17   scaling, your normalization changed the data from

18   being accurate to something else.  Correct?

19   A.    No, this is not correct for a simple reason.

20   These X-ray diffraction powder patterns were measured

21   on the Panalytical instrument in transmission.  That

22   means we cannot compare the counts of the X-ray

23   diffraction pattern of one to each other because this

24   would be misleading because the intensity of an X-ray

25   diffraction power pattern depends on the sample

1   preparation and amount of material used for the sample

2   preparation.  So in order to get a representative

3   picture, we need to normalize.

4   Q.    I'm going to ask this very easily:  You will

5   agree in Dr. Rogers' plot the .1 crystalline sample

6   has a bigger peak at 3.5 than the .3 sample.  Correct?

7   A.    It has a higher intensity.

8   Q.    It has a higher intensity, a larger peak area?

9   A.    This is correct.

10  Q.    And that relationship is straight from the raw

11  data.  Correct?

12  A.    That's correct.

13  Q.    And that relationship gets reversed in your plot

14  because of normalization.  Correct?

15  A.    That's correct.

16  Q.    So when you normalize, you change the relative

17  peak heights of different samples.  Correct?

18  A.    No.  This is a representation.  I don't change

19  anything.

20  Q.    You represent them differently?

21  A.    Yes.

22  Q.    And when you make the different representation,

23  you then look at them visually to draw conclusions.

24  Correct?

25  A.    Yes.

*Henck - Cross/Zimmerman*                    190

1   Q.    And, so, whereas the underlying data says you

2   have a bigger, more intense peak at 3.5 for the .1

3   sample than the .3, your normalization changes the

4   perception of that so that it looks like the .3 has a

5   bigger peak than the .1.  Correct?

6   A.    Yes.

7   Q.    And then you drew visual comparisons from that.

8   Correct?

9   A.    Yes.

10  Q.    And you didn't say anything on your graphs they

11  were normalized to change per session?

12  A.    A person skilled in the art would see this

13  because we used an arbitrary Y scale.

14  Q.    When I asked you about the arbitrary Y scale at

15  your deposition and at the trial, you never mentioned

16  normalization.  It was only after seeing Dr. Rogers'

17  accurate plots that you remembered you normalized

18  these.  Correct?

19  A.    Yes.

20  Q.    And normalization can alter how the relative

21  peak heights are perceived.  Right?

22  A.    Yes.

23  Q.    I would like to talk to you a little bit about

24  the issue of magnesium stearate.  You talked about the

25  magnesium stearate not being visible in Ranbaxy's

1   tablets, and you talked about the grade of magnesium

2   stearate.

3        You will agree whoever made the placebo and

4   the spiked standards for your spiking study at SSCI

5   did not use the same brand and grade of magnesium

6   stearate as is used in Ranbaxy's tablets.  Right?

7   A.    Not the exact same manufacturer, that's correct.

8   Q.    You have actually written an article identifying

9   the different types of magnesium stearate.  Correct?

10  A.    Yes.

11  Q.    And you have identified them as an anhydrate, a

12  dehydrate, and a dihydrate, a trihydrate?

13  A.    Yes.

14  Q.    In that article you cited, another article by

15  Sharpe, and that article shows that the different

16  forms of magnesium stearate have different peak

17  heights at 3.5 and 5.4.  Correct?

18  A.    Yes.

19  Q.    Are you familiar with the article, "Raw

20  Material" by Britton?  It's DX-814 in your book.

21  A.    I think I have seen this a long time ago.

22  Q.    If we could look at pages 16 and 17.  We'll

23  start with 16.

24       Does this article discuss that the properties

25  of magnesium stearate can vary based on where it is

*Henck - Cross/Zimmerman*                                    192

1    from, and, specifically, that material obtained from

2    Italy is amorphous in comparison to those of other

3    countries?

4    A.    Yes.

5    Q.    And on the following page, it shows different

6    XRD patterns for magnesium stearate based on the

7    country of origin?

8    A.    Yes.

9    Q.    And the relative peak heights at 3.5 and 5.4

10   differ based on country of origin?

11   A.    Yes.

12   Q.    And, so, you'll agree, the lower angle peaks of

13   magnesium stearate vary based on the form of the

14   magnesium stearate and the manufacturer.  Correct?

15   A.    That's true.

16   Q.    And you didn't perform any comparison between

17   the magnesium stearate used by SSCI to make the

18   placebo and the spiked crystalline samples in

19   comparison to the magnesium stearate used in Ranbaxy's

20   tablets?

21   A.    That's correct.

22   Q.    And so you have no data to show how the

23   difference in magnesium stearate between those two

24   varies?

25   A.    This is correct.

*Henck - Cross/Zimmerman*                                    193

1   Q.      In PTX-767.06, you state:

2                   "Ranbaxy's tablets will not show

3               a peak at 5.4 degrees in the spiking

4               study because of the nominal concen-

5               tration of magnesium stearate relative

6               to the amount of valganciclovir

7               hydrochloride."

8               Right?

9   A.      Can you repeat this?

10  Q.      Here you state that

11                  "Ranbaxy's tablets will not show

12              a peak at 5.4 degrees in the spiking

13              study because of the nominal concen-

14              tration of magnesium stearate compared

15              to the amount of valganciclovir

16              hydrochloride."

17              Correct?

18  A.      Yes.

19  Q.      And you cited both DX-551 and DX-552 and you

20  brought those up on the screen in your direct

21  testimony.  Right?

22  A.      Yes.

23  Q.      And those are fast scans of Ranbaxy's tablets

24  and placebo over the 2 to 40 degree range.  Correct?

25  A.      This is correct.

1   Q.    They are not slow scans over the 3 to 6 degree

2   range as in your spiking study.  Right?

3   A.    This is correct.

4          MR. ZIMMERMAN:  If we could bring up DX-553.

5   Q.    Did you consider this data, Dr. Henck, which are

6   Ranbaxy's, in use studies when saying you wouldn't be

7   able to detect peaks for magnesium stearate?

8   A.    No.

9   Q.    Don't Ranbaxy's slow scans from 3 to 6, like

10  your spiking study, always show a peak at 3.5 for

11  magnesium stearate and a peak at 5.4 for magnesium

12  stearate?

13  A.    But these are Ranbaxy's tablets.  Right?

14  Q.    The bottom two are Ranbaxy's tablets.

15         You see the peak at 3.5 and the peak at 5.4?

16  A.    And the two at the top are the ones with 0.5

17  percent crystalline valganciclovir hydrochloride.

18  Q.    Spiked in placebo?

19  A.    So how can you distinguish between valganci-

20  clovir hydrochloride and magnesium stearate?

21  Q.    In the bottom two we are looking at Ranbaxy's

22  tablets?

23  A.    Yes.

24  Q.    Are you saying the peak at 5.4 in Ranbaxy's

25  tablets could be from something other than magnesium

1    stearate?

2    A.    No, that's not what I'm saying.  I'm referring

3    to the peak at 3.5 and 3.6 degrees two theta.

4    Q.    Let's back up.

5          We agree in Ranbaxy's slow scans you see a

6    peak at 5.4 for magnesium stearate?

7    A.    That's correct.

8    Q.    Now, if we look at your plot from the spiking

9    study, PTX-699, last page, the top two are Ranbaxy's

10   tablets.  Correct?

11   A.    This is correct.

12   Q.    And we see a peak at 5.4?

13   A.    This is correct.

14   Q.    And that's for magnesium stearate?

15   A.    This can be for magnesium stearate, yes.

16          MR. ZIMMERMAN:  If we can bring up 767.06

17   again, PTX, Ranbaxy's tablets.

18   Q.    (Reading.)

19              "Ranbaxy's tablets will not show

20           peaks for magnesium stearate at 3.6 or

21           5.4 degrees two theta."

22   A.    Yes.

23   Q.    When you say that, you are dead wrong because

24   your own spiking study shows a peak at 5.4 in

25   Ranbaxy's tablets.  Right?

1        MR. ZIMMERMAN:  And if we could bring up

2   PTX-699.

3   Q.    That's your spiking study data, and the top two

4   are Ranbaxy's tablets, and they show a peak at 5.4 for

5   magnesium stearate; don't they?

6   A.    We don't have a peak in the placebo that

7   contains magnesium stearate.

8   Q.    In your demonstrative, you didn't say placebo.

9   My question was:  In the top two Ranbaxy's tablets,

10  you see a peak at 5.4 degrees two theta for magnesium

11  stearate?

12  A.    I see a peak at 5.4 degrees two theta, and it

13  could be due to magnesium stearate.

14  Q.    Is there anything else in Ranbaxy's tablets that

15  you know of that could cause that peak?

16  A.    I don't know.

17  Q.    As an expert for Roche in this case, you have

18  looked at all the components of Ranbaxy's tablets.  Is

19  there anything else in the tablets that had a peak at

20  5.4 that could cause what we are seeing in Ranbaxy's

21  tablets in your spiking study?

22  A.    No.

23  Q.    If you look at the spike samples -- the .1, the

24  .3, and .5, we see a peak at 5.4 approximately again.

25  Correct?

1   A.    It varies.  It is not -- here for the 3.6

2   degrees compared to 5.4 degrees two theta.

3   Q.    It is in the region of 5 and 5.6.  Right?

4   A.    Yes.

5   Q.    Is there anything else in those spike standards

6   that could cause that peak other than magnesium

7   stearate?

8   A.    No.

9   Q.    Okay.  So we see a peak in Ranbaxy's tablets in

10  your spiking study for magnesium stearate.  We see a

11  peak in all of the spiked samples from the magnesium

12  stearate.  When we look at the placebo, why don't we

13  see a peak at 5.4 from the magnesium stearate?

14  A.    I don't know.

15  Q.    In the placebo, the concentration of magnesium

16  stearate is higher than any of the other components in

17  the spiking study.  Correct?

18  A.    Yes.

19  Q.    So if we saw a peak at 5.4 for magnesium

20  stearate, it should be the biggest in the placebo.

21  Right?

22  A.    It should be.

23  Q.    And that's not what we see?

24  A.    Exactly.

25  Q.    And you have absolutely no idea why the placebo

1    doesn't show that peak at 5.4?

2    A.    I don't know.

3    Q.    Isn't it because something is wrong with the

4    placebo?

5    A.    It doesn't have to.  The peak at 3.6 degrees two

6    theta is in the original magnesium stearate is a very

7    weak peak.  So depending on sample preparation,

8    depending on the conditions that were chosen, it is

9    not necessary that we see the same peak ratio between

10   these two peaks in every sample.  So why we don't see

11   the peak at 3.6 and 5.4 degrees two theta in this

12   experiment, I don't have an explanation for it.

13   Q.    And you agree that the placebo should show a

14   peak at 5.4 from the magnesium stearate?

15   A.    I don't know whether I should agree.  The data

16   does not show a peak for the placebo.

17   Q.    Given that all the other samples do, and the

18   concentration of magnesium stearate in the placebo is

19   bigger than all the other samples, we should see a

20   peak in the placebo at 5.4 for magnesium stearate;

21   shouldn't we?

22   A.    It would not surprise me if we would see one.

23   Q.    I'm asking you if we should see it.

24   A.    We should see a peak.

25   Q.    And the placebo in your spiking study, the XRD,

1   was run nearly 3 1/2 months after the placebo was

2   actually prepared.   Correct?

3   A.    Yes.

4   Q.    And the placebo is the baseline for all the

5   comparisons in your spiking study.   Right?

6   A.    It's not a baseline.   It's a comparison to the

7   other materials in this study.   This is not a

8   quantitative assessment.   It's a qualitative

9   assessment.

10  Q.    After you got the data for the spiking study,

11  didn't you ask somebody to go back and run the placebo

12  so you would have something to compare everything else

13  to?  Right?

14  A.    Yes.

15  Q.    So the placebo is the baseline you used for

16  comparison.   Right?

17  A.    I wouldn't call this a baseline.   You call this

18  a baseline.   I'll not call this a baseline.

19  Q.    I'd like to talk to you for a minute on the

20  single peak issue.

21        In all of the articles you referred to, none

22  of them were identifying whether crystalline material

23  was present in an unknown sample using one peak.

24  Correct?   They were all analyzing known mixtures?

25  A.    That's correct.

1    Q.    In we could look at your gastric fluid study for

2    just a minute, PTX-766.02.

3    A.    Yes.

4    Q.    You don't disagree with Dr. Rogers with respect

5    to what the processing times were as reflected by the

6    LIMS report.  Right?

7    A.    Can you repeat your question?

8    Q.    You don't disagree that the 30-second gastric

9    fluid sample took 22 minutes to process, as reflected

10   in the LIMS report.  The other ones took 10, 11, and

11   12 for the one-, two-, and four-minute samples

12   respectively?

13   A.    Yes.

14   Q.    That data comes right out of the LIMS reports

15   that you prepared at SSCI?

16   A.    This is correct.

17   Q.    As a GMP facility, you would have to have those

18   time-stamped.  Right?

19   A.    Yes.

20   Q.    Can you tell me why those time stamps don't

21   exist for the eight- and the 15-minute?

22   A.    No, I don't know why they do not exist.  I'm

23   pretty sure they can be found.  I'm not quite sure why

24   they were not -- they were not available in this

25   context.

*Henck - Cross/Zimmerman*                    201

1   Q.    If we could bring up PTX-700, last page.

2   A.    Yes.

3   Q.    Dr. Henck, you agree that for the 30-second

4   sample, the light blue one, the peak at 3.5 is much

5   bigger than the one-minute, two-minute, four-minute

6   peak at 3.5.  Right?

7   A.    That's correct.

8   Q.    It's about twice as big; isn't it?

9   A.    Yeah, roughly.

10  Q.    And the 30-second sample, it took 22 minutes to

11  process from the time it was pulled out of the gastric

12  fluid to the time XRD was done.  And you would agree

13  for the one-minute, two-minute, and four-minute

14  samples, the peak at 3.5 is about the same height.

15  Right?

16  A.    Yes.

17  Q.    And those took 10, 11, and 12 minutes to

18  process.  So about the same time.  Correct?

19  A.    Yes.

20  Q.    Doesn't that data, isn't that consistent with

21  the peak at 3.5 not being caused by being in the

22  gastric fluid, but the length of time it takes from

23  the time you pull it out to finish the processing?

24        And I'm not asking if it is or isn't.  I'm

25  asking if the data is consistent with that.

1  A.    If the data is consistent with your assessment?

2  Q.    Yes.

3  A.    It is consistent with your assessment, but I

4  would use a different explanation for it.

5  Q.    And what we see is, from your data, is that the

6  peak height at 3.5 gets bigger the longer it takes to

7  process the sample after removal from the gastric

8  fluid.  Correct?  That's what the data shows.

9  Correct?  It's a yes or no question.

10  A.    Up to four minutes -- your question would

11  include up to four minutes, but would exclude eight

12  and 15 minutes?

13  Q.    Yes, because we have no idea what the processing

14  times were, because in violation of GMP, SSCI didn't

15  keep that data.

16  A.    I don't think it's a violation of GMP.

17  Q.    We don't have processing times for the eight and

18  15 minutes.

19  A.    I don't know.

20  Q.    What we do see is the longer it takes to process

21  after you pull it out of the gastric fluid, the bigger

22  the peak at 3.5.  Right?

23  A.    Yes.

24  Q.    I would like to address two other points very

25  quickly, Dr. Henck.

*Henck - Cross/Zimmerman*                    203

1          PTX-763, the limit of detection from the FDA

2     guidance you presented.  If we could go to page 7 of

3     that document.

4          If we could go under Step A and highlight,

5     quote, based on visual evaluation, quote, the last

6     sentence which you didn't read, Dr. Henck, is:

7               "The detection limit is determined

8          by the analysis of samples with known

9          concentrations of analyte, and by

10         establishing the minimum level at

11         which the analyte can be reliably

12         detected."

13         What is the minimum level in the spiking study

14    at which crystalline valganciclovir hydrochloride can

15    be reliably detected?

16    A.    According to my study, somewhere between 0.1 and

17    0.3.

18    Q.    Do you have documentation where you established

19    that and that it was reliable?

20    A.    This was just by the visual inspection.

21    Q.    Doesn't the guidance that you refer to say if

22    you are going to use visual inspection, you have to

23    establish that the minimum level of analyte can be

24    reliably detected?  Did you do multiple studies to do

25    that?

*Henck - Cross/Zimmerman*                                    204

1    A.    We did 0.1, 0.3, and 0.5 percent spiking study.

2    Q.    So you ran the spiking study once, and it's your

3    position that satisfied the FDA guidelines?

4    A.    Yes.

5    Q.    I do have one last question:  On any of the

6    samples that were ground --

7    A.    Rendered into a powder.

8    Q.    I say "ground"; you say "rendered" into a

9    powder.  We'll agree to disagree on that one.

10         On any of the samples where the opadry coating

11   was ground in, did you actually see the sample?

12   A.    Yes.

13   Q.    And when the opened opadry came off, it was like

14   a plastic shell?

15   A.    It was flaky.

16   Q.    It's like a plastic and comes off all at once?

17   A.    No.

18   Q.    When you hit it on the top, it doesn't peel

19   away?

20   A.    No, not every time.  No.

21   Q.    Not every time; most times?

22   A.    Sometimes.

23   Q.    Doesn't it take a lot of force to grind up the

24   plastic opadry coating?

25   A.    Obviously, you never have done this.  No, it

*Henck - Cross/Zimmerman*                                    205

1    doesn't take a lot of force.

2    Q.    You are sure, based on what you saw?

3    A.    Yes.

4    Q.    And do you end up with a white powder with

5    orange flakes in it or a homogenously orange powder?

6    A.    You end up with a white powder that has orange

7    cores in it.

8    Q.    Orange flakes?

9    A.    Orange cores.

10   Q.    And they differ in size, the orange pieces,

11   relative to the white ones?

12   A.    Yes.

13   Q.    So it is not a homogenous mixture that's being

14   tested when you grind the opadry in it?

15   A.    It is.  The coating has a different particle

16   size; but because of the sample preparation, you

17   analyze most of the sample, which means in this

18   context because of spinning of the samples, we make

19   sure we get a homogenous representation of the sample.

20   Q.    But the powder doesn't have a uniformed particle

21   size?

22   A.    That's correct.

23   Q.    And it's not homogenous, is it?

24   A.    That's correct.

25        MR. ZIMMERMAN:  I have no further questions.

*Henck - Redirect/Pezzano*                    206

1    REDIRECT EXAMINATION

2    BY MR. PEZZANO:

3    Q.    Dr. Henck, do you recall your testimony that

4    normalization can change how relative peak heights are

5    perceived in connection with the crystalline seed

6    study?

7    A.    Yes.

8    Q.    And does normalization have any effect on the

9    ability of a person skilled in the art to tell

10   qualitatively whether a peak at a given two theta

11   angle is present?

12   A.    No, absolutely not.

13   Q.    Does normalization have any effect on a person

14   skill in the art's ability to tell qualitatively

15   whether valganciclovir hydrochloride is present?

16   A.    No.

17   Q.    I want to direct your attention to PTX-700.

18   These are your results on the Simulated Gastric Fluid

19   Study?

20   A.    Yes.

21   Q.    Let's go to the last page.

22        You offered to give an explanation concerning

23   the following:

24        What explanation would you give as to why the

25   height of the peak in the 30 second peak that was in

1   your LIMS reports as being analyzed in a 22-minute

2   timeframe, why the height of that peak is higher than

3   the other peaks at one-minute, two minutes, four

4   minutes, whereas the timeframe in the LIMS report is

5   documented at 10 to 12 minutes before the tablet is

6   taken out of the simulated gastric fluid and tested by

7   XRD?

8   A.    First of all, this is a qualitative analysis,

9   and we cannot perform all the experiments on one

10  tablet.  So these are individual tablets that I

11  exposed at different times to the simulated gastric

12  fluid, and these tablets behave differently individu-

13  ally.

14          We know this because they are taking up water

15  over time in a different way, and so for the first

16  sample we have a different composition than we have

17  for the other samples, and all these kinds of effects

18  will contribute to changes in the peak height at 3.5

19  degrees two theta.

20  Q.    And the effect on the changes in the peak height

21  is caused by the simulated gastric fluid and being in

22  the simulated gastric fluid or the ambient conditions

23  outside of the simulated gastric fluid?

24  A.    They are caused by the gastric fluid and because

25  the ambient conditions, as we have shown many times,

*Henck - Redirect/Pezzano*                           208

1    do not impact on this short time scale the appearance

2    of crystalline valganciclovir hydrochloride.

3             MR. PEZZANO:  I have no further questions.

4             MR. ZIMMERMAN:  I have no questions, your

5    Honor.

6             I would move to admit DX-821.

7             THE COURT:  And Mr. Pezzano has some exhibits

8    to put in.

9             Any objection to the exhibit Mr. Zimmerman

10   just referred to?

11            MR. PEZZANO:  I have no objection.

12            THE COURT:  All right.  That's in evidence.

13            (Defendants' Exhibit No. DX-821 was

14            received in evidence.)

15            MR. PEZZANO:  The exhibits I'm offering into

16   evidence are:  PTX-752, 763, 764, 765, 766, 767 -- and

17   I'll note for the record 764 through 767 are

18   demonstratives, for illustrative purposes only --

19   PTX-768, PTX-716, PTX-770, PTX-772 and DX-603.

20            MR. ZIMMERMAN:  No objection, your Honor.

21            THE COURT:  All right.  They will be admitted

22   except for the demonstratives.

23            (Plaintiff's Exhibits Nos. PTX-752,

24            PTX-763, PTX-768, PTX-716, PTX-770,

25            PTX-772 and DX-603 were received in

*Henck - Redirect/Pezzano*                              209

1          evidence.)

2          THE COURT:  You are excused Dr. Henck.  You

3    may step down.

4          (Witness excused.)

5          THE COURT:  That concludes the testimony.

6          MR. PEZZANO:  It does.

7          Also, the parties over the weekend discussed a

8    proposal on the briefing schedule.

9          MR. ZIMMERMAN:  And we would be happy to send

10   it to you in a letter.

11         THE COURT:  I can do a conference call on

12   January 5th when I return.  My suggestion is you not

13   agree on a schedule and actually take the holidays

14   off, which is why I wasn't going to discuss it with

15   you today.

16         MR. PEZZANO:  There is one point; the briefing

17   is all contingent upon Ranbaxy represented to your

18   Honor they would not be coming on the market until the

19   earliest January 15, and Ranbaxy's counsel represented

20   to us this weekend -- I'll leave the representation up

21   to them because that impacts on the briefing schedule,

22   and I believe it is appropriate we get a representa-

23   tion now so we can work on this briefing schedule.

24         MR. ZIMMERMAN:  Your Honor, we have a proposed

25   briefing schedule.  The January 15 time gives us

210

1   plenty of time.  Ranbaxy will agree not to come on the

2   market prior to April 1st to give us enough time to do

3   a briefing schedule.

4        THE COURT:  Remember, whatever your briefing

5   schedule is, you have to build in my schedule.

6        MR. ZIMMERMAN:  Yes, and that's all I have

7   authorization for today.

8        THE COURT:  Okay.

9        MR. ZIMMERMAN:  The other one is, we do have

10  deposition designations from Ranbaxy that we held for

11  our case, if I could submit those.

12       THE COURT:  Bring those up.

13       Did I ever get the briefing on the

14  nonobviousness?  I never got handed it.  Is this it

15  over here in the corner?

16       MR. ZIMMERMAN:  We E-file it, your Honor.

17       THE COURT:  Okay.

18       MR. DOUGHERTY:  Roche has a couple of things

19  to hand up also.

20       We have a CD with the list of all of the Roche

21  exhibits that had been admitted prior to today, so we

22  can hand that up.  That will be, of course, updated.

23       THE COURT:  Wait.  Send me one CD, and I did

24  say I would take the exhibits by CD.  You could each

25  do this now and get it ready.  I'm away until the 5th.

1          MR. DOUGHERTY:  In addition to that, we would

2    like to hand up a CD of the joint deposition

3    designations along with a CD of the video clips of

4    Ranbaxy's witnesses that Roche played at trial.

5          THE COURT:  That's fine.

6          You can submit to me the exhibits on CDs, both

7    of you, in January.  That's fine.

8          Let's plan on either Monday, the 5th, or

9    Tuesday, the 6th, that we will have a call.  She will

10   get in touch with you and work that out.  We have to

11   deal with timing, right, California people, so it will

12   be late morning or early afternoon.

13         Okay.  Thank you for all your cooperation

14   during the trial.  I think it went pretty smoothly,

15   and you finished on time.  I appreciate it.

16         If I need to enter an order, I think you

17   people should take the holidays off.  No briefing

18   until January.

19         Thank you very much.  Have a good holiday.

20         THE CLERK:  All rise.

21         (Proceedings concluded at 4 p.m..)

22   ///

23

24

25

212

# I N D E X

Proceedings                                                    Page

Discussion re Dr. Stella's testimony/DX-459
    By Mr. Jennings                                        3-6
    By Mr. Verdirame                                       4-6
    Ruling by the Court                                      6

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **Valentino J. Stella** | | | | |
| By Mr. Verdirame | 7 | -- | 69 | -- |
| By Mr. Jennings | -- | 35 | -- | -- |
| **Hans Maag** | | | | |
| By Mr. Pezzano | 72 | -- | 127 | -- |
| By Mr. Olson | -- | 89 | -- | -- |
| **Jan-Olav Henck** | | | | |
| By Mr. Pezzano | 129 | -- | 206 | -- |
| By Mr. Zimmerman | -- | 177 | -- | -- |

# E X H I B I T S

Plaintiff's                                            In evidence

655                                                             35
255 B                                                           85
255 C                                                           89
PTX-752, PTX-763, PTX-768, PTX-716,
    PTX-770, PTX-772 and DX-603                           209

Defendants'

DX-181, DX-182, DX-305                                         127
DX-821                                                         208

213

# C E R T I F I C A T E

I, **Vincent Russoniello**, Official United States
Court Reporter and Certified Court Reporter of the
State of New Jersey, do hereby certify that the
foregoing is a true and accurate transcript of the
proceedings as taken stenographically by and before me
at the time, place and on the date hereinbefore set
forth.

I do further certify that I am neither a relative
nor employee nor attorney nor counsel of any of the
parties to this action, and that I am neither a
relative nor employee of such attorney or counsel and
that I am not financially interested in this action.

S/Vincent Russoniello
Vincent Russoniello, CCR-R
Certificate No. 675
Date:  April 22, 2009